```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MICHIGAN
                         SOUTHERN DIVISION

   ALBERT GUZMAN,

                         Plaintiff,

   -v-                                    Case No. 24-12080

   FORD MOTOR COMPANY, et al.,

                         Defendant.
   _____/

                          MOTION HEARING

              BEFORE THE HONORABLE LINDA V. PARKER
                   United States District Judge
              Theodore Levin United States Courthouse
                   231 West Lafayette Boulevard
                        Detroit, Michigan
                        September 16, 2025

   APPEARANCES:

   FOR THE              Nicholas J. Siciliano
   DEFENDANTS:          Latham & Watkins LLP
                        330 North Wabash Avenue
                        Suite 2800
                        Chicago, IL 60611

                        Roger P. Meyers
                        Bush Seyferth PLLC
                        100 W. Big Beaver Road
                        Suite 400
                        Troy, MI 48084

   FOR THE MOVANTS:     Francis P. McConville
                        Labaton Keller Sucharow LLP
                        140 Broadway
                        New York, NY 10005

                        Adam M. Apton
                        Levi & Korsinsky, LLP
                        33 Whitehall Street, 27th Floor
                        New York, NY 10004
```

APPEARANCES          **David Shea**
CONTINUED...         Shea Law Firm PLLC
                     26100 American Dr.
                     2nd Floor
                     Southfield, MI 48034

                     **Michael Albert**
                     Robbins Geller Rudman & Dowd LLP
                     655 West Broadway
                     Suite 1900
                     San Diego, CA 92101

ALSO PRESENT:        Matthew I. Henzi, Asher Kelly
                     Ken Dolitsky, Robbins, Geller
                     Tom Michaud, VanOverbeke Michaud & Timmony
                     Samuel Pigler, Local 710 Pension Fund Rep

                 To Obtain a Certified Transcript Contact:
               Shacara V. Mapp, CSR-9305, RMR, FCRR, CRR
                        www.transcriptorders.com

## TABLE OF CONTENTS

| MATTER | PAGE |
|---|---|
| **MOTION HEARING**........................................................ | |
| **THE COURT'S INITIAL QUESTIONS**.............................. | **6** |
| **Counsel's Response** | |
| By Mr. Apton:...................................................... | 7 |
| By Mr. McConville:................................................ | 16 |
| By Mr. Albert:.................................................... | 29 |
| **Counsel's Follow-up Response** | |
| By Mr. McConville:................................................ | 41 |
| By Mr. Apton:..................................................... | 45 |
| By Mr. Siciliano:................................................. | 47 |
| WITNESSES: | |
| None.............................................................. | |
| EXHIBITS RECEIVED: | |
| None Offered...................................................... | |
| Certificate of Reporter.................................... | 51 |

Detroit, Michigan

September 16, 2025

10:04 a.m.

                          *      *      *

LAW CLERK:  All rise.

The United States District Court for the Eastern District of Michigan is now in session.  The Honorable Linda V. Parker presiding.

The Court calls Guzman versus Ford Motor Company, et al, Civil Case Number 24-12080, time set for a motion hearing.

Counsel, if you'll state your name for the record, beginning with the movants.

MR. McCONVILLE:  Good morning, Your Honor.  Francis P. McConville on behalf of Teamsters Local 710, --

THE COURT:  Thank you.

MR. McCONVILLE:  -- of the law firm, Labaton, Keller, and Sucharow.

THE COURT:  Okay.  I want you to say your name once more for me.

MR. McCONVILLE:  Francis McConville.

THE COURT:  Thank you.  Good.

MR. MEYERS:  Good morning.  My name is Michael Albert from the Robbins, Geller, Rudman, and Dowd Law Firm, and we represent Clark Crippen.

THE COURT:  Good.  Mr. Crippen's counsel.  Okay.

MR. APTON:  Good morning, Your Honor.  Adam Apton from Levi and Korsinsky for Mr. Ronald Ferrante.

MR. SHEA:  Good morning, Your Honor.  David Shea on behalf of Mr. Ferrante.

THE COURT:  Okay.  All right.

And, here?

MR. SICILIANO:  Nick Siciliano from Latham and Watkins on behalf of the defendants.

THE COURT:  Thank you.

Sir?

MR. MEYERS:  Good morning, Your Honor.  Roger Meyers from the Seyferth Law Firm, also on behalf of the defendants.

THE COURT:  All right.  Thank you.  You may be seated.

And gentlemen who are seated behind you, are these clients?  Tell me who it is.  Is this Mr. Ferrante, Mr. Crippen, someone from Teamsters?  Tell me who this is.

MR. McCONVILLE:  Yes, Your Honor, with me is Matthew Henzi, who is a member of the Asher Kelly Firm, local counsel. And then, I also have Mr. Sam Pilger who -- he is a board member on the Local 710 Pension System.

THE COURT:  Okay.  Anyone else?

Okay.  Be seated, everyone.  Thank you.

There was someone else in the back?  Who else?  I'm sorry.

MR. ALBERT:  Yes, Your Honor.  I'm sorry.  I have my colleague, Ken Dolitsky, from the Robbins, Geller Law Firm, and Tom Michaud from the VMT Law Firm who is our local counsel.

THE COURT:  Excellent.  All right.

So I have read everything that you all have put before me.  Quite a bit, but it's all good.  I've got it, and I have questions.

And so, I would like to start off with my questions.  And then, I'm going to allow you to close, if you would, you know, if a part I have covered has not been brought out in terms of my questions.

I'm going to begin with counsel for Mr. Ferrante.  Who is that?  Thank you.

MR. APTON:  Should I approach the lectern, Your Honor?

THE COURT:  You can.

MR. APTON:  Okay.

THE COURT:  You can.

**THE COURT'S INITIAL QUESTIONS**

THE COURT:  All right.  How are you doing this morning?

MR. APTON:  Very good.  And, yourself?

THE COURT:  Excellent.  I'm doing well.

I want to just start off with what I perceived as

your view, potentially, that the expanded class period, the Sklodowski class period, if you will, you believe that -- and I know that Mr. Sklodowski's counsel is not present today. But you believe from what you've filed, that Sklodowski's complaint was filed for a nefarious reason. We first had Guzman, we had the initial class period, and then you seemed to imply -- and maybe not "nefarious" is the word you would use, -- but I think you do have -- take objection to the fact that it was filed. And my question -- I mean, believing it was filed to make way for Mr. Crippen to, perhaps, have the largest financial interest. I note that Mr. Crippen is not represented by the same attorneys from Sklodowski.

So my question, do you believe that Crippen and his counsel were colluding with counsel from Guzman and Sklodowski? And if you do, can you tell me the basis?

If that's not applicable at all here, what are you really saying?

**COUNSEL'S RESPONSE**

MR. APTON: I wouldn't say colluding, Your Honor.

THE COURT: Okay.

MR. APTON: A strong word.

THE COURT: It is.

MR. APTON: Nefarious reasons, also --

THE COURT: A little too strong?

MR. APTON: -- a bit strong.

I mean, I know counsel, for most of the folks in here, and we do have good working relationships.

THE COURT:  Okay.  Good.

MR. APTON:  I do think that the class period in this Sklodowski action, though, doesn't make sense under the allegations certainly before the board.  If this case is about Ford Blue, it would not make sense if there was a misrepresentation about Ford Blue before Ford Blue came into existence.  But as Your Honor knows, in the reply papers, we've made clear it doesn't make sense.

THE COURT:  Okay.

MR. APTON:  Mr. Ferrante has the largest financial interest in the lot, under either of the class periods.  And at that point, we should be looking at whether or not any of the other movants have enough proof, evidence to rebut the presumption in Mr. Ferrante's favor.

THE COURT:  Okay.  When you talk about the Ford Blue segment, so to speak -- is that how you refer to it?

MR. APTON:  Yes, Your Honor.

THE COURT:  So wasn't there -- I thought there was information to suggest that it wasn't just limited -- that that issue was not just limited to the initial class period. The concerns about warranties and so forth were -- existed well before the initial class period.  You know, sometime -- well, it included, I should say, the 2021 period.

MR. APTON:  Sure.

THE COURT:  Do you dispute that, sir?

MR. APTON:  So, Your Honor, the -- I guess this issue turns on the corrective disclosure at the end of the class period, --

THE COURT:  Okay.

MR. APTON:  -- in July of 2024.  At that point in time, Ford comes out and says we have higher warranty reserves, Ford, Ford Blue.  It ties to Ford Blue.  And so, that is the basis for our understanding of the allegations and our argument as to whether the Sklodowski class period should or should not be credited at this stage.  It may very well be, Your Honor, that facts come to light during the course of the case where, yeah, the class period should not only encompass Sklodowski, but even events prior to that.  But at this point in time, we look at what's on file before the Court, and that's the way I look at the allegations.

THE COURT:  Okay.

I notice that just in terms of your opportunity to file a reply to the other filings, that you didn't really address the other movants' argument, that your client's failure to disclose securities transactions for the Sklodowski proposed class period rendered his motion untimely.

What do you have to say about it now, because I didn't see you responding directly to it?  Did I miss

something?

MR. APTON:  Yes, Your Honor.

Well, I shouldn't say that.

THE COURT:  Okay.

MR. APTON:  Respectfully, I -- the reply brief, as Your Honor knows, is limited to seven pages, --

THE COURT:  Okay.

MR. APTON:  -- so we have to be very careful with the number of words and what we say.  I do address that.  There was no -- on pages four and five, and six of the reply, page IDs 1041 to 1043, --

THE COURT:  So okay.

MR. APTON:  -- we do address this notion that Mr. Ferrante intentionally concealed transactions from the Court; which is false.  We voluntarily provided those additional transactions in a supplemental declaration with our opposition.  That was at ECF number 39-4.  And with those additional transactions, Mr. Ferrante's recoverable loss actually increases.  It's not as if these additional transactions somehow eliminated his -- his financial interest in the case, or otherwise rendered him unfit to pursue recovery.  It actually made him more --

THE COURT:  A little bit bolstered?

MR. APTON:  Yeah, it did, Your Honor.

And so, you know, look, I understand that in this

situation when one movant, Mr. Ferrante, has the largest financial interest in the case and appears to be adequate and typical, and the presumption is vested in his favor, the other movants have to come forward with proof, and so they try to create arguments.

THE COURT:  They take issue with the timeliness of his disclosure.  What do you have to say about that?

MR. APTON:  I would have to say that the additional transactions provided in the supplemental declaration do not render him inadequate, or preclude him from serving as lead plaintiff.

Mr. Ferrante's certification complied with the PSLRA, he provided the transactions in the complaint that was on file.  And we cite the Ultimasa case for that point, from 2019, in New York.  Even still, there are a number of cases from cross the country where providing additional transactions after the 60-day deadline does not render a movant incapable or inadequate, or unfit to serve as lead plaintiff.

Again, these are not additional transactions that conflicted with his interest or the interest of the class, at all.  It made his loss greater.  And so, the cases where you do see this becoming a problem is where additional transactions come out during the course of the briefing that decrease a movant's loss, --

THE COURT:  Okay.

MR. APTON:  -- or somehow show that he was trying to conceal something intentionally.  And, that's not the case here.

THE COURT:  Well, I mean clearly, they're going to the adequacy of -- under Rule 23, that the plaint -- that your client, as being lead plaintiff, is not capable of taking it on.  And the Teamsters, actually, specifically talks about there was gross negligence involved in not having, you know, included the information that we've been discussing.

How do you respond to that?

MR. APTON:  I would say that is a gross mischaracterization of what happened.

THE COURT:  Okay.

MR. APTON:  We have Mr. Ferrante who provided his transactions for the -- the Guzman class period.  Not a single transaction was omitted.  And none of the transactions was provided in error.  It's the additional class period from the Sklodowski case filed two weeks before the 60-day deadline that arguably created a need to disclose more, which we did, in our opposition.  We did not hold anything back.

THE COURT:  Okay.

You have -- obviously, I know -- I mean, you're opposing the -- oppose the appointment of Mr. Crippen as lead plaintiff.  Are there any other defenses -- I mean, you spoke specifically just this morning about the Ford Blue segment and

how it kind of fits in there.  Are there any other defenses -- and you believe, from what you've filed, that that puts him in a position where the fact that he -- let's see.

I'm talking about the typicality --

MR. APTON:  Yes.

THE COURT:  -- requirement now.  And you say that you feel that that's an issue for Mr. Crippen.  Can you expand on that for me?

MR. APTON:  Sure.

So if there's a difference, assuming there's a difference between typicality and adequacy, --

THE COURT:  I think there is.  You don't see it?

MR. APTON:  No, I do, Your Honor.

THE COURT:  Okay.

MR. APTON:  But I would characterize it as more of an adequacy issue, because in terms of typicality, Mr. Crippen certainly bought during a class period, the expanded class period.  He bought on the open market.  He invested a significant amount in Ford, so I would say he's typical of the class.

The adequacy issue that we've raised in our briefing is, well, if the Sklodowski class period is not legitimate, for lack of a better word, --

THE COURT:  Okay.

MR. APTON:  -- then Mr. Crippen potentially has a

problem. But if we're going to go with the expand class period, the broadest class period possible, then that's not an issue that is dealt with at this stage of the proceedings. It's only an issue if Your Honor thinks that on the face of the pleadings, there's enough to say, yeah, we should not look at the Sklodowski class period, we should focus only on Guzman. But otherwise --

THE COURT: Do you think --

MR. APTON: Oh.

THE COURT: -- there are any other defenses that only Crippen -- that are unique to Crippen, or to the punitive class members who only purchased securities before April of 2022? What other defenses? Am I missing anything in terms of --

MR. APTON: No, Your Honor.

And, Your Honor, if Mr. Crippen had a larger financial interest in the case than Mr. Ferrante, I probably wouldn't be here because there's no point in trying to rebut that presumption that would be vested in Mr. Crippen at this -- at this stage of the case.

I understand Teamsters has an argument about it being an institution, but that's not enough to overcome that presumption. There's no special provisions for institutions. Notwithstanding the PSLRA's preference for institutional investors, if an institution does not have larger financial

interest, that's it. And in this case, it's hard because the Teamsters Fund is a large fund. The amount of money they lost, though, percentage wise, is minuscule compared to Mr. Ferrante or Mr. Crippen. So if anyone's going to be more interested in pursuing this case to the fullest extent of the law, it's going to be those retail, those individual investors who really need that money back, not the Teamsters Fund that effectively lost what amounts to what, a rounding error.

THE COURT: Now, I want to go back to what we talked about earlier with Teamsters and what their argument is.

MR. APTON: Sure.

THE COURT: Their argument specifically is that your client didn't disclose based upon the Sklodowski complaint. What is your response to that?

MR. APTON: My response to that is that the Sklodowski complaint was filed two weeks before the deadline. Notices for the expanded deadline were not prevalent in the marketplace. There was no intent to conceal any transactions. The transactions were voluntarily provided once the issue was -- was raised by the competing movants. And there was no problem, so to speak, created by the additional transactions.

So again, they did not eliminate Mr. Ferrante's loss, or even lessen it, but increased it. Mr. Ferrante would have no motive to withhold transactions. And, there was no error.

Again, the cases cited by the Teamsters Fund all

involve cases where the certifications contain errors, serious errors.  There were no errors in Mr. Ferrante's certification. It was completely in compliance with the PSLRA, providing all of his transaction data for the class period.  And when the issue of the expanded class period was raised, of course he provided the transactions.  Why wouldn't he?  He has more to gain by pursuing the broader class period.

THE COURT:  I'm going to talk to you in a little bit. You can have a seat for now.

MR. APTON:  Very good.  Thank you, Your Honor.

THE COURT:  I want to talk to Teamsters' counsel.

I'm going to give you a chance to respond to what's been said in terms of -- I don't want to put words in your mouth, so you give me your position on the adequacy of Mr. Ferrante.

MR. McCONVILLE:  Thank you, Your Honor.

THE COURT:  And then, I'm going to let you -- we're going to talk specifically about --

MR. McCONVILLE:  Sure.  I look forward to it again.

Frank McConville from Labaton, Keller, Sucharow on behalf of Local 710.  So there were a lot of reasons given for why the initial transactions for Mr. Ferrante were not included in its initial motion, but I think Your Honor hit it right on the head, it was gross negligence.  Because the complaint that was filed that expanded --

THE COURT:  You said that, I didn't say it.

Okay.  Go ahead.

MR. McCONVILLE:  No, you repeated the words that were in our papers.

THE COURT:  I did.  I did.

MR. McCONVILLE:  And the reality is, the complaint that was filed that expanded the class period is part of the case now.  That class period controls.  That case was filed on September 23rd of 2024.  Mr. Ferrante signed his certification for the initial class period on September 9, 2024.  So query whether Mr. Ferrante was even aware of the expanded class period.  Because if the position that Mr. Ferrante and his counsel take is that the expanded class period is frivolous or implausible, or shouldn't control because something nefarious was happening here, well then, that should have been discussed in the opening brief.  In which, he had two weeks to prepare to say, look, the class period that was initially filed is the most plausible and controlling class period, notwithstanding this additional class period.  We don't think it controls, but here are our transactions.

And the reason why I think that this is the case, as counsel for Mr. Ferrante just said several times, his losses go up.  Why wouldn't he include transactions in a period where his losses actually go up?  It's to his benefit.

So, no, there's no --

THE COURT: So what do you think the reason -- what rationale do you believe?

MR. McCONVILLE: I don't think Mr. Ferrante was aware of the longer class period.

THE COURT: Okay.

MR. McCONVILLE: Which again, goes to his adequacy.

And let me just point Your Honor to a new case that came out earlier in 2025, where the same exact issue happened. And, in fact, it was an institutional investor that failed to disclose transactions in the initial class period.

THE COURT: Okay.

MR. McCONVILLE: The case is Salem versus Methode Electronics it's 24-cv-07696. It's in the Northern District of Illinois, and it's in front of Judge Ellis.

And the Court explained there was a Michigan fund that failed to identify and correct their certification for the controlling class period. And the Court said that, enough, is evidence of inadequacy, and I will not appoint you. And the Court appointed a movant with a smaller financial interest, which also happened to be an institutional investor.

THE COURT: Okay.

MR. McCONVILLE: But our position on the certification as we lay in -- lay out in our papers is one of two things; the first being, we are -- Mr. Ferrante is advocating on behalf of a shorter class period, which puts him

in a position that we believe is antagonistic to the full interest of the class.  We think the more likely option, as we've been discussing this morning, is that it's just a plain error.  He didn't know of the longer class period.  He didn't revise the certification after the new class period was filed.  And, he didn't include it in his initial motion.  So you've got to question:  If Mr. Ferrante doesn't know the controlling class period, how's he going to adequate -- adequately lead this litigation?

And the point about the percentage of loss, that has been widely rejected throughout the jurisprudence of PSLRA of the lead plaintiff.  If the metric for a financial interest would be what percentage of a portfolio, you know, the loss included, an institutional investor would never be appointed because their portfolios are so large.

And on that point, I will point out that Mr. Sam Pilger from Local 710 is at the hearing today, and neither of the two individuals.  So, you know, if the argument is if this means a lot to them, why aren't they here?

THE COURT:  Okay.  All right.

You have asked me to look at the first two Lax factors, which deal with the number of shares purchased during the class period, as well as the number of net shares purchased during the class period, in order for me to assess who has the largest financial interest here.  However, you

also -- I glean from your -- really from your filings, is that you're urging me to focus on only that second factor, the net shares.  Why is that?

MR. McCONVILLE:  Right.

So in normal instances, the four Lax factors: --

THE COURT:  Yep.

MR. APTON:  -- total shares, net shares, net expenditures, and losses, --

THE COURT:  Right.

MR. McCONVILLE:  -- in normal instances, the losses will encapsulate the first three factors.  And so, you look at the loss because it's the most -- it's the truest indicator of a financial interest, of the potential recovery in the class, right?  That's what the PSLRA is looking for.

In this specific case, we think that net shares is the most important metric.

THE COURT:  And I got that --

MR. McCONVILLE:  Sure.

THE COURT:  -- from what you were saying.

MR. McCONVILLE:  And I'll explain why.

THE COURT:  Yep.  Yes, please.

MR. McCONVILLE:  The pleadings before the Court, there are two complaints now, both of them include only one disclosure.  And that one disclosure is from July of 2024. There are no corrective disclosures throughout the class

period, okay?  Which means -- and this is based on any of the cases that we cite in our papers, ECF 38, 11 to 14.  When there is one disclosure, courts have looked at that and determined there's a constant fraud premium throughout the class period.

THE COURT:  Right.

MR. McCONVILLE:  Now that means that each share, no matter what price you buy the stock at, each share is damaged that exact same amount, that amount that comes out at the end of the class period.  And when you combine -- so that alone -- we think that fact pattern alone would lend the Court to look very closely at the net shares competent of the Lax factors.

Now, when you combine that with the way that the Ford stock traded during this class period, --

THE COURT:  Yep.

MR. McCONVILLE:  -- and the way that Mr. Crippen -- because really, the net shares discussion for us is really with Mr. Ferrante out with adequacy issues is our position, --

THE COURT:  I know.

MR. McCONVILLE:  -- would be Mr. Crippen.  When you look at his purchasing pattern, he buys, basically, his entire position at the class period high.

And what do I mean by that?  He bought 65,000 plus shares of his 67,000 shares at $24 on January 13th of 2022.  The class period high for the Ford stock was the next day,

January 14th of 2022, at $25. The stock, thereafter, throughout the course of the class period, trades downwards from that $24, where Mr. Crippen purchases, all the way down to is 13.67. And there's no allegation that that 11-point delta was the result of any disclosure of fraud. That is just normal marketing dynamics. The stock trades up, it trades down. Ford is a stock that, you know, trades at various levels.

And so, what you need to do really closely is look at his LIFO loss. We don't dispute the calculation. The calculation and the math makes sense. But what we say is that entire difference between that 24 and that 13 needs to be set aside because it's for reasons entirely unrelated to the fraud.

And this is pursuant to the Dura Pharmaceuticals case from the Supreme Court. In order to demonstrate actual damages, which is what the recovery in this case is looking for, you need to show that the purchase of their shares was held over a corrective disclosure.

And there's authority on this point, Your Honor. The case Turpel v. Canopy Growth, 704 F. Supp. 3d 456, where the Court looks at the exact same fact pattern: Purchases at the class period high, stock trade is all the way down, holds the shares, and then the stock goes down. The difference, the Court said you have to put that aside because it's not

recoverable under the federal securities laws.

So based on -- on these sort of very unique circumstances, the single disclosure, Crippen's trading profile, and the way Ford stock traded, we believe that the relief sought by the class, which is the financial interest competent of the PSLRA, is best exemplified by the net shares. That's our position.

THE COURT:  Yep.

MR. McCONVILLE:  And again, this is not a new concept.

Your Honor, I will read the Pio case, which I was counsel for the losing movant in that case, so I'm very familiar with that opinion, where the Court says, retained shares more closely approximates recoverable losses, whereas here, the alleged fraud was only disclosed at the end of the class period and, therefore, variations and share price during the class period are the result of their factors.  Same situation here.

I'll cite another case, Markett v. Xoma, 2016 West Law 2902286.  This is at pages five and six, where the Court says:  In single disclosure cases, the retained shares or the net shares is more accurate than LIFO because it excludes losses incurred during the class period, that are likely attributable to normal market fluctuations rather than broad. That's what we have here.

So that is -- and I apologize if I'm being longwinded.

THE COURT:  No.

MR. McCONVILLE:  That is sort of the explanation for why we think the net shares component is really the dispositive one for determining --

THE COURT:  And I'm going to be asking counsel to respond to that, too, --

MR. McCONVILLE:  Sure.

THE COURT:  -- so keep that in mind.  I've just made a note of that, so go ahead.

MR. McCONVILLE:  No problem.

We think the net shares is the dispositive one.

THE COURT:  Okay.  Yep.

Let me ask you, you said in your response brief that Crippen -- Mr. Crippen, as well as Mr. Ferrante, their -- as well as their initial motion demonstrates that they're unknown individuals who lack sophistication to serve as lead plaintiff.  You've identified in Mr. Ferrante's filing, which you believe -- you've identified the defects in his pleading, you've said that before, as to why that supports your position.  Aside from Mr. Crippen's asserted lack of experience with complex and or securities class actions, what about his initial motion do you feel shows his inadequacy to serve as lead plaintiff?

MR. McCONVILLE:  Yeah.  Your Honor, I think there's a subtle distinction here.  I don't know if I would say inadequate.  What I would say is he failed to trigger the adequacy requirement under the PSLRA.  And the reason I say that is because there's a growing rubric of the requirements that individuals need to show in order to trigger the most adequate plaintiff presumption.

THE COURT:  Okay.

MR. McCONVILLE:  And we cite our case at -- we cite these cases in our papers:  The TG Therapeutics case, the World Wrestling case, the HEXO Corp. case, where the courts really look at, what sort of experience does this individual have managing lawyers, demonstrating that they can be in control of the lawyers in a complex litigation.  Because that's precisely what the PSLRA was designed for, they want the lawyers to be controlled by the clients, sophisticated, whether it be an individual or whether it be an institution, that are really going to sit down and make sure that the case is being prosecuted.

THE COURT:  Do you cite those cases in your --

MR. McCONVILLE:  We do.

THE COURT:  Okay.

MR. McCONVILLE:  And I'm happy to provide the citations for you right now.

So TG Therapeutics is 2022 West Law 1655585; World

Wrestling is 2020 West Law 2614703, and HEXO is 2020 West Law 905753.

THE COURT: Those are all cases within this circuit?

MR. McCONVILLE: Those are all cases in the Southern District of New York, Your Honor.

THE COURT: Southern District of?

MR. McCONVILLE: New York.

THE COURT: Thank you.

MR. McCONVILLE: Apologies.

But again, they go to ensuring that the class is protected by an -- by the leader who is going to control the lawyers and push the litigation forward, who's going to be able to sit at the table across from defense counsel, some of the biggest firms in the world, and ensure that, you know, whether it's a mediation or some other type of resolution, ensure that the class is being protected in getting the most money back possible.

And this is not -- you know, this is not just hypothetical. I'll cite some statistics that have come out in recent reports from Cornerstone Research, which indicates that when institutional investors lead class actions, the settlements are over five times larger. And when institutions lead class actions, there's a 38 reduct -- a 38 percent reduction in the motion to dismiss being granted.

So these are -- these are objective metrics that show

that Congress was right, institutional investors should be the lead plaintiff here.  Particularly, when it's a close call.

If there were an individual in this case that had a $5 million loss, that had experience overseeing lawyers, that really looked like they were sophisticated and to -- and could do a great job, we wouldn't be here today.  We would say the class is in good hands.  But because it's a relatively close call, no one has a massive financial interest here, we think the case law is pretty clear that you really have to take a good, hard look at what the individuals have presented in their motion, and contrast that with an institutional investor that has done this before, that is -- experienced fiduciary. We have over -- Local 710 has over 14,000 members, four and a half billion under management.  They've settled cases before in the multimillion-dollar range, and so we think the class is really best served by having that institutional investor lead the case.

THE COURT:  Okay.  And do you -- and just getting back to Mr. Crippen, too, did anything else besides the -- that can speak to his inability to satisfy the requirements set forth in Rule 23?

MR. McCONVILLE:  Yeah.  I would point to, as counsel for Ferrante said, the trading that occurred prior to the start of the Cruise last period, everything is in the longer class period.  And again, we take position that the lead

plaintiff takes the longer class period controls.  It's in the best interest of the class.  But as this happened numerous times in other cases, when a class period gets shortened and the lead plaintiff now no longer has a position in the case, that could be a year, two years down the road, all of a sudden, we need to re-open the case and find a new lead plaintiff which, you know, delays the case, delay -- delays the prosecution, and ultimately, is not in the best interest of the class.

I'll point Your Honor to -- to one opinion actually handling this exact same scenario, and said you need to ask in management for SanDisk case.  2016 West Law 406283 where Judge Chhabria, out in the Northern District of California, indicated in his lead plaintiff order that he had hesitation appointing one fund because they only had trading in a longer period.  He did so, but then when he dismissed that period, he basically said in his motion to dismiss order, I should have used the shorter period because now I need to appoint a new lead plaintiff.

THE COURT:  Okay.  All right.

One -- okay.  We've covered it.  All right.  Thank you.

MR. McCONVILLE:  Thank you, Your Honor.

THE COURT:  I'm going talk to counsel for Mr. Crippen.  I'm going to give you an opportunity this

morning, Counsel, to just go right in it, and tell me how you feel about the perspective, and the statements that have been made regarding your client not being adequate to serve as lead plaintiff.

MR. ALBERT: Your Honor, the only attack to my client's adequacy that I've heard so far is some suggestion that we manipulated the class period.

THE COURT: That you?

MR. ALBERT: That we manipulated the class period. And I mean, that's just false.

THE COURT: Okay.

MR. ALBERT: Really, the two issues, I think, are before the Court are which of the proposed class periods to use, and what's the appropriate metric for financial interest.

THE COURT: Let me just ask you a question.

MR. ALBERT: Sure.

THE COURT: Have you -- have you had an opportunity to speak to Sklodowski's attorney?

MR. ALBERT: We did.

THE COURT: Do you know why this filing is encompassing -- goes beyond the initial class period of Guzman? Why? Do you understand why?

MR. ALBERT: I understand why the case supports the longer class period, but I don't know what Sklodowski's counsel, what their rationale was.

THE COURT:  Okay.  Go ahead.  You can go ahead then.

You said the two most important things?

MR. ALBERT:  I was just going to say that I think the PSLRA provides a very clear three-step process for appointing a lead plaintiff.  And in this case, it really burns on two main questions that Your Honor has been asking counsel about.  The first thing is longer class period versus shorter class period, and the second -- the second key issue is how do you gauge larger financial interest.

THE COURT:  Okay.

MR. ALBERT:  Your Honor, on -- on the first issue of class period, not only does the law support -- overwhelmingly support using the most inclusive class period, because at this stage of the litigation, it incorporates more class members, it increases Plaintiff's claim, and it's just overall good for the case.  But specifically, in this case, it makes sense as well, for the reasons we've described in our papers.

And I'm happy to get into those if you'd like, Your Honor.

But the second, I think, more critical question is how you measure financial interest.  All movants set forth their financial interest using LIFO loss.  The ultimate goal of this litigation is to recover the losses suffered by investors.  And that's the dominant approach within the Sixth-- and District courts within the Sixth Circuit.

And I would point Your Honor to the FirstEnergy case where Judge Marbley really meticulously analyzes this from start to finish.

And, Your Honor, I think the reason why we're here and even debating this is because of Your Honor's decision in General Motors. And, the General Motors' case was so distinguishable for several reasons, but the movants were setting forth their losses using different metrics. In each brief, from the opening to the opposition, to the reply, the metrics kept changing.

Here, everyone agrees --

THE COURT: Yeah.

MR. ALBERT: -- on the LIFO numbers. There's no dispute, like, if you add this number. The only real question is whether in this case we should -- we should look to the other factors.

And for the reasons that I think Judge Marbley talks about in FirstEnergy, those other factors, which serve as a proxy for loss, are just simply not necessary when we all agree on -- on loss.

THE COURT: Okay.

MR. ALBERT: And if I may, Your Honor, I just wanted to address a few -- a few points that the other counsel have made against --

THE COURT: For Mr. Crippen?

MR. ALBERT:  -- our motion.  Yes.

THE COURT:  Okay.

MR. ALBERT:  I think Teamsters 710's counsel has a very hard position to kind of toe here because on one hand, you know, they're saying that Mr. Ferrante, for example, should have alluded to the class period issues in his opening motion, and if he wasn't going to provide the trading for the longer class period, he should have said it in his opening motion.  But if -- if net shares purchased is the end all and be all of financial interest, why didn't they talk about it in their opening motion?  None of the facts of the case changed. There's one corrective disclosure alleged, and if that was their position, they should have addressed it then and there.

Along those same lines, counsel for Teamsters 710 talks about, well, courts routinely reject this percentage of the portfolio argument that Mr. Ferrante's counsel made with respect to retail investors versus institutional investors. Namely, that retail investors lost a bigger percentage of their portfolio so that, you know, they're going to care about the case more.  And it's true that that's an outlier position that's been rejected by courts, but so has this idea that net shares purchased is the end all, be all.  It's approximately the same amount of courts that have -- that after they look at the percentage of the portfolio, they could find -- they find losses.  I'm sorry, they find net shares purchased determined.

And the reason for that, Your Honor, is because in these cases, we're at the very beginning stage.  And Your Honor really discusses this in Pio versus General Motors, where he talked about, look, this is the beginning of the case, a lot of things are going to change in the case, and there's not supposed to be this huge analysis on the merits -- of the merits at this stage.  That's not to say, Your Honor, that, don't look at the merits.

If you want to talk about potential credit -- corrective disclosures in the case, Ford -- Ford releases information about its warranty information -- I'm sorry, about its product defect issues pretty -- pretty regularly.  There are a lot of disclosures in the case, a lot of announcements in the case about -- about the issues that affected -- that affected investors here.  So I think it's -- it's very premature to just say we only look at -- you know, we look at net shares purchased because there's one end-of-class rate disclosure.

THE COURT:  Let me ask you something just in terms of, I'm just still trying to flush out more of the adequacy arguments that have been raised in looking, really, at Rule 23.  I'm comfortable in knowing that the LIFO method, everybody agrees on that.  And so, there -- I am looking at these other factors, and I want you to, with counsel who just was speaking -- who was that?  That was Mr. --

MR. McCONVILLE: McConville.

THE COURT: Thank you, Mr. McConville.

-- was talking about, you know, what courts are looking to for purposes of selecting the lead plaintiff, understanding that you do need to have a savvy plaintiff who can really work with the lawyers, and that there's a management required -- requirement of the lawyers.

Can you speak to that and, you know, your client's ability to do that? And what kind of experience has he had that would place him in the position to execute what many courts have found to be an important factor?

MR. ALBERT: Sure, Your Honor.

And, Your Honor, it's true what Mr. McConville said, that the PSLRA's legislative history shows a preference for institutional investors. But the statute's plain text, it makes clear that the preference is expressed through the financial interest requirement. It's not a factor -- they don't get extra credit for being an institutional investor. That really goes to the heart of the Teamsters 710's position here.

THE COURT: I'm not talking about that, though. I'm talking about specifically whether or not, in terms of the adequacy of your client serving as lead plaintiff, would he be able to -- you know, is there something in his prior experience that would, you know, speak to his ability to

manage counsel.  And that -- that is something that has emerged.

Has he done that before?  Has he had to ensure that a class's interest are being protected?  Does he have the experience that Mr. McConville has explained, and cited cases of, in support of the fact that courts are viewing a lead plaintiff's responsibility to include just that.

What about Mr. Crippen's experience -- because it wasn't anywhere in the materials that I viewed, -- that speaks to his experience to be able to do that?

MR. ALBERT:  Sure, Your Honor.

THE COURT:  Okay.

MR. ALBERT:  So Mr. Crippen has about 30 years of experience of federal service.  He -- he worked for the Coast Guard -- he worked for the Coast Guard, and then he's a Vietnam War vet --

THE COURT:  Yep.

MR. ALBERT:  -- veteran.  I believe he has experience overseeing counsel in routine matters.  I do not believe that he has experience overseeing groups of lawyers in connection with complex securities litigation.  But that goes back to the statute, Your Honor.  They would have made it a requirement for an institutional -- for a movant to be an institution if that's what they wanted, Your Honor.

I would also say that the Southern District of New

York cases pointed to by Mr. McConville, they look at -- they look at the errors in the filings of these individuals. And then, as an additional reason for not appointing them, they say, hey, this person made errors out the gate, and in addition to that, you know, we don't have any indication of their sophistication.

THE COURT: Right.

MR. ALBERT: But sophistication isn't -- like, you can't exclude someone from overseeing a case because they haven't managed a securities class action or an anti-trust class action, or -- Mr. Crippen is eminently qualified.

THE COURT: Okay. Hang on a second. I want to make sure I've asked everything I want to ask in terms of the typicality or the adequacy issue.

MR. ALBERT: Your Honor, and if I just may say one more thing.

THE COURT: Yeah.

MR. ALBERT: The statute requires a prima facie showing of typicality and adequacy. It doesn't require an evidentiary test of this person's qualifications to manage groups of lawyers.

THE COURT: How do you -- okay. I appreciate that. How do you respond to the issue of all of the -- the purchasing that your client did on one date, and they were purchased at a high level, high amount? How do you respond to

that being -- that's factual, right?

MR. ALBERT:  It's absolutely factual.

THE COURT:  Okay.

And so, do you feel -- you've heard other counsel complain about that and object to that, and to talk about -- I mean certainly, his interest are -- can be viewed differently in terms of if we were to look at an expanded class period. How can he speak to that?  Does he even have losses there? Does he have, you know -- and, it's been raised, the word has been used, "self-interest."  How do you respond to that?

MR. ALBERT:  Your Honor, the typicality requirement does not -- does not require some sort of diverse trading pattern.  As Mr. Apton conceded, my client purchased within the longer class period, just like everyone else did.

Essentially, what both competing movants -- particularly, Teamsters 710 is doing, is they're inviting a beauty contest.  They're saying, hey, you purchased on a Wednesday instead of a -- instead of Tuesday.  Hey, look, we have three purchases, you have one purchase.

The statute provides a very clear three-step process, Your Honor.  And again, if it wasn't for the General Motors case, which is distinguishable on the facts, and which -- it's like the saying, bad facts makes bad loss sometimes.  This is a very simple process.

You look to law.  Like over 95 percent of courts,

Your Honor, since -- in the 30 years of the PSLRA's jurisprudence, there's about 200 cases a year.  What's that, like, 5- or 6,000 cases?  Over 90 percent of them, you look at LIFO loss, you identify the movant that has the largest financial interest, and then you see if that movant made a prima facie showing of typicality and adequacy.  And if they did, the other movants could advance to rebut it, using proof, Your Honor, not speculation.  There's no freewheeling beauty contest where it's, hey, we have this many billions under assets under management, we've recovered this amount for shareholders.

Mr. McConville lists all these statistics about institutional investor recoveries.  I can stand up here and say, well, Your Honor, you know, Mr. Crippen is the most qualified movant because he hired the law firm that recovered 70 percent of all -- of all dollars recovered last year in securities litigation.  That's from the ISS Securities Class Action Report from last year.  But that doesn't matter if we have the presumption, and it can't be rebutted.

THE COURT:  Okay.  Anything else you want to say at this point?

MR. ALBERT:  No, Your Honor, unless Your Honor has any other questions.

THE COURT:  Not right now.  I'm going to ask a group question, so -- well, maybe you can.  Let me see.  Let me give

-- let me just check.

Okay. Are there any -- let me ask you while you're here. You have taken the position -- what is specifically your position on -- you believe that the -- you don't have an objection to using the expanded class period; yes, or no?

MR. ALBERT: I do not have an objection, I believe the longer class period --

THE COURT: Is the one to you?

MR. ALBERT: -- is necessary.

THE COURT: Okay. Okay.

Are there any -- anything else that you have -- is there something that you have not yet addressed in terms of whether or not -- when you look at the allegations that have been set forth in the pleadings, do you feel -- and you've addressed this, but I want to just hear it one more time, just in terms of the material, misstatements, or omissions that you believe existed, or others believe that existed, do you believe that any of those omissions or state -- misstatements support using the longer class period correctly?

MR. ALBERT: Yes, Your Honor. The --

THE COURT: Okay. Speak to that.

MR. ALBERT: The longer class period includes two key financial reports and the shorter period doesn't.

THE COURT: Okay.

MR. ALBERT: It's Ford's 3-Q 2021, Form 10-Q. That

was filed on October 28th, I believe, 2021.  And then the full year 10-K filed on February 4, 2022.

The all -- the allegations are that these reports were the beginning of the allegedly misleading course of conduct.  And while these filings, they disclosed certain warranty accruals, they're alleged to be materially misleading because they failed to disclose the known underlying deficiencies in the quality control, and the true escalating costs of those -- of those issues.

And the factual basis for including this, I think, is pretty strong.  We laid out in our papers, the -- when everything was ultimately disclosed in 2024, they were explicitly attributable, by Ford's own management, to problems with the 2021 model years.  Issues that the company admitted that they -- that, quote, "could have been detected at launch."  Therefore, the financial statements issued during 20 -- 2021 and 2022, which were the first to reflect the financial impact of those defective models, they were misleading for omitting this important information.

THE COURT:  All right.  Anything else you want to say?

MR. ALBERT:  No, Your Honor.

THE COURT:  Okay.

MR. ALBERT:  Thank you very much.

THE COURT:  All right.  I'm going to give counsel for

Teamsters, and then for Mr. Ferrante, an opportunity to respond, and then I'll take it from there. I've got a couple group questions.

MR. McCONVILLE: Thank you, Your Honor.

THE COURT: Clean up, yeah.

**COUNSEL'S FOLLOW-UP RESPONSE**

MR. McCONVILLE: Unless you have any specific questions, I'll go ahead and respond.

THE COURT: Nope, go ahead.

MR. McCONVILLE: So the point about Local 710 sort of shifting gears in the loss analysis is just a blatant mischaracterization of what we actually put in our brief.

THE COURT: Let me stop you. I want you to address the last question.

MR. McCONVILLE: Sure.

THE COURT: Yeah, I want everyone to address that question.

MR. McCONVILLE: So the last question about the class period?

THE COURT: Yeah.

MR. McCONVILLE: Yeah, we agree with counsel for Crippen, that the class period that protects the longest -- the largest possible class of investors should be the controlling class period at this stage of the litigation.

That said, we do think that there's a significant

risk that that class period will get cut, for reasons that Mr. Ferrante has stated. And if that were to happen, again, Mr. Crippen has no trading in the operative class period.

THE COURT: Okay.

Okay. You can go ahead.

MR. McCONVILLE: Sure.

Just really quickly about the shifting gears analysis for the loss -- the financial interest. We put in our opening brief the four Lax factors. At no point did we say the LIFO loss is a controlling loss. We stated total shares, net shares, expenditures, and losses. It was only after seeing Mr. Crippen's trading pattern, which, again, is very unique, and purchases basically entire position at class period high, did we realize that the LIFO calculation is just not a reliable metric. We're not disputing his LIFO calculation.

THE COURT: Okay.

MR. McCONVILLE: That's right, the math is correct. It's just not a reliable metric for determining the relief sought by the class.

And I'll point to Your Honor's order in Pio because I don't think it's distinguishable at all. That case had one disclosure, and the movants in that case jockeyed about with the various ways to calculate losses. They did a retained share analysis, they did a -- you know, an analysis of LIFO. They did this, they did that. But -- and I remember because I

was in the courtroom for the Court's hearing on that, the parties agreed, counsel for New York teachers, and counsel for Menora agreed that the LIFO calculations was correct math.  So it's not like we're disputing the math, it was that they turned the loss into an apples-to-orange comparison.  And because of that, the first three Lax factors were a more objective metric to determine financial interest.

We would -- we would proffer that as the exact same case here.  We don't think the LIFO calculation is an -- is a reliable determination of financial interest because of the way the stock traded, and because of where Mr. Crippen purchased it.

THE COURT:  Okay.

MR. McCONVILLE:  The other point I'll make about the FirstEnergy case, the Owens case, which counsel for Mr. Crippen relies on, that case had multiple corrective disclosures, which entirely eliminates the utility of net shares.  We will concede that.  It's just not the scenario here.  Here, is one corrective disclosure.

The final point I'll make, Your Honor, on this idea of adequacy and way -- and the ways in which individual investors need to demonstrate adequacy to trigger the prima facie presumption.  I think the reason why courts are really sort of drilling down and really taking a rigid hard look at these applications is because individual investors, people are

inherently unpredictable.  And you don't want to get in a situation where you have a case three years down the road where, God forbid, someone gets sick or something happens.

I'll point to a very recent case in the Southern District of New York.  Christian versus Spectrum Pharmaceuticals, 2025 West Law 2234041, where the court was forced to re-open the entire lead plaintiff after three years of litigation because the individual who was lead plaintiff was contacting defendants personally, outside the presence of counsel.

I'm not saying either Mr. Ferrante or Mr. Crippen would do that.  They seem like they have very good intentions to lead this class action.  All I'm doing as counsel for Local 710 and the punitive class, is ensuring that the class is in the best hands possible to maximize recovery, and ensure that there is a settlement or some sort of, you know, resolution at trial for the benefit of the class.

And there's enough data, there's enough statistics out there to really take a hard look and say, okay, which is the best option to serve as the lead plaintiff of the class.

THE COURT:  Okay.  Thank you.  Appreciate it.

MR. McCONVILLE:  Thank you, Your Honor.

THE COURT:  Counsel, before you --

MR. APTON:  Hello, Your Honor.

THE COURT:  Yeah, before you start, I want to just

get from you, also what your position is in terms of -- as relates to your client, what do you feel is the appropriate period for the Court to focus on?  What is the appropriate class period?  And to what extent do you think that any of the material, misstatements, or omissions that have been alleged in the complaint, do you feel that those support a longer class period?  Do you see a connection between the alleged misstatements and misrepresentations on behalf of Ford, do you see any of those being -- providing support for the use of the Sklodowski period?

MR. APTON:  No, based on what's currently in the papers.

THE COURT:  Okay.

MR. APTON:  Again, the case could -- could turn a different way.

THE COURT:  Yep.

MR. APTON:  Whomever Your Honor appoints as lead plaintiff may expand or shorten the class period, but based on what's currently before the Court, Guzman's class period.

THE COURT:  Okay.

MR. APTON:  Your Honor, counsel for both, especially Teamsters, is very focused on the notion that my client made an error.  He uses the words "gross negligence."  I disagree fully with that.

Even if there was an error, though, it was promptly

corrected, and the case law says that that's okay.

THE COURT: Mm-hmm.

MR. APTON: The case that Mr. McConville cited, Methode Electric, that involved a scenario in which the certification contained errors and was not corrected. The cases, respectfully, that this Court should look at for guidance would be Chill v. Green Tree Financial Corp., 181 F.R.D. 398, at 411. That's from Minnesota, in 1998, which is about 20 years ago, but the same rule still stands to this day.

I'll refer the Court to Silver Wheaton from CD of California, 2017. 2017 WL 2039171, at 10. Same holdings still applies. This is not a novel concept. It is part of the law on this particular issue. It has been this way for the past 20 plus years.

Mr. McConville knows this. In the Estee Lauder case in which he has in Southern District of New York, he just filed an errata correcting a certification. That's 23-cv-10669, docket entry 55, September 2024.

The point is, is what Mr. Ferrante did was not grounds to reject his motion. This issue of the expanding class period came to light, he provided the transactions right away, there was nothing nefarious about it, and there was nothing that could create any sort of conflict based on the information that he did openly disclose.

Mr. Ferrante wants to be the lead plaintiff in this case. He's been investing in securities for 21 years. He's a business owner. He owns graphics and pin striping facilities at auto dealers. He is not a stranger to litigation, for better or worse. Being in business for that amount of time, he has dealt with litigation. He also has a significant real estate portfolio. So he has litigation and transactional legal experience.

And finally, Your Honor, this is his money, almost a million dollars that he lost from his personal portfolio. If anyone in this room is most concerned about getting the money back, it is him. It is not the representative from the Teamsters Fund who is treating this as a nine-to-five job, which is why he's here.

Mr. Ferrante has other issues to deal with, especially in light of the significant loss that he incurred.

Thank you, Your Honor.

THE COURT: Okay. Let me ask representatives from Ford, is there anything you would like to place on the record?

MR. SICILIANO: No.

Obviously, we strongly disagree with any class period, and believe there weren't any false or misleading statements, nor did the defendant act in that, but the time for that is later.

THE COURT: Okay. Fair enough.

All right.  Let me ask counsel to put their heads together and think about this.  But I would like to know what you all would consider to be the next step forward.  I mean, obviously, I'll be ruling.  So we know that's going to take place, but once I have rendered my decision as to who should be appointed as lead plaintiff and counsel, would counsel prefer to confer and then submit a proposed stipulated order?  Maybe this isn't the right time for you all to do that, or -- you know, with deadlines for the lead plaintiff's filing of the amended complaint.  Because I would assume -- I'm assuming, maybe that's an assumption I should not make, but -- oh, you all have already talked about it.  Look at you.

MR. APTON:  Your Honor, we're all going to say the same thing, Your Honor.

THE COURT:  What are you all going to say?

MR. APTON:  We're all going to say that we would ask for 14 days to meet and confer with defense counsel and submit a stipulation with the schedule.

THE COURT:  After my order?

MR. APTON:  Correct, Your Honor.

MR. ALBERT:  I'm sorry, not to disagree with Mr. Apton, but I would just like to point, Your Honor, I believe a stipulation has already been entered.

MR. SICILIANO:  That's correct, Your Honor.

THE COURT:  Good.

MR. SICILIANO:  It's actually Docket Number 6 that was entered on September 7, 2024.

THE COURT:  And what did you all stipulate to?

MR. SICILIANO:  It's self-executing, such that when you do appoint lead plaintiff and lead counsel, that lead plaintiff will have 60 days to file an amended complaint, --

THE COURT:  Okay.

MR. SICILIANO:  -- and then we would have 60 days to file a motion in response.

THE COURT:  Okay.  Well, I missed that.  I would have to say that in preparing and reading, I missed that.  That's excellent.  Very good.  I appreciate your having thought that through.

Okay.  Any -- any final thoughts?  The mic is open.  Open mic.

MR. ALBERT:  Your Honor.

THE COURT:  Just state your name again.

MR. ALBERT:  Sorry, this is Michael Albert on behalf of Mr. Crippen.

THE COURT:  Yep.

MR. ALBERT:  I wasn't happy with the response I gave you after Mr. Crippen's bonafides, --

THE COURT:  Yeah.

MR. ALBERT:  -- after looking at his declaration one more time, and that's Docket Number 33-5, I can confirm that

he is familiar with selecting and overseeing counsel.  He has approximately 30 years of investment experience, and he served as the Vice Chair of the Stafford County Electrical Board.  I just wanted to close with that.

THE COURT:  Okay.  Fair enough.

MR. ALBERT:  Thank you, Your Honor.

THE COURT:  All right.  Anyone else?  All set?

What was the docket number?  You said ECF number 35 for Mr. Crippen's counsel?

MR. ALBERT:  33-5.

THE COURT:  Okay.  Thank you.

MR. ALBERT:  Page ID 674.

THE COURT:  Okay.  That's the page ID.

LAW CLERK:  I'm checking, and it's not listed as that.  33-5 is Mr. Crippen's declaration.

MR. ALBERT:  That's what I was referring to.

LAW CLERK:  I'm talking about the proposed order.

MR. SICILIANO:  Yeah, it's ECF Number 6, filed on September 7, 2024.

THE COURT:  Okay.  Thank you.

I'm sorry.

MR. ALBERT:  I apologize.

THE COURT:  That was my fault, actually.  I thought we were asking that question as well, yeah.

Is it there, correct?

You got a note back saying that it was accepted?

MR. SICILIANO:  We did.

THE COURT:  Okay.  That's really all we need to know then.

All right.  Counsel, I appreciate your time here today, it was informative.  And, I will be ruling shortly, all right?

MR. ALBERT:  Thank you, Your Honor.

MR. APTON:  Thank you, Your Honor.

THE COURT:  All right.  Thank you, have a great day.

LAW CLERK:  Court's in recess.

(The proceeding was adjourned at 11:09 a.m.)

*     *     *

C E R T I F I C A T E

I certify that the foregoing is a correct transcription of the record of proceedings in the above-entitled matter.


S/ Shacara V. Mapp                    09/17/2025

Shacara V. Mapp,                           Date

CSR-9305, RMR, FCRR, CRR

Official Court Reporter