UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALBERT GUZMAN and
ROBERT SKLODOWSKI, *Individually
and on Behalf of All Others Similarly
Situated*,

                Plaintiffs,                    Case No. 24-cv-12080
                                            (Consolidated with
v.                                       Case No. 24-cv-12492)
                                            Honorable Linda V. Parker

FORD MOTOR COMPANY,
JAMES D. FARLEY, JR., and
JOHN T. LAWLER,

                Defendants.
_____/

## OPINION AND ORDER ON PENDING MOTIONS FOR APPOINTMENT OF LEAD PLAINTIFF AND LEAD COUNSEL

This is a consolidated putative class action lawsuit filed under the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA").  Plaintiffs Albert Guzman and Robert Sklodowski (collectively "Plaintiffs") allege that Defendants made materially false misrepresentations and/or omissions about Ford Motor Company's business, operations, and prospects, and that the value of the company's securities dropped when the truth was disclosed.  Guzman filed a Complaint seeking to represent a class of investors who purchased Ford Motor Company ("Ford") securities

between April 27, 2022 through July 24, 2024, inclusive.  In his Complaint, Sklodowski proposes a class of investors who purchased Ford securities between October 28, 2021 and July 24, 2024, inclusive.

The matter is presently before the Court on competing motions for appointment as lead plaintiff and lead counsel, filed initially on October 7, 2024, by Michael M. Press, Clark D. Crippen, Teamsters Local 710 Pension Fund ("Teamsters 710"), and Ronald Ferrante.  The motions are fully briefed.  On October 21, 2024, Press filed a notice in which he concedes that he does not have the "largest financial interest" and, therefore, is not presumptively the "most adequate plaintiff" to represent the interests of class members.  (ECF No. 18.)  The Court held a hearing with respect to the remaining motions on September 16, 2025.

## I.      Factual and Procedural Background

Ford is an automotive manufacturing company which develops, delivers, and services a range of trucks, cars, and luxury vehicles worldwide.  (ECF No. 3 at PageID.42 ¶ 2.)  During the period relevant to Plaintiffs' claims, Defendant James D. Farley, Jr., was Ford's Chief Executive Officer, and Defendant John T. Lawler was its Chief Financial.  (*Id.* at PageID.45 ¶¶ 13, 14.)

On July 24, 2024, after the stock market closed, Ford announced its second quarter 2024 financial results, revealing that its "profitability was affected by an increase in warranty reserves" and "higher warranty costs."  (*Id.* at PageID.42 ¶ 3.)

2

Analysts and journalists reported that, in the second quarter, Ford's warranty and recall costs had increased by $800 million more than the first quarter and by $700 million more than the year before.  (*Id.* at PageID.2-3 ¶ 3.)  As a result, Ford revised its outlook for full-year earnings for its electric vehicle segment to "reflect[] higher warranty costs than originally planned."  (*Id.*)  On this news, Ford's share price fell 18.36% the following day.  (*Id*. at PageID.3 ¶ 4.)

On August 8, 2024, Guzman filed his Complaint against Defendants (ECF No. 1), followed by an Amended Complaint a few days later (ECF No. 3). Guzman claims that Defendants made materially false and misleading statements and/or omissions in public announcements and filings with the Securities and Exchange Commission ("SEC") between April 27 and July 24, 2024.  (ECF No. 3 at PageID.43 ¶ 5.)  Specifically, Guzman alleges that Defendants failed to disclose: (1) that Ford had deficiencies in its quality assurance of vehicle models since 2022; (2) that, as a result, Ford was experiencing higher warranty costs; (3) Ford's warranty reserves did not accurately reflect the quality issues in vehicles sold since 2022; and (4) as a result, Defendants' positive statements about Ford's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.  (*Id*.)

On September 23, 2024—two weeks before the October 7 deadline to file lead plaintiff motions in the *Guzman* action—Sklodowski filed in this District a

substantially identical putative class action.  Compl., *Sklodowski v. Ford Motor Co.*, No. 24-cv-12492, ECF No. 1.  Sklodowski, however, proposes a class period beginning on October 28, 2021.  *See id.* at PageID.1 ¶ 1.  In his Complaint, Sklodowski asserts the same nondisclosures by Defendants set forth in the preceding paragraph, but he does not identify a period for when the deficiencies in Ford's quality assurance of vehicle models began.  *See id.* at PageID.3 ¶ 5.  Sklodowski also offers an expanded list of Ford's announcements and SEC filings where the alleged misrepresentations and/or omissions were purportedly made, which precede Guzman's proposed class period.  *See id.* at PageID.6-7 ¶¶ 17-19.

Plaintiffs, who invested in Ford securities, claim that they suffered significant losses and damages due to the precipitous decline in the market value of their holdings when the truth about the companies warranty problems was disclosed.

As indicated, on October 7, Press, Crippen, Teamsters 710, and Ferrante filed motions seeking their appointment as lead plaintiff and their counsel of choice as lead counsel.  (ECF Nos. 13-17.)  Teamsters 710, Crippen, and Press also sought consolidation of the *Guzman* and *Sklodowski* actions.  (*See* ECF Nos. 13, 15, 17.)  Each movant attached the PSLRA-required certification and a list of the movant's transactions in Ford securities.  (*See* ECF No. 13-2 [Teamster 710]; ECF No. 14-2 [Ferrante]; ECF No. 15-3 [Crippen]; ECF No. 17-4 [Press].)  All of the movants,

4

except Ferrante, disclosed their transactions during the *Sklodowski* expanded class period, while Ferrante limited his disclosures to the shorter *Guzman* period.  (*Id.*)  Thereafter, Press effectively withdrew his motion (ECF No. 18), and briefing was completed with respect to the remaining motions (*see* ECF Nos. 19-24).

It was not until October 21, 2024, when Ferrante responded to the motions filed by Crippen and Teamsters 710, that he disclosed his transactions in Ford securities during the expanded *Sklodowski* proposed class period.  (*See* ECF No. 19-2 at PageID.507; ECF No. 19-3; ECF No. 19-4 at PageID.519.)  Ferrante did not explain why these transactions had not been disclosed initially.  However, he did take issue with the expanded class period, suggesting that the *Sklodowski* action—with its extension of the beginning of the class period to October 28, 2021—was filed for "a tactical purpose" or "illegitimate reasons[.]"  (ECF No. 19 at PageID.490-91.)

On November 27, 2024, after the Court consolidated the two matters (ECF No. 31), Crippen, Teamsters 710, and Ferrante refiled their respective briefs in support of and in opposition to the motions for appointment of lead plaintiff and lead counsel.  (ECF Nos. 33, 35-42.)

## II.    The PSLRA's Procedures

After a complaint is filed under the PSLRA, the plaintiff must "cause to be published, in a widely circulated national business-oriented publication or wire

service, a notice" informing putative class members of the lawsuit, the claims asserted, and the purported class period. *See* 15 U.S.C. § 78u-4(a)(3)(A)(i)(I). Within 60 days of the notice's publication, members of the purported class seeking appointment as lead plaintiff must file the appropriate motion with the court. *See id.* § 78u-4(a)(3)(A)(i)(II). The motion must be accompanied by a sworn certification that includes certain information, including "all of the transactions of the [movant] in the security that is the subject of the complaint during the class period specified in the complaint[.]" *Id.* § 78u-4(a)(2)(A).

If more than one action on behalf of a class asserting substantially the same claim(s) is filed and consolidation is sought, the PSLRA instructs the court to refrain from appointing a lead plaintiff until it decides whether consolidation is appropriate and then to render a lead plaintiff decision "[a]s soon as practicable[.]" *Id.* § 78u-4(a)(3)(B)(ii).

The PSLRA requires a court to consider any motion timely filed by a putative class member seeking to be appointed as lead plaintiff and to "appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of the class members." 15 U.S.C. § 78u-4(a)(3)(B)(i). The PSLRA creates a rebuttable presumption that the most adequate plaintiff is the person who:

> (aa) has either filed the complaint or made a motion in
> response to a notice under subparagraph (A)(i);

6

> (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and

> (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

*Id.* § 78u-4(a)(3)(B)(iii)(I).  Once the court identifies a presumptive lead plaintiff, the presumption "may be rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff . . . will not fairly and adequately protect the interests of the class; or . . . is subject to unique defenses that render such plaintiff incapable of adequately representing the class."  15 U.S.C § 78u-4(a)(3)(B)(iii)(II).

With respect to the third requirement to trigger the lead plaintiff presumption (i.e., otherwise satisfying the requirements of Rule 23), the rule provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

> (1) the class is so numerous that joinder of all members is impracticable;

> (2) there are questions of law or fact common to the class;

> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  Courts deciding which investor to appoint as lead plaintiff focus on the third and fourth factors, delaying a more rigorous analysis of the first two factors for its decision on whether to certify the matter as a class action.  *See, e.g., In re The Goodyear Tire & Rubber Co. Sec. Litig.*, No. 5:03 cv 2166, 2004 WL 3314943, at *6 (N.D. Ohio May 12, 2004) (collecting cases); *Lax v. First Merchants Acceptance Corp.*, No. 97 C 2715, 1997 WL 461036, at *6 (N.D. Ill. Aug. 11, 1997) (citation omitted).

The typicality requirement of Rule 23 is met if the prospective lead plaintiff's claims "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory."  *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1082 (6th Cir. 1996).  Rule 23's adequacy requirement is satisfied where the representative "ha[s] common interests with those of unnamed class representatives" and is "capable of vigorously prosecuting the action with the assistance of qualified counsel."  *Id*.

"The initial inquiry (i.e., the determination of whether the movant with the largest interest in the case 'otherwise satisfies' Rule 23) should be confined to determining whether the movant has made a *prima facie* showing of typicality and adequacy."  *In re Cendant Corp. Litig.*, 264 F.3d 210, 263-64 (3d Cir. 2001) (collecting cases); *see also Shupe v. Rocket Cos.*, 601 F. Supp. 3d 214, 220 (E.D. Mich. 2022) (providing that, "all that is required is a preliminary showing that the

8

lead plaintiff's claims are typical and adequate of the class") (cleaned up).  This is a determination to be "made by 'the court,'" *In re Cendant Corp. Litig.*, 264 F.3d at 263 (quoting 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)), and the inquiry "need not be extensive[,]" *id.* at 264.  "[T]he court may and should consider the pleadings that have been filed, the movant's application, and any other information that the court requires to be submitted."  *Id.*  "In keeping with the statutory text, however, the court generally will not consider at this stage any arguments by other members of the putative class; rather such allegations should be dealt with in terms of assessing whether the lead plaintiff presumption has been rebutted rather than in terms of deciding whether it has been triggered."  *Id.*; *see also In re Cavanaugh*, 306 F.3d 726, 730-31 (9th Cir. 2002) (indicating that, once the court identifies the movant with the greatest financial stake, the court should focus its attention on that movant and determine, based on the information the movant provides in its filings, whether it satisfies the adequacy and typicality requirements of Rule 23; "there is no adversary process to test the substance of those claims").

## III.   Lead Plaintiff Analysis

### A.   Timeliness and the Impact of Ferrante's Delayed Complete Transaction Disclosures

The 60-day window for putative class members to seek the appointment of lead plaintiff in these consolidated actions closed on October 7, 2024.  As indicated, all movants filed their lead plaintiff motions by that deadline.  Teamsters

710 nevertheless contends the Ferrante's motion should be deemed untimely because he used "the wrong Class Period"—that is, the shorter period proposed by Guzman—and did not disclose all of his relevant Ford securities transactions until after the October 7 deadline.  As previously set forth, Ferrante's initial certification covered his securities transactions only between April 27, 2022 to July 24, 2024.  He did not disclose his transactions going back to the start of the *Sklodowski* proposed class period (i.e., October 28, 2021) until October 24, 2024.

However, in the cases Teamsters 710 cites in support of its argument, the courts did not deem the movants' motions to be untimely due to errors in their certifications.  Instead, the courts found those errors relevant in assessing the movants' adequacy to serve as lead plaintiff.  *See, e.g., Plaut v. Goldman Sachs Grp., Inc.* No. 18-CV-12084, 2019 WL 4512774, at *5 (S.D.N.Y. Sept. 19, 2019) (citations omitted) (finding that the movant's certification, which "inadvertently omitted certain Class Period transactions . . . due to a clerical error" "speaks to a level of carelessness," causing the court "to doubt whether [the movant] possesses the necessary adequacy and sophistication to be lead plaintiff"); *Rodriguez v. DraftKings Inc.*, Nos. 21 Civ 5739, 21 Civ. 6497, 2021 WL 5282006, at *5-6 (S.D.N.Y. Nov. 12, 2021) (acknowledging that "[t]he slovenliness of [a movant's] submissions is undoubtedly relevant and concerning, and plays an important role in the Court's assessment of his adequacy as a putative class representative[,]" but

10

finding no reason to conclude that the movant's claimed losses were inaccurate); *see also Tomaszewski v. Trevena, Inc.*, 383 F. Supp. 3d 409, 414-15 (E.D. Penn. 2019) (finding doubt as to whether a movant "possesse[d] the necessary adequacy and sophistication to be lead plaintiff" where his sworn statements contained repeated errors, even though they were "minor or inadvertent mistakes in absolute terms"). Some courts respond to late disclosures by only considering timely-disclosed transactions and losses when assessing which movant has the largest financial interest. *See, e.g., In re Able Labs. Sec. Litig.*, 425 F. Supp. 2d 562 (D.N.J. 2006); *In re Telxon Corp. Litig.*, 67 F. Supp. 2d 803, 818 (N.D. Ohio 1999).

"[T]he plain language of [the PSLRA] precludes consideration of a financial loss asserted for the first time . . . *after* the sixty (60) day window has closed." *In re Able Labs. Sec. Litig.*, 425 F. Supp. 2d at 565-66 (quoting *In re Telxon Corp. Sec. Litig.*, 67 F. Supp. 2d at 818) (declining to consider late amended certification asserting a $2.1 million loss and finding instead that the plaintiffs with a combined $1.7 million loss had the greatest financial interest); *In re Regions Morgan Keegan Open-End Mut. Fund Litig.*, Nos. 07-2784, 07-2830, 08-2017, 2009 WL 10665043, at *3-4 (W.D. Tenn. 2009) (citing *In re Telxon Corp. Sec. Litig.*, 67 F. Supp. 2d at 819; *In re Eaton Vance Corp. Sec. Litig.*, 219 F.R.D. 38, 42 (D. Mass. 2003)); *see also Salem v. Methode Elec., Inc.*, No. 24 C 7696, 2025 WL 368955, at *3 (N.D. Ill. Feb. 3, 2025) (collecting cases) (acknowledging that "the majority of courts

11

refuse to consider modifications to certifications or claimed losses made after the PSLRA lead plaintiff motion deadline"); *but see Lim v. Hightower*, No. 23 C 1454, 2023 WL 7979869, at *2 n.4 (N.D. Ohio Nov. 16, 2023) (considering a revised loss chart, after the original loss chart contained inadvertent errors, as the revised chart contained the same transactions initially reported). Courts limit their review to transactions reported and losses claimed within the 60-day window "even when a later-asserted loss would permit a different party to assert that it had the greatest financial interest in the litigation." *In re Regions Morgan Keegan Open-End Mut. Litig.*, 2009 WL 10665043, at *4 (citing *In re Telxon Corp. Sec. Litig.*, 67 F. Supp. 2d at 818-19; *In re Able Labs.*, 425 F. Supp. 2d at 565-66, 571). Courts reason that "compliance with the procedural requirements of the PSLRA is mandatory and should be strictly enforced." *Okla. Law Enf't Ret. Sys. v. Adeptus Health Inc.*, No. 17-cv-00449, 2017 WL 3780164, at *3 (E.D. Tex. Aug. 31, 2017) (citations omitted); *see also In re Able Labs. Sec. Litig.*, 425 F. Supp. 2d at 565; *In re Regions Morgan Keegan Open-End Mut. Litig.*, 2009 WL 10665043, at *4 (citations omitted). Thus, in evaluating which movant has the largest financial interest, the Court considers only the transactions and losses claimed by Ferrante with his initial timely certification.

But even if Ferrante still comes out as the movant with the largest financial interest, the Court has reservations concerning his adequacy to serve as lead

12

plaintiff due to his failure to disclose all relevant transactions within the 60-day window. Ferrante has not offered a persuasive explanation for his late disclosure. He asserts that all the PSLRA required was the disclosure of his securities transactions that are the subject of the *Guzman* Complaint, but his cited caselaw is not directly on point and is distinguishable. *See Plumbers & Pipefitters Nat'l Pension Fund v. Alta Mesa Res., Inc.*, No. 10 Civ. 920, 2019 U.S. Dist. LEXIS 234325, at *5-6 (S.D.N.Y. Apr. 29, 2019) (concluding that movant in Southern District of New York litigation asserting §§ 14(a) and 20(a) claims was not required to provide transactions within class period asserted in two actions filed in the Southern District of Texas asserting a § 10(b) claim); *Ark. Teacher Ret. Sys. v. Insulet Corp.*, 177 F. Supp. 3d 618, 624 (D. Mass. 2016) (finding a justification for movant's use of a class period shorter than what was proposed in two other putative class actions previously pending in the district where there was no support offered for the extension of the class period in those cases).[1]

The fact that Ferrante did not acknowledge the potential longer class period until filing his response brief suggests he and his counsel were not even aware of the *Sklodowski* action. Ferrante's counsel seemed to concede as much at the motion hearing when he suggested that notice of the *Sklodowski* action was not

---

[1] As will be discussed *infra*, this Court finds support for the expanded class period proposed by Sklodowski.

13

widely distributed, although it was published in the same widely-circulated wire service as the *Guzman* Action.  (*See* ECF Nos. 17-2, 17-3.)  As Teamsters 710 argues, this unawareness is suggestive of negligence and inadequacy to serve as lead plaintiff and lead counsel.[2]

The Court is further troubled by Ferrante's steadfast advocacy of the shortened class period, particularly at this early stage of the proceedings and when, as discussed later, there are non-frivolous allegations supporting the expanded period.  Such advocacy benefits Ferrante's position as lead plaintiff while potentially jeopardizing at the starting gate the interests of many putative class members.

## B.    "Largest Financial Interest"

Most courts, when deciding which movant has the "largest financial interest," simply consider which potential lead plaintiff has suffered the greatest total losses.  *See, e.g., Patel v. Reata Pharms., Inc.*, 549 F. Supp. 3d 559, 565 & n.2 (E.D. Tex. 2021) (citing *Giovagnoli v. GlobalSCAPE, Inc.*, No. SA-17-753, 2017 WL 11220692, at *3 (W.D. Tex. Nov. 6, 2017) (collecting cases)); *Knox v. Yingli*

---

[2] The Court acknowledges that Ferrante signed his certification on September 9, 2024, before the *Sklodowski* action was filed.  (*See* ECF No. 14-2 at PageID.199.) Nevertheless, it is incumbent on counsel to take note of changes requiring an amendment before a document—especially a sworn certification—is filed.  Further carelessness is reflected in Ferrante's certification that he authorized only the filing of a complaint, not his motion.  (*See id.*)

*Green Energy Holding Co.*, 136 F. Supp. 3d 1159, 1163 (C.D. Cal. Oct. 6, 2015) (citations omitted); *In re Gentiva Sec. Litig.*, 281 F.R.D. 108, 117 (E.D.N.Y. 2012) (collecting cases); *Takara Tr. v. Molex, Inc.*, 229 F.R.D. 577, 579 (N.D. Ill. 2005). Consistent with that approach, the movants here all focused on their losses in their initial motions to argue that they should be appointed lead plaintiff.  (*See* ECF No. 17 at PageID.352 [Press]; ECF No. 33 at PageID.657 [Crippen]; ECF No. 35 at PageID.692 [Teamsters 710]; ECF No. 36 at PageID.776 [Ferrante].)

Courts also apply the four factors outlined by the District Court for the Northern District of Illinois in *Lax.  See, e.g., In re the Goodyear Tire & Rubber Co. Se. Litig.*, 2004 WL 3314943 at *3 (citing cases recognizing the four-factor inquiry outlined in *Lax*); *In re Olsten Corp. Sec. Litig.*, 3 F. Supp. 2d 286, 295 (E.D.N.Y. 1998).  Those factors are: (1) the number of shares purchased during the class period; (2) the number of net shares purchased during the class period (i.e., shares purchased during and retained at the end of the class period); (3) the total net funds expended during the class period; and (4) the approximate losses suffered during the class period.  *Lax*, 1997 WL 461036, at *5.  Ferrante, in his response and reply briefs, advocates for the application of the *Lax* factors when determining the movant with the largest financial interest.  (ECF Nos. 39, 42.)  In its response

and reply briefs, Teamsters 710 urges the Court to consider only the first two *Lax*

factors.[3]  (ECF Nos. 38, 41.)

In support of this modified application of the *Lax* factors, Teamsters 710

cites two cases: *Westchester Putnam Counties Heavy & Highway Laborers Local

60 Benefits Funds v. Brixmor Prop. Grp., Inc.*, No. 16-cv-02400, 2016 WL

11648466 (S.D.N.Y. Nov. 29, 2016); and *Pio v. General Motors Co.*, No. 14-cv-

11191, 2014 WL 5421230 (E.D. Mich. Oct. 24, 2014).[4]  However, the district

---

[3] While the first two *Lax* factors actually favor Ferrante, Teamsters 710 maintains that he is not adequate to serve as lead plaintiff.

[4] In its response and reply briefs, Teamsters 710 also advocates for the Court's consideration of only the second *Lax factor* (net shares).  Its counsel focused on net shares at the motion hearing, too.  Teamsters 710 claims that courts have recognized the propriety of determining largest financial interest based primarily on this factor because the candidate with the most shares purchased will normally have the largest potential damage recovery.  Teamsters 710 again cites *Pio* in support of this argument, as well as *Shupe*, 601 F. Supp. 3d at 219; *Jastram v. Nextera Energy*, No. 23-80833, 2023 WL 11885983, at *4 (S.D. Fla. Oct. 26, 2023); *In re Network Assocs., Inc. Sec. Litig.*, 76 F. Supp. 2d 1017, 1027 (N.D. Cal. 1999); and *Perlmutter v. Intuitive Surgical Inc.*, No. 10-cv-03451, 2011 WL 566814, at *6 (N.D. Cal. Feb. 15, 20111).  Teamsters 710 asserts that this factor is the most accurate measure of a movant's financial interest where, as here, there is a constant fraud premium through the class period.  As discussed, the undersigned considered all four *Lax* factors in *Pio*.  The *Jastram* court noted that some courts have found net shares to most accurately reflect the largest financial interest, 2023 WL 11885983, at *2 (citing cases), but the district court in that case still considered all four *Lax* factors, *id.* at *3.  The district courts in *Shupe* and *Perlmutter* made the same observation yet also considered all four *Lax* factors.  *Shupe*, 601 F. Supp. 3d at 219-20; *Perlmutter*, 2011 WL 566814, at *7-11.  In *Network Associates*, the district judge seemed to focus on net shares "[a]t least as a first approximation" because "the candidate with the most net shares purchased will normally have the

judges in those cases—one being the undersigned—did not consider only the first and second *Lax* factors.

The *Brixmor* court not only considered all four factors, but noted that "[t]he trend among New York courts is to view the factors in ascending order of importance, such that the number of shares purchased is the least important and the losses incurred are the most important."  2016 WL 11648466, at *1 (citing *Richman v. Goldman Sachs Grp., Inc.*, 274 F.R.D. 473, 475-76 (S.D.N.Y. 2011)). In *Brixmor*, the court ultimately did not treat the movants' losses as the most important factor, but that was because the difference between the movants' approximate losses was 16%, and it found courts split on whether such a difference should be construed as "roughly equal" or "not negligible."  *Id.*  As the remaining *three* factors "overwhelmingly favor[ed]" one movant, the court relied on those factors instead.  *Id.* at *2.  The difference between Crippen's and Teamsters 710's approximate losses ($904,340 and $350,182, respectively) is far greater than the 16% difference in *Brixmor*.  The difference could not be construed to be "roughly equal."

---

largest potential damage recovery." 76 F. Supp. 2d at 1027.  However, the limited reasoning the *Network Associates* court provided for not relying upon the remaining three *Lax* factors does not persuade this Court that it should follow its lead.

In *Pio*, the undersigned considered all four *Lax* factors, rejecting one movant's urging to consider only the last factor. *See* 2014 WL 5421230, at \*4-8. The Court had no trouble concluding that the first three factors favored one movant. *See id.* at \*4. The Court had some difficulty assessing the fourth factor because the movants employed different methodologies to calculate their losses—not only from each other but also from brief to brief, offering varying estimations of their own losses. *Id.* at \*5. Nevertheless, this Court eventually concluded that this factor favored the same movant, too. *Id.* at \*8.

In this case, however, for the following reasons, the Court elects to focus on approximate losses suffered to identify the movant with the largest financial interest. First, most courts agree that it is the most salient factor in assessing the lead plaintiff. Second, as indicated, it was the approach all of the movants used in their opening briefs when arguing for their appointment to the position. Teamsters 710 and Ferrante only advocated for an alternative approach when it became apparent that they did not have the greatest approximate losses. *See La. Sheriffs' Penson & Relief Fund v. Cardinal Health, Inc.*, No. 2:19-cv-3347, 2020 WL 3396660, at \*6 (S.D. Ohio June 19, 2020) (citing *Garden City Emps. Ret. Sys. v. Psychiatric Sols., Inc.*, Nos. 3:09-cv-00882, 3:09-01211, 2010 WL 1790763, at \*4 (M.D. Tenn. Apr. 30, 2010)) (declining to follow method for calculating loss not advocated by one movant until its response brief, noting that courts have

18

"expressed disproval for vacillating advocacy such as this"); *St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co.*, No. 3:18-cv-00988, 2019 WL 494129 at *3 n.9 (M.D. Tenn. Jan. 9, 2019) (citing *Nicolow v. Hewlett Packard Co.*, No. 12-05980, 2013 WL 792642, at *4 (N.D. Cal. 2013)) (finding that the movant's failure to argue for focusing on the first three *Lax* factors in their original motion "undermines [their] later argument" that those factors must control the analysis).

The court has the discretion to choose the method for calculating the losses suffered by a class member during the class period, provided the chosen method is "rational and consistently applied[.]" *Shupe*, 601 F. Supp. 3d at 218 (citing *In re Regions Morgan Keegan Closed-End Fund Litig.*, 2010 WL 5173851, at *4); *see also Plumbers & Pipefitters Local 562 v. MGIC Inv. Corp.*, 256 F.R.D. 620, 623-24 (E.D. Wis. 2009); *In re Cavanaugh*, 306 F. 3d 726, 730 n.4 (9th Cir. 2002). Courts employ a variety of methods to make this determination and "there does not appear to be any consensus . . . as to which method is best." *Id.* (citing *MGIC Inv. Corp.*, 256 F.R.D. at 623 & n.4). Here, the movants uniformly use the last in first out ("LIFO") method. (*See* ECF No. 17-5 [Press]; ECF No. 21 at PageID.572 [Crippen]; ECF No. 35-3 [Teamsters 710]; ECF No. 36-3 [Ferrante].) As this method is regularly used by district courts, *see, e.g., Porter v. Graftech Int'l Ltd.*, No. 1:24 CV 00154, 2024 WL 2189642, at *7 n.6 (N.D. Ohio May 15, 2024)

(citing *Plagens v. Deckard*, No. 20-cv-2744, 2021 WL 3284265, at *7 (N.D. Ohio

Aug. 2, 2021)), this Court relies on those calculations.

Which movant suffered the greatest approximate losses varies, depending on

whether the Court focuses on the *Guzman* proposed class period (April 27, 2022

through July 24, 2024, inclusive) or the *Sklodowski* proposed class period (October

28, 2021 through July 24, 2024, inclusive).  This is because Crippen purchased all

of his Ford securities before April 27, 2022.  As the charts below reflect, Ferrante

incurred the greatest approximate losses, followed by Teamsters 710, under the

shorter proposed class period.  Crippen has the largest losses under the expanded

proposed class period.

### *Guzman* Proposed Class Period

| Movant | Shares Purchased | Net Shares Purchased | Net Funds Expended | Approx. Losses |
|---|---|---|---|---|
| Ronald A. Ferrante | 342,210 | 302,242 | $3,841,470 | $621,230 |
| Teamsters Local 710 Pension Fund | 88,000 | 88,000 | $1,197,519 | $259,905 |
| Michael M. Press | 103,600 | 81,800 | $978,729 | $107,174 |
| Clark D. Crippen | 0 | 0 | $0 | $0 |

### *Sklodowski* **Proposed Class Period**

| Movant | Shares Purchased | Net Shares Purchased | Net Funds Expended | Approx. Losses |
|---|---|---|---|---|
| Ronald A. Ferrante[5] | 342,210 | 302,242 | $3,841,470 | $621,230 |
| Teamsters Local 710 Pension Fund | 109,100 | 109,100 | $1,512,610 | $350,182 |
| Michael M. Press | 103,600 | 81,800 | $978,729 | $107,174 |
| Clark D. Crippen | 67,546 | 67,546 | $1,624,024 | $904,340 |

Ferrante advocates for the *Guzman* proposed class period. Crippen and Teamsters 710 advocate for the *Sklodowski* proposed class period.

Ferrante asserts that the *Sklodowski* action, with its longer proposed class period, was filed for a tactical purpose—that is, to make way for Crippen to serve as the largest financial stakeholder. Ferrante points out that Sklodowski filed his Complaint on the eve of the 60-day lead plaintiff deadline. But as Ferrante's counsel acknowledged at the motion hearing, Sklodowski and Crippen are not represented by the same attorneys, and there is no evidence of Sklodowski, Crippen, and/or their counsel colluding. Ferrante offers no basis from which to conclude that Sklodowski or his counsel filed the second lawsuit to benefit Crippen or for some other tactical or nefarious purpose.

---

[5] For the reasons discussed in the preceding section, the Court uses only the transactions and losses Ferrante disclosed within the 60-day window.

Ferrante nevertheless maintains that there was no justification for filing the later action, with its extended proposed class period.  The complaints in both actions, he contends, focus on Ford's "Ford Blue" segment, which did not exist before March 2022.  Therefore, Ferrante maintains, any statements made prior to that date are disconnected from the theory of liability in both complaints.

Teamsters 710 points out, however, that October 28, 2021—the beginning date for the Sklodowski proposed class period—coincides with misleading financial metrics issued by Ford.  Teamsters 710 further points out that courts "use the longest noticed class period unless the factual allegations supporting the period are 'obviously frivolous.'"  *In re BP, PLC Sec. Litig.*, 758 F. Supp. 2d 428, 434 (S.D. Tex. 2010) (quoting *MGIC Inv. Corp.*, 256 F.R.D. at 625); *see also Munch v. Sprout Soc., Inc.*, Nos. 24-cv-3867, 24-cv-5582, 2024 WL 4753734, at *4 (N.D. Ill. Nov. 12, 224) (citing cases supporting the application of the longer proposed class period provided the allegations supporting it are not "obviously frivolous").  The Court does not find the allegations in Sklodowski's Complaint, which support the longer class period, to be "obviously frivolous."

Contrary to Ferrante's assertion, the allegations are not focused on Ford's statements concerning warranty costs for only its "Ford Blue" segment.  The allegations include alleged material misrepresentations concerning warranty costs beginning in late October 2021.  In fact, it appears that Ford's higher warranty

22

costs were associated with older vehicles from the 2016 and 2021 model years. (*See* ECF Nos. 40-2, 40-3.)  Thus, the Court applies the *Sklodowski* proposed class period for purposes of determining the movant with the largest financial interest. As indicated, that movant is Crippen.

## C.  Whether Crippen Makes a Prima Facie Showing as to Rule 23's Requirements

Crippen makes a prima facie showing that he satisfies the typicality and adequacy requirements of Rule 23.  Like the investors he seeks to represent, Crippen purchased Ford securities and suffered losses as a result of Defendants' alleged misconduct.  His claims are based on the same legal theory as other putative class members.  Crippen's interests are not antagonistic to those of the class he seeks to represent, and his chosen counsel appears qualified to conduct the litigation.

Having found that Crippen has timely moved to be appointed lead plaintiff, has the largest financial interest in the relief sought by the class, and otherwise satisfies the typicality and adequacy requirements of Rule 23, the Court concludes that he is the presumptive lead plaintiff.

## D.  Whether the Presumption is Overcome

Teamsters 710 challenges Crippen's adequacy to serve as lead plaintiff, asserting that he is an "unknown individual[] who lack[s] the sophistication to serve the Class as Lead Plaintiff."  (ECF No. 38 at PageID.914.)  Teamsters 710

maintains that Crippen's status as a Vietnam War veteran and career experience do not show that he is capable of managing this securities litigation or supervising and controlling counsel in sophisticated litigation.  Yet, Teamster 710's arguments are not proof that Crippen lacks the intelligence, resources, or skills to serve as lead plaintiff.

Moreover, a movant's adequacy is judged in part by whether the movant has chosen qualified counsel, presumably with the assumption that such counsel is capable of managing complex and sophisticated litigation.  Further, in its expression of the requirements to serve as lead plaintiff in the PSLRA, Congress did not choose to include experience managing securities or other complex litigation.  Nor is such experience expressly encapsulated in Rule 23.

In its briefs, Teamsters 710 continuously challenges the adequacy of the other movants based on Teamsters 710's status as an institutional investor. Teamsters 710 maintains that the PSLRA's legislative history reflects Congress's preference for institutional plaintiffs over individual plaintiffs as lead plaintiffs, and that many courts recognize this preference when appointing institutional investors to this role.  *See, e.g., In re Pfizer Inc. Sec. Litig.*, 233 F.R.D. 334, 337 (S.D.N.Y. 2005); *City of Pontiac Gen. Emps.' Ret. Sys. v. Stryker*, No. 1:10-cv-520, 2011 WL 13228127, at *1 (W.D. Mich. Jan. 3, 2011) (quoting *City of Marysville Gen. Emps. Ret. Sys. v. Nighthawk Radiology Holdings, Inc.*, No. CV 09-659, 2010

WL 2000040, at *6 (D. Idaho May 19, 2010)) (observing that "[t]he focus on the plaintiff with the largest financial interests reflects 'a clear congressional preference for institutional investors to serve as lead plaintiffs'").  In fact, Teamsters 710 offers a list of cases where Crippen's chosen attorneys made this exact argument in support of their institutional investor clients, who were seeking the lead plaintiff position.  (*See* ECF No. 20 at PageID.561 n.3.)

However, in this Court's view, the arguments by Crippen's attorneys in other lawsuits on behalf of their clients is not a concession that institutional investors should always be selected over individual investors.  Instead, it merely reflects counsel's advocacy for their client at the time—which counsel was under a fiduciary obligation to zealously represent.  Further, it shows counsel's skill and experience handling PSLRA litigation.

In any event, the preference for institutional investors is primarily based on the presumption that they will have the largest financial interest rather than an assumption that they are the most adequate putative class member for the role.  *See In re Telxon Corp. Sec. Litig.*, 67 F. Supp. 2d at 821 ("It is worth noting . . . that the legislative history and academic material cited in that legislative history . . . are based on the theoretical assumption (and empirical reality) that, generally speaking, the institutional investor will have suffered the greatest financial loss; and, because it suffered the greatest financial loss, the institutional investor will be

the presumptively most adequate plaintiff."); *City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*, No. 1:19-cv-24, 2019 WL 2611013, at *4 (E.D. Tenn. June 26, 2019) (citing *MGIC Inv. Corp.*, 256 F.R.D. at 622-23) ("[T]he preference for institutional investors is built into the PSLRA itself by means of the second requirement—*to wit*, the most adequate plaintiff shall have the largest financial interest in the action.").  As determined earlier, however, Crippen suffered the largest financial loss.

Further, if Congress preferred institutional investors for the lead plaintiff role, regardless of whether those investors had the largest financial loss, it could have expressly included such a preference in the PSLRA.  As the district court reasoned in *Telxon*:

> The institutional investor is not presumptively the most adequate plaintiff solely by virtue of its status as an institutional investor . . ..  If that were the case, Congress would have simply provided that *institutional investors* are presumptively the most adequate plaintiffs, regardless of the size of financial loss, and saved the Court from the need to engage in the [financial loss analysis].  Instead, Congress chose to use the size of financial loss as the initial proxy for determining whether a particular plaintiff would be the "most adequate plaintiff."

*Id.* at 821-22.  Finally, a preference for institutional investors is not proof of Crippen's inadequacy, which is what Teamsters 710 must demonstrate to rebut the lead-plaintiff presumption.

A more substantive challenge to Crippen's adequacy arises from the fact that he purchased all of his Ford securities between January 13 and April 26, 2022. (*See* ECF No. 33-3.)  He did not purchase or acquire any shares during the *Guzman* proposed class period (i.e., April 27, 2022 through July 24, 2024).  Further, of the 67,546 shares Crippen purchased, all but 2,502—that is, 96% of his shares—were purchased on a single date, January 13, 2022.  Ferrante argues that, as a result, Crippen, "instead of focusing on meritorious claims asserted under the *Guzman* class period, . . . will prioritize his self-interest in defending the *Sklodowski* class period (even if it proves detrimental to the class at large)."  (ECF No. 39 at PageID.948.)  Ferrante further argues that this will make Crippen "vulnerable to 'unique defenses' and otherwise render[] him 'incapable of adequately representing the class.'"  (*Id*.)

Uncertain what "unique defenses" Ferrante was alluding to, the Court inquired of his counsel at the motion hearing.  Counsel responded that it was only the legitimacy of the *Sklodowski* class period.  Yet, for the reasons discussed earlier, nonfrivolous allegations support the extended period, including material misstatements or omissions made as early as October 28, 2021, and Ford's alleged concealment of overall higher warranty costs—not just the Ford Blue division.  Notably, Teamsters 710 does not challenge Crippen's adequacy based on the timing of his transactions.  If it becomes clear later in the litigation that the timing of

27

Crippen's transactions render him an inadequate lead plaintiff, a substitution can be made.  At this juncture, however, Ferrante's assertions to challenge Crippen's adequacy are speculative.

For these reasons, Teamsters 710 and Ferrante fail to rebut the presumption that Crippen should be appointed lead plaintiff.

## IV.    Lead Counsel Analysis

The PSLRA provides that the "most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class."  15 U.S.C. § 78u-4(a)(3)(B)(iv).  Crippen has selected Robbins Geller Rudman & Dowd LLP. Crippen's submissions demonstrate that his chosen counsel is competent, experienced, and qualified to represent the interests of the plaintiff class.  No competing movant has challenged their qualifications.

Thus, the Court will not disturb Crippen's selection.

## V.    Conclusion

For the reasons stated, the Court **DENIES** the motions for appointment as lead plaintiff and lead counsel filed by Press (ECF No. 17), Teamsters 710 (ECF No. 35), and Ferrante (ECF No. 36) and **GRANTS** the motion filed by Crippen

(ECF No. 33).

      **SO ORDERED**.

s/ Linda V. Parker
LINDA  V. PARKER
U.S. DISTRICT JUDGE

Dated: September 22, 2025