VANOVERBEKE, MICHAUD & TIMMONY, P.C.
THOMAS C. MICHAUD (P46787)
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
tmichaud@vmtlaw.com

Local Counsel

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| ALBERT GUZMAN, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> FORD MOTOR COMPANY, et al., <br><br> Defendants. | Civ. No. 2:24-cv-12080-LVP-KGA (Consolidated with Civ. No. 2:24-cv-12492) <br><br> Honorable Linda V. Parker <br><br> <u>CLASS ACTION</u> <br><br><br><br> <u>DEMAND FOR JURY TRIAL</u> |

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

4933-9010-5723.v1

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

JURISDICTION AND VENUE .............................................................................11

PARTIES...............................................................................................................12

    Plaintiffs.......................................................................................................12

    Defendants ...................................................................................................12

FACTUAL BACKGROUND.................................................................................13

    Ford's Business and Financial Reporting.....................................................13

    Ford's Warranty Costs .................................................................................15

    The Individual Defendants Placed Warranty Costs at the Center of
        Their Executive Goals and Focus.........................................................17

    Defendants Closely Monitored Warranty Costs and Inputs .........................21

    Warranty Costs Continued to Drastically Increase During the Class
        Period...................................................................................................25

    Expert Insight Corroborates the Allegations ...............................................35

DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD
    STATEMENTS ............................................................................................41

    Defendants' False and Misleading Statements Claiming Positive
        Trends in Ford's Warranty Costs and Quality Improvements ............42

    Defendants' False and Misleading Risk Warnings and Reserves
        Disclosures ..........................................................................................55

FORD'S CLASS PERIOD FINANCIAL STATEMENTS WERE
    MATERIALLY FALSE AND MISLEADING ...........................................60

THE TRUTH EMERGES .....................................................................................65

    October 2023 Disclosures............................................................................65

July 2024 Disclosures ...................................................................67

ADDITIONAL SCIENTER ALLEGATIONS.......................................................71

The Individual Defendants' Public Statements Support a Strong
Inference of Scienter ................................................................71

Defendants Closely Monitored Ford Warranty Costs and Financial
Performance, Which Were Critical to Ford .......................................74

The Scope and Severity of the Massive Spike in Ford's Warranty
Costs Support a Strong Inference of Scienter ....................................78

Ford's Consent Order with the NHTSA Supports a Strong Inference
of Scienter....................................................................................83

Insider Stock Sales Support a Strong Inference of Scienter.........................85

LOSS CAUSATION AND ECONOMIC LOSS.....................................................87

PRESUMPTION OF RELIANCE.............................................................91

NO SAFE HARBOR ..........................................................................92

CLASS ACTION ALLEGATIONS .........................................................93

PRAYER FOR RELIEF ......................................................................98

JURY DEMAND ...............................................................................99

Lead Plaintiff Clark D. Crippen and additional named plaintiff Ronald A. Ferrante (together, "Plaintiffs"), individually and on behalf of all others similarly situated, allege the following based upon personal knowledge as to Plaintiffs' own acts and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys. This investigation included, among other things, review and analysis of: (i) U.S. Securities and Exchange Commission ("SEC") filings by Ford Motor Company ("Ford" or the "Company"); (ii) Ford press releases, quarterly earnings call transcripts, and other analyst or investor conference call transcripts; (iii) statements made by Ford executives during speeches or in online videos; (iv) analyst reports and media reports about Ford; (v) information released by the National Highway Transportation Safety Administration ("NHTSA"), an operating administration of the United States Department of Transportation ("DOT"); and (vi) other public information regarding Ford, including information posted on the Ford website, as well as consultation with an automotive manufacturing and operations expert. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1. This securities fraud class action is brought on behalf of purchasers of Ford common stock from October 28, 2021 through July 24, 2024, inclusive (the

- 1 -

"Class Period"). The claims are alleged against: (i) Ford; (ii) Ford's Chief Executive Officer ("CEO") and President, James D. Farley, Jr. ("Farley"); and (iii) Ford's former Chief Financial Officer ("CFO") and current Vice Chair, John T. Lawler ("Lawler") (collectively, "Defendants"). The claims assert violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §78j(b) and §78(t)(a)), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

2.     This case arises because during the Class Period, Defendants made false and misleading statements that claimed the Company was reducing warranty costs through improved quality and understated Ford's warranty reserves, which inflated its reported operating income, and also its stock price. At the end of the Class Period, investors were shocked when Ford reported massively increased warranty costs and reserves for automobile defects that had existed for years, causing the stock price to decline and investors to suffer massive losses. Rather than having experienced a positive trend of lowering warranty costs, the massive reserve increase signaled that Ford's long struggle with quality problems and warranty costs had continued throughout the Class Period.

3.     By way of background, leading into the Class Period, Ford's stock price languished amid high warranty costs that stifled profits, with analysts reporting in 2020 that "[w]arranty has been a ~$2bn headwind [for Ford] since 2017." Such

- 2 -

"warranty" costs reported by Ford typically included not only costs from repairing issues under warranty, but additional costs for "field service actions" ("FSAs") that were required to address defects in Ford's automobiles.[1] In October 2020, defendants Farley and Lawler were appointed to lead Ford and they promised to reverse course by lowering warranty costs through improved quality.

4. It was critical to lower warranty costs to fund innovation. In May 2021, Ford launched an overhauled "Ford+" strategy that Defendants claimed was the "'biggest opportunity for growth and value creation since Henry Ford started to scale the Model T.'" The strategy included "transforming" Ford from a "build and sell" cars model "to a lifelong, always on customer relationship." This transformation was based on making significant investments in electric vehicles and software. For example, Ford announced that the Ford+ strategy would accelerate investments in electric vehicles and battery development technologies to $30 billion by 2025.

5. This strategy put defendants Farley and Lawler under pressure to improve profitability. Analysts noted that Ford had to secure "success on the 'near' (*i.e.*, today's revenue)" to "enable[] adequate resource allocation to the 'far' (*i.e.*, [electric vehicles])." Analysts reported it was "crucial" that Defendants improve Ford's performance to finance "its increased funding environments." In other

---

[1] Unless otherwise stated herein, references to Ford's warranty costs, issues, or reserves include those related to both warranty and FSAs.

words, analysts noted, Ford's "core business pillars" – including traditional gas-powered offerings – would have to "fund [Ford's] future business."  To that end, Ford emphasized target EBIT[2] margins of 8% (compared to less than 5% margins reported in 2020), which analysts wrote implied that the Company's core business would be "even stronger than initially anticipated."

6.      To improve profitability, the Company had to lower its very high warranty costs and improve quality.  Leading up to the Class Period, in May 2021, defendant Farley assured investors that he and defendant Lawler were "running a much tighter ship," "mak[ing] a lot of progress," and "[m]aking the tough choices and decisions to restructure and redesign our business."  Acknowledging that high warranty costs had burdened Ford in the past, defendant Lawler claimed Ford had "taken lasting actions to continuously improve quality and costs," including actions to "reduce warranty costs" such as "changes in design, vehicle inspection and supplier management."  Another Ford executive stated that Ford could "improve our future warranty expense by about 8%."  At around the same time, defendant Farley touted a "$400 million improvement in our warranty expense," and explained that he and defendant Lawler were "attacking warranty" costs by "work[ing] with

---

[2]   "EBIT" is a commonly-used profitability metric that represents Ford's earnings before interest and taxes, and excludes interest on debt (excluding Ford Credit debt (defined *infra* n.7)), taxes, and pre-tax special items.

- 4 -

suppliers on their quality," taking an "enhanced design approach" on vehicle development to "ensure the absolute highest quality," and "using connected data to identify issues early and drive quality to improvement."  Thus, investors were led to believe that positive trends were developing and Ford's leaders were finally targeting the massive "headwind" of poor quality and high warranty costs.

7.      To comply with Generally Accepted Accounting Principles ("GAAP") and Ford's accounting policy, Ford was required to both account for the current costs of repairs and also create (and report) a fair and accurate reserve for future costs of repairs.  This was required so that income and losses could be fairly measured in the current period, rather than, for example, when costly repairs were made in future years.  However, reserves are notoriously an area presenting increased risk of manipulation since management can be tempted to understate reserves, which would inflate short-term profitability, and allow them to "kick the can down the road" and book the increased costs in the future.[3]

---

[3]  *See* Daniel Cohen, *et al.*, *Warranty Reserve: Contingent Liability, Information Signal, or Earnings Management Tool?*, 82 No. 2 Accounting Review 569, 571 (2011) (noting that "opportunistic accounting decisions can be achieved through changes in the assumptions and estimates underlying warranty accruals" in order to "achieve specific financial reporting objectives"); *SEC v. Dell Inc.*, Litigation Release No. 21599, 98 SEC Docket 3375 (July 22, 2010) (SEC announcing consent order with company arising from, in part, company's manipulation of reserves to misstate financial metrics).

8.     Here, when defendants Farley and Lawler took over in 2020 amidst significant warranty headwinds, Ford's reported warranty payments were approximately 3.4% of auto sales.  In the years that followed, Defendants reported warranty reserves that reflected a positive trend, signaling to investors that their "transformative" Ford+ strategy, "tough decisions," and "attack[s]" on warranty costs were working.  During the Class Period, Defendants represented, both in their statements and by booking lower warranty reserves, that warranty costs and trends were improving.  For example, leading up to the Class Period in 2019 and 2020, Ford had been booking massive increases in warranty reserves related to pre-existing (older) cars.  Then, during the Class Period, Defendants reported a drastic reversal of that negative trend with much smaller increases in the reserves in 2021 and 2022:



9.     At the same time, Defendants reported warranty payments that dropped to 3.1% and 2.8% as a percentage of auto sales in 2021 and 2022, respectively.

- 6 -

4933-9010-5723.v1

Defendants reinforced the positive trend reflected in the reported numbers with their statements to investors and analysts.  For example, in early 2022, defendant Lawler falsely and misleadingly stated that "***lower warranty costs [helped] more than offset*** [certain] production losses and higher commodity costs" to positively contribute to Ford's higher reported EBIT, and claimed that "***[w]e're improving our quality . . . [and] [w]e saw that come through this year from a year-over-year warranty standpoint it was down roughly $1.4 billion***."[4]  Defendants claimed they were able to use technology to quickly and more cheaply address "recalls and customer satisfaction actions" by "***tak[ing] actions [to] quickly . . . resolve***" quality issues and "***making much more frequent use of over-the-air updates[,] [a]nd boy, has that worked for us***."[5]

10.    However, unbeknownst to the investing public, in truth there was no positive trend in quality or warranty costs, as Defendants concealed that Ford continued to be plagued with the same quality problems that existed leading up to

---

[4]    Bold and italics have been added to identify the specific statements being alleged as false and misleading statements.  *See also* ¶¶77-115.

[5]    With over-the-air updates or "OTAs," Ford remotely delivers software updates to vehicles that have cellular and/or Wi-Fi capabilities, which is cheaper than replacing hardware.  A Ford executive recently stated that, when available, "OTAs cost over 95% less than physical repairs."  Ford began equipping vehicles with advanced OTA functionality in 2020, and started issuing OTA updates late in the same year.

- 7 -

4933-9010-5723.v1

the Class Period.  The truth began to be partially revealed when the warranty costs skyrocketed in October 2023, partially indicating that reserves had been artificially suppressed.  On October 26, 2023, Ford reported warranty costs had increased $1.2 billion for 3Q 2023, more than double the first and second quarter of 2023 *combined*. These increased costs, inconsistent with the lower reserve increases Ford had been booking, began to partially reveal that Ford's warranty trends were not as Defendants portrayed, and Ford's stock price declined by 12%, wiping out more than $5 billion in market capitalization.  Analysts reported that Ford shares had declined "on [the] Q3 miss driven by more warranty issues."

11.    However, Defendants treated it as a blip rather than a trend, as they continued to conceal the true state of Ford's warranty problems by recording understated reserves and claiming to be adequately fixing the problems from 3Q 2023.  For example, in February 2024, defendant Lawler assured analysts that "*from a warranty standpoint, costs are probably going to be about flat this year*" because "*[w]e're starting to see green shoots [i.e., positive developments] in the quality improvements*."  In April, Ford again reported a small change in reserves for pre-existing warranties in 1Q 2024 of *$397 million*, and defendant Farley continued to tout that "*[o]ur quality is making real progress*."

12.    The full truth was finally revealed when the continually high warranty costs forced Defendants to massively increase the reserves.  More specifically, on

- 8 -

July 24, 2024, after market close, Defendants shocked investors, revealing that rather than quality improving, the Company's "[p]rofitability was affected by an increase in warranty reserves" so significant that they caused Ford's core gas-engine business to suffer a near 50% decline in year-over-year EBIT from $2.3 billion to $1.2 billion. Ford reported that the change in reserves related to pre-existing warranties had skyrocketed to $1.4 billion, a 60% increase from prior year, and that the Company paid $2.8 billion in warranty claims in the first half of 2024, a 40% increase from prior year. As a percentage of sales in the first half of 2024, Ford's warranty payments were 3.4%, exactly where they had been in 2020 when defendants Farley and Lawler took over, negating any notion of the purported positive trend.

13. Significantly, Defendants admitted the increased costs did not relate to new problems or new car sales that suddenly arose at the end of the Class Period, rather, they were driven largely by long-standing issues that had been impacting the Company's "older model[]" vehicles for years. For example, defendant Lawler admitted in July 2024 that the "largest" impact was from "a rear axle bolt for vehicles that were engineered for the 2021 model year." But, the 2021 models of its flagship Ford F-150 pickup truck were sold beginning in the fall of 2020, prior to the Class Period, and had defective rear axle bolts that would "shear off" even at low mileages. This defect could not be remedied by simply replacing the bolt, but instead required an entire redesign of the axle components. Defendant Farley admitted that warranty

4933-9010-5723.v1

repairs to the "rear axle" are "super expensive" and "complicated." Defendants also blamed costs from oil pump defects in "2016 launched vehicles," which had been prevalent for years but Ford failed to account for in reporting warranty costs. And, defendant Farley lamented increased costs from dealerships unnecessarily replacing computer modules in vehicles, rather than using OTA software fixes, contrary to Defendants' earlier claim that OTA updates were working well.[6]

14. In short, investors were shocked to learn that Ford stood exactly at the end of the Class Period where it stood before it, suffering from massive headwinds to profitability from quality issues that caused high warranty costs. Defendants' purported positive trend of lowering warranty costs during the Class Period was a façade: the Company continued to be plagued by significant and expensive vehicle defects that threatened Ford's ability to fund the Ford+ strategy. Defendants had simply underreported the warranty reserves, providing a short term and illusory boost to profitability during the Class Period to inflate their prospects and success in carrying out the Ford+ strategy.

15. After the truth was fully revealed by the negative July 24, 2024 disclosures, Ford's stock declined by another 18%, or $2.51 per share, reportedly

---

[6] Similarly, when Defendants announced the significantly increased warranty costs in October 2023, defendant Farley tied the warranty issues to "technology that we rolled out like cameras," and Ford had been suffering from costly defective rear-view-cameras for several years.

4933-9010-5723.v1

marking the stock's largest one-day percentage decline in over 15 years, *i.e.*, since the 2008 financial crisis.  Analysts and media attributed Ford's historic stock decline to the shocking "surge in warranty repair costs for older vehicles" and Ford's "number of field service actions (FSAs) on older product[s]."  In total, this single-day stock decline wiped out nearly $10 billion in market capitalization, adding to the more than $5 billion in market investor losses suffered in October 2023.

16. This lawsuit seeks to recover the significant losses suffered by investors as a result of Defendants' false and misleading statements that artificially inflated the stock price, as permitted under the securities laws.

## JURISDICTION AND VENUE

17. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

18. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act, 15 U.S.C. §78aa.

19. Venue is proper in this District pursuant to 28 U.S.C. §1391(b)-(c), and §27 of the Exchange Act, 15 U.S.C. §78aa.  Ford maintains its principal place of business in this District, and certain of the acts and conduct complained of herein, including the dissemination of materially false and misleading information to the investing public, occurred in this District.

4933-9010-5723.v1

20.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

**Plaintiffs**

21.    Lead Plaintiff Clark D. Crippen purchased shares of Ford common stock during the Class Period and was damaged thereby. *See* ECF 33-3.

22.    Named Plaintiff Ronald A. Ferrante purchased shares of Ford common stock during the Class Period and was damaged thereby. *See* ECF 36-2, ECF 39-4.

**Defendants**

23.    Defendant Ford is a multinational company headquartered in Dearborn, Michigan.   The Company's stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "F."

24.    Defendant Farley has served as Ford's President and CEO since October 2020.  Upon originally joining Ford in 2007, Farley has served in multiple senior leadership roles, including most recently as Ford's Chief Operating Officer ("COO") from March 2020 to September 2020.

25.    Defendant Lawler served as Ford's CFO from October 2020 to January 2025, and has served as Vice Chair since February 2025.  After originally joining Ford in 1990, Lawler has served in multiple senior leadership roles.

- 12 -

4933-9010-5723.v1

26.     Defendants Farley and Lawler are collectively referred to herein as the "Individual Defendants."

## FACTUAL BACKGROUND

**Ford's Business and Financial Reporting**

27.     Ford is primarily in the business of designing, manufacturing, and selling automobiles under its "Ford" and "Lincoln" brands.  Substantially all of Ford's vehicles, parts, and accessories are sold through dealerships, which are largely independently owned.

28.     After trading at prices that at times exceeded $35 per share in the late 1990s, Ford's stock price has suffered since the early 2000s.  From 2002 up until the start of the Class Period, Ford stock failed to reach $20 per share for nearly two decades, as it operated in a competitive market with rising costs and increased competition from both legacy automakers and new, electric-vehicle-focused automakers.  As reported by *The Detroit News*, defendant Farley's ascension to Ford CEO in October 2020 came "amid persistent dissatisfaction with Ford's languishing share price, which is down by about one-third over [former CEO Jim] Hackett's tenure."  In other words, defendant Farley and defendant Lawler, who was named CFO at the same time, came in to boost Ford's financial performance and stock price and reverse the longstanding negative trends.

- 13 -

4933-9010-5723.v1

29.     On May 26, 2021, during Ford's 2021 Capital Markets Day, Ford officially announced its "Ford+" business strategy, with defendant Farley claiming it was the "'biggest opportunity for growth and value creation since Henry Ford started to scale the Model T, and we're grabbing it with both hands.'"  Under this strategy, Ford was going to leverage its existing gas vehicles to finance its advanced technology and movement into electric vehicles and connective software services.

30.     During its Capital Markets Day conference call, defendant Farley described Ford+ as "Ford's approach to the auto revolution" that would result in "a new, much better experience that pairs [Ford's] world-classic, iconic[,] and what we would say[,] passionate vehicles with a whole new connected human-centered solutions that improve every day all the time."  Defendant Lawler claimed that "'[w]e're fueling Ford+ by further strengthening our core automotive operations and generating consistently healthy cash flow that will fund growth and create value.'"

31.     As part of the Ford+ plan, Ford subsequently announced a new financial reporting structure, resulting in the formation of three distinct business segments:

- The "Ford Blue" segment primarily includes the design and retail sales of Ford and Lincoln internal combustion engine ("ICE") and hybrid vehicles, including Bronco, F-150, Mustang, and Navigator.

- The "Ford Model e" segment primarily includes the design and retail sales of electric vehicles ("EVs"), including F-150 Lightning and Mach-E.  The Ford Model e segment also develops and provides software and connected vehicle technologies for the entire Company, including Ford Blue.

- 14 -

- The "Ford Pro" segment primarily includes the sale of Ford and Lincoln vehicles, service parts, accessories, and services for commercial customers. The Ford Pro segment does not produce or manufacture its own vehicles. Instead, the segment reflects Ford Blue and Ford Model e automobiles sold to commercial customers.[7]

**Ford's Warranty Costs**

32.     Ford provides warranties on its vehicles. Pursuant to these warranties, Ford will repair, replace, or adjust parts on a vehicle that are defective in factory-supplied materials or workmanship during the specified warranty period. For example, Ford provides a "new vehicle limited warranty" (commonly understood as a "bumper-to-bumper warranty") for its Ford Blue offerings, which lasts for three years or 36,000 miles, whichever comes first. Ford also offers other types of warranties, such as the "powertrain warranty" which covers the engine, transmission, and drivetrain, and is for 5 years or 60,000 miles.

33.     In addition to the costs associated with Ford's warranty coverages provided on its vehicles, the Company also incurs costs as a result of FSAs. FSAs include safety and emission recalls as well as various customer satisfaction programs and campaigns that may occur during or after the base warranty coverage period.

34.     At the time a vehicle is sold, Ford records a reserve of estimated warranty coverages and FSAs – collectively, warranty reserves. The Company

---

[7] Additionally, the Company provides financial services through Ford Motor Credit Company LLC, which is referred to as the "Ford Credit" segment.

- 15 -

4933-9010-5723.v1

establishes such estimates by using estimation models based on historical information regarding the nature, frequency, and average cost of claims for each vehicle line by model year. More recently, software updates have increasingly become a component of vehicle service and may be performed during warranty coverage repairs, through FSAs, or through OTA updates. *See supra* n.5.

35. In July 2016, when he was Ford's Corporate Controller, defendant Lawler participated in a conference call where he "discuss[ed] [Ford's] process for handling warranty reserves." During this call, defendant Lawler explained that "[r]eserves are established by vehicle lines, by model year, and by market" and that Ford "calculate[s] the cost per unit by vehicle, by model year, and by market." Defendant Lawler added that for FSA reserves, which are a component of the warranty reserves, "we book an estimated lifetime cost per unit at the time of wholesale. The cost per unit is based upon several years of historical data, as determined by the model and the market." In a slide presentation accompanying the call, Ford confirmed that it takes "[a]n average of the most recent seven model years of history to develop [c]ost [p]er [u]nit" when calculating its reserves for FSAs. And, for warranty coverages and FSAs, Ford's warranty reserve is simply these costs per unit multiplied by the volume of cars sold.[8]

---

[8]  Ford's publicly-disclosed policies for setting and updating reserves, as set forth in its SEC filings, have not substantively changed since 2016.

4933-9010-5723.v1

36.     These initial estimates are purportedly updated based on current information.  For example, while a new model reserve might be based on historical estimates of similar vehicles, as data comes in, the reserves are supposed to be updated.  As to warranty reserves, Ford states that:

> Experience has shown that initial data for any given model year may be volatile; therefore, our process relies on long-term historical averages until sufficient data are available.  With actual experience, we use the data to update the historical averages.  We then compare the resulting accruals with present spending rates to assess whether the balances are adequate to meet expected future obligations.  Based on this data, we update our estimates as necessary.

37.     Likewise, as to FSAs, Ford states, "[w]e assess our obligation for field service actions on a regular basis using actual claims experience and update our estimates as necessary."  In short, Ford claims to monitor actual data and if such data shows costs are higher than expected, Ford's policy requires that such increased costs are accounted for in that period and that reserves are increased to account for the estimated costs of future repairs.

**The Individual Defendants Placed
Warranty Costs at the Center of
Their Executive Goals and Focus**

38.     The automobile industry is highly competitive and operates on thin profit margins, and at times manufacturers have suffered significant losses.  In the earlier years of defendant Farley's tenure with Ford, in 2012 and 2013 for example, Ford's warranty payments as a share of sales were below 2% every quarter.  But by

- 17 -

the end of 2018, it had increased to 3%.  Comparatively, Ford's historical competitor General Motor Company's ("GM") reported warranty claims in 2018 that, as a share of sales, were slightly above 2%.

39.     Indeed, in 2018, GM reported that it paid $2.9 billion in warranty payments, which was $226 million less than the previous year, and its fourth straight year of declining warranty payments.[9]  For Ford, in 2018, its payments rose by over $900 million, from nearly $3.5 billion to over $4.3 billion (despite selling fewer vehicles than GM), and represented Ford's third consecutive annual increase of warranty payments.

40.     Prior leadership struggled to contain warranty costs.  In October 2019, Ford reported that it had been "experiencing more headwinds than expected in our fourth quarter, especially higher warranty," and, as a result, was reducing its 2019 EBIT guidance by up to $1 billion, from $7 to $7.5 billion down to $6.5 to $7 billion. Ford executives explained that "the bulk of the guidance change is really warranty related."

41.     In response to analyst questions about the warranty costs, then-Ford CEO James Hackett made clear that "warranty is getting a lot of attention."  His

---

[9]     According to a July 18, 2019 report from *Warranty Week*, GM's 2018 warranty payments were its "lowest of the past 16 years, and . . . [its] first publicly-reported annual total below $3 billion."

colleague, then-Ford Automotive President Joseph Hinrichs, added that "the bulk of the warranty cost increases are in North America" with:

> [2018] model year and before that are the model years where [we]'ve seen an increase in the higher time and service, warranty claims than we had accrued for and have been planning for.  That's largely driven by some powertrain actions.  Some of [our] suppliers, some of them our own.  As Jim [Hackett] suggested, we've done a lot of rework on our product development process to make sure we've learned from this.

*    *    *

> The way our process works, of course, we accrue for Ford models based on the experience we've been having.  And so it takes a little while for that to work its way through the system.[10]

42.    In a November 2019 report on Ford investor meetings, Credit Suisse reported that "[w]arranty was one of the most central topics in the discussions given it was the largest of the three factors driving Ford's recent guidedown for '19." Likewise, Credit Suisse reported in 2020, "[w]arranty has been a ~$2bn headwind [for Ford] since 2017."

43.    As noted, defendants Farley and Lawler assumed leadership roles and made reducing warranty costs a central focus.  Shortly after being appointed COO, during a February 26, 2020 conference call, defendant Farley stated "we need to

---

[10]  Hinrichs was viewed as a fall guy for Ford's botched 2019 rollout of the 2020 Explorer, which suffered production issues, recalls, higher warranty costs, and disappointing sales.  In February 2020, CNN Business reported that Ford would "replace the president of its auto unit [Hinrichs], three days after it announced a disappointing earnings outlook and financial results," largely due to the Explorer. At the same time, defendant Farley was announced as the Company's new COO.

- 19 -

lower our warranty spending" and placed it at the top of his list of "[t]he four things that we need to fix" at Ford. He claimed that Ford had "a very concrete plan now" to reduce warranty costs, which included using new connectivity capabilities and resolving problems quickly. Notably, defendant Farley explained that Ford's warranty problems were not "a total mystery," adding "[t]here are issues that people knew about that just weren't being resolved."

44. A few months later, defendant Farley was elevated to CEO and, during an October 28, 2020 conference call, he acknowledged that "we know we haven't fixed the issues that have held us back in our automotive business. They include warranty costs, which remain unacceptably high." When an analyst asked about warranty costs, defendant Farley stated that the Company had taken steps to improve warranty costs, including becoming "punitive" with suppliers that send bad parts and making quality "a key metric that we drive our management team to."

45. Like defendant Farley, defendant Lawler emphasized his focus on addressing Ford's warranty problems and attempting to lower warranty costs upon his appointment as CFO. During a November 2, 2020 conference call, he stated that "we're laser focused on improving our costs in a couple of areas, in particular around warranty and then [also] in material costs."

46. At the same time, the media also reported on the Individual Defendants' focus on reining in Ford's warranty costs and fixing quality issues. On November

- 20 -

4933-9010-5723.v1

24, 2020, *Reuters* published an article titled "Focus: Ford's new CEO tackles warranty costs in bid to boost profit" and emphasized that defendant Farley "is aiming to rein in rising warranty repair costs that are a key reason" why Ford's "financial performance in North America has lagged that of its archrival, General Motors Co." The article highlighted Ford's increasing warranty costs compared to GM, stating that "for Ford investors, action to shrink" the Company's "outlays for vehicle defects is overdue" as "Ford's warranty costs for the first nine months of 2020 were more than $2 billion higher than those of GM."

**Defendants Closely Monitored Warranty**
**Costs and Inputs**

47. As part of the Individual Defendants' "laser focus" on warranty costs, defendant Farley has made clear that Ford executives "look at the root causes" of such cost issues and "go through . . . hundreds" of them. Defendant Lawler has likewise confirmed that, with respect to FSAs and "older model[]" vehicles, Ford executives are "out looking at all the data we can" in order to "try to get out in front of any of those."

48. When asked about "contribution [cost] margin," which includes warranty costs, defendant Farley confirmed that Ford's senior management, including defendant Lawler, "spend Tuesday once a month on costs, material costs and supplier costs." In addition to the Tuesday monthly meetings, defendant Lawler stated that during "the other 3 weeks in the month on Tuesday," he and other senior

4933-9010-5723.v1

executives are "doing deep dives" into costs issues. Ford also monitors warranty reports and employs a Critical Concern Review Group ("CCRG") that reviews and investigates potential defects and safety issues with Ford vehicles.

49. The Company also gathers, analyzes, and monitors warranty data and service information submitted by Ford dealerships. For example, before the Class Period, Ford made enhancements to the Company's Global Warranty Measurement System (the "GWMS"). The GWMS helps thousands of Ford dealerships monitor warranty costs and warranty claim trends, presented in dashboards made available to Ford dealers on their computers. As stated by a Global Systems Manager in Ford's Global Warranty Operations division, "'[we] have always had data on actual costs'" and, thanks to enhancements to the GWMS, Ford even started "'show[ing] [dealers] how they compare monetarily to other dealers within their measurement groups for each type of repair.'" Stated differently, following these enhancements, Ford started "'accessing the same data as before, but . . . have presented and visualized it in new ways for a different audience.'"

50. As reported in a profile regarding Ford's use of GWMS from before the Class Period:

> Ford can analyze the warranty data to ensure that critical repairs are conducted on each vehicle on the dealership service lot in a timely fashion. With more electronic systems on board today's cars and trucks, this foresight is especially valuable for software updates. Ford knows where all the vehicles are and which ones need which updates, since this type of service is logged as a warranty repair. Analyzing this

- 22 -

4933-9010-5723.v1

data in aggregate on a weekly basis helps the company gauge if the dealer network is on track to meet Ford's quality improvement goals.

51.     Moreover, Ford's U.S. Privacy Notice (the "Privacy Notice"), which is published on the Company's website, expressly states that the Company gathers service and warranty data from dealerships.[11]  Namely, the Privacy Notice states Ford "collect[s] vehicle service history from you [the consumer] when you provide it to us on our sites," such as a Ford dealership.  Ford also "receive[s] information in connection with vehicle sales and service."  Specifically, "[w]hen you service or repair your vehicle with a Ford or Lincoln dealer," Ford obtains the vehicle's service history, "which includes history of repairs and may include information such as . . . service details, repair history, applicable recall repairs" as well as "warranty and extended service plan information."

52.     In addition to analyzing service data from dealers and mechanics, Ford has long monitored message boards regarding their vehicles.[12]  During the Class Period, Ford employed "teams within each vehicle line that monitor social media sites looking for trends," in an effort to purportedly identify issues early rather than "waiting for problems to snowball."  According to Ford's Executive Director of

---

[11]  *See* https://www.ford.com/help/privacy/.

[12]  *See* Richard Read, *Taking your car complaint online? Chrysler, GM, and Ford will see it*, Christian Science Monitor (Aug. 21, 2012), https://www.csmonitor.com/Business/In-Gear/2012/0827/Taking-your-car-complaint-online-Chrysler-GM-and-Ford-will-see-it.

4933-9010-5723.v1

Quality, defendant Farley was directly involved in monitoring and addressing quality, stating defendant Farley "pings me several times a week, so do most of his direct reports, all asking how they can support and how they can engage to make sure that we have a culture focused around quality."

53. As defendant Lawler admitted, Ford executives "start to see the warranty [issues] coming in" for new vehicles at around "12 to 18 months" after launch. Beyond just the number of FSA or warranty issues, Defendants knew that the nature of any defect issue could have a significant impact on the Company's financial results. For example, during a podcast interview on September 21, 2023, defendant Farley acknowledged generally the high costs associated with axle issues, stating that with ICE cars, the "transmission and rear axle – you move all that, that's all the stuff that goes bad. And when it does it's super expensive. And it's complicated." Defendant Farley further stated during a conference call on April 27, 2022 that "[w]e're going to attack complexity in areas such as powertrain" – of which the rear axle is a part.

54. Likewise, issues requiring full-scale engine replacements, for example, are typically the highest cost repairs an automobile can undergo. In materials published in October 2022, Ford outlined that, using the Ford Edge as an example,

- 24 -

the average estimated cost for an engine repair in the United States is nearly $7,000.[13] The materials state that repairing an engine – a "major component" in the vehicle – can be "significant" and easily eclipse the costs of repairing other "major components" in the vehicle, such as the steering gear ($2,367) and the headlamp & tail lamp assembly ($2,739).

55.     In summary, warranty issues not only affect Ford's reputation for quality, but they are a massive cost and key business issue, which is why so much attention was directed at monitoring and improving warranty costs.

**Warranty Costs Continued to Drastically
Increase During the Class Period**

56.     During the Class Period, Defendants understated warranty reserves and overstated Ford's success in containing warranty costs, as Ford continued to be plagued by long-standing warranty and FSA issues.  As set forth in the chart below, the stark divergence of Defendants' purported changes in reserves in 2021 and 2022 from the years leading up to and following that time period support that they did not reflect reality, and instead were artificially suppressed by Defendants.

---

[13]     *See* https://jarrettscottfordprotect.com/pdf/PremiumCARE_Ford_ESP.pdf.

4933-9010-5723.v1



57.     Indeed, when Defendants belatedly revealed the true nature of Ford's underlying warranty issues and costs, they did not identify any new problems that recently arose or anything related to new product launches that could not have been anticipated.

58.     Instead, Defendants attributed the skyrocketing warranty costs to: (i) "a rear axle bolt for vehicles that were engineered for the 2021 model year" (*see* ¶138); (ii) "a failed oil pump issue" for "2016 launched vehicles" (*see* ¶138); (iii) "cameras" that were included in Ford's vehicles in years prior that "put[] a huge burden on th[e] electric architecture with a lot of extra modules and software" (*see* ¶133); and (iv) dealers opting to replace in-vehicle computer modules, rather than rely on OTA

- 26 -

4933-9010-5723.v1

updates and fixes (*see* ¶139).[14]  But none of that was new, and, in fact, the issues were prevalent before and during the Class Period.

59.     *First*, in the Fall of 2020, Ford launched the MY 2021 Ford F-150 pickup truck with the Trailer Tow Max Duty Package.  Shortly thereafter, owners began experiencing broken rear axle bolts that required complete replacement of the axle, the same type of repair defendant Farley knew was "super expensive" and "complicated."  ¶53.  For example, by January 2022, the defect had become the subject of online discussion, with an owner of a 2021 Ford F-150 with "the max trailer tow package" posting in an online forum that at a "10K mile [checkup]," the rear axle "bolt came off with the tire."  The user reported that "[t]he dealership was unable to remove the broken bolt and indicated that they'll need to replace the axle."[15]  Another user responded around the same time, "I just pulled my same tire off to rotate tires and the bolt was sheared," adding later the same month that after

---

[14]  Ford's "SYNC" system is the Company's in-vehicle infotainment system, which allows drivers and passengers to, among other things, make hands-free phone calls, access navigation services, play music, and connect to a user's cell phone.  Starting with Ford's SYNC 4 system, introduced in 2020, Ford vehicles could receive advanced OTA software updates.

[15]  The posts referenced in ¶¶59-63, and more, are available at https://www.f150forum.com/f129/2021-powerboost-rear-rotor-axle-bolt-sheared-515460/.

- 27 -

contacting the dealership, his new axle "is supposed to be in on Friday possibly Monday."

60.     Other F-150 owners and users reported the same (and even worse) issues, providing multiple comments and sharing their experiences in the same forum.  For example, in February 2022, one user stated that a "passenger rear bolt sheared off" after he "popped the wheel off" after hearing a "scraping sound" the night prior.  The user added that his parts "were ordered on [February] 4th" and he "was told there were 11 axles available," but then "[t]he following Monday [he] was told they were on back order until February 18th."  In April 2022, another user stated that the "right rear axel [*sic*] bolt sheared" at 12,500 miles.  In June 2022, a user stated that he experienced "the same issues as everyone" else as "[b]oth [a]xles [b]olts [*sic*] [s]heared!"  In another June 2022 post, another used stated that the "[p]assenger rear bolt sheared cleanly at the end of the axle shaft" and commented that "[b]ased on the smoothness and weathering of the sheared piece, it had been that way for sometime [*sic*]."  And, in August 2022, a user stated that he found the axle "bolt sheared off" on the "[r]ear passenger side," providing the following photo:

- 28 -



61.     Some users reported multiple attempts at a fix by Ford dealerships.  For example, in June 2022, one user stated that "months" after experiencing a "sheared axle bolt," which was "replaced" by a local Ford dealership, the replaced bolt started to "work[] itself loose."  In July 2022, one user stated that the "right rear axle bolt sheared" for the "2nd time" which was roughly "4000 miles since the first time."[16]

62.     The posts in this online forum, as well as posts in other online forums, were monitored by the Company.  *See* ¶52.  For example, in response to a user saying the repair could not be completed "since the parts are on backorder," the Official Ford Account of Ford Motor Co. provided a response.  Rather than dispute the defect or the nature of the repair necessary – *i.e.*, replacement of the axle – Ford stated "[t]his doesn't sound like an experience we want you to have with your F-150. Could you please send us a PM [private message] with your VIN [vehicle identification number] and the name and location of your Ford dealer?"

---

[16]   Given the scale of this issue, one user in this online forum tracked and noted that over 100 users reported failures with respect to the rear axle bolt in this thread alone.

4933-9010-5723.v1

63. The Official Ford Account of Ford Motor Co. provided other responses as well. In response to a user's post about the "right rear axle shaft" and the "condition of the retainer bolt" on his F-150 – and a "back order" of necessary parts – Ford once again did not dispute the defect. Instead, Ford stated: "[w]ould you send over a private message with your VIN [vehicle identification number] and the name and location of your Ford dealer so I can look into this axle delay concern on my end?" In another post, where the user commented that the "bolt sheared off" on the "[r]ear passenger side" of the user's F-150, Ford similarly responded that "[t]his axle concern doesn't sound like something we want you to experience with your F-150. Could you please send us a PM [private message] with your VIN [vehicle identification number] and the name and location of your Ford dealer?"

64. By June 2022, NHTSA contacted Ford regarding "reports of broken rear axle hub bolts on 2021-2022 model year F-150 vehicles equipped with the 9.75-inch HD 3/4 float axle" – the axle used for the Trailer Tow Max Duty Package. Ford met with NHTSA twice in June 2022 to discuss the Vehicle Owner's Questionnaires and "to provide responses to NHTSA's requests for information."

65. *Second*, starting in the Fall of 2015, Ford equipped certain vehicles with a 1.0L EcoBoost engine, including the 2016 through 2018 Ford Focus and the 2018 through 2022 Ford EcoSport and Ford Fiesta. Many such vehicles equipped with the 1.0L EcoBoost engine began to fail due to the same issue – a defective oil pump

- 30 -

belt system that would cause the oil pump drive belt to degrade and lose teeth, resulting in a loss of oil pressure.[17]  Oil pumps, located inside the engine, are critical to ICEs because they pump oil through the engine, which is necessary for engine cooling and lubrication.[18]  Without proper oil circulation, the engine will suffer damage and eventually lock up and cease to be able to move, typically meaning engine failure.

66.     The oil pump failure in Ford's 1.0L EcoBoost engine was widespread, with customers repeatedly reporting severe issues associated with the engine.  For example:[19]

- In June 2020, a customer reported that their 2017 Ford Focus engine experienced "FAILURE."  The "vehicle was towed" to the dealership and "the manufacturer was notified of the failure."  The "mechanic told the consumer there were issues with timing/oil pump belt (located inside the engine) broke/shred.  Oil pressure dropped and pieces of belt clogged oil pump and also circulated through the engine."  The customer was presented with a complete engine replacement that cost approximately $7,100.  The same month, a customer reported that their 2017 Ford Focus had to be towed to a dealer, which said "probably the

---

[17]  *See, e.g.*, NHTSA Recall No. 23V-905 and Ford Recall No. 23S64.

[18]  *See* Dustin Hawley, *What is an Oil Pump?*, J.D. Power (July 19, 2023), https://www.jdpower.com/cars/shopping-guides/what-is-an-oil-pump.

[19]  The reports referenced in ¶¶66-67, and more, are available on the NHTSA's website dedicated to "[t]rack[ing] recalls & safety issues," https://www.nhtsa.gov/?nhtsaId.  The NHTSA Safety Issue ID Numbers for the referenced reports are: 11330569, 11330943, 11342142, 11373258, 11440950, 11441806, 11464002, 11473126, 11481834, 11510755, and 11497226. Capitalization has been modified for certain reports.

timing/oil pump belt broke or shredded and clogged up the oil pump" and it "would cost $800 to find out the actual problem and if the [mechanic] was right the engine would have to be replaced costing $7400."

- In July 2020, a customer reported that their 1.0L EcoBoost engine experienced "engine trouble at 62,000 miles – metal shavings in the oil."

- In November 2020, a customer reported that their 2018 Ford Ecosport, had "a loss of engine oil pressure" and had to be towed, at which point the customer was told "the block is damaged and looks like the oil belt tensioner broke and damaged engine."

- In November 2021, a customer reported that their 2018 Ford Ecosport "lost all acceleration" and the dealer told them "pieces of [the] timing belt were in the oil," meaning the customer "needed a new engine and long block."  The customer stated that they contacted Ford, which was "willing to provide some assistance" and the "dealer also had an EcoSport in [the] service dep[artment] . . . with the same issue."  The same month, another customer reported for their 2016 Ford Focus, "[o]il pump failure 2 times in a ro[w] within 75,000 miles.  Had to have a brand new engine replacement each time."

- In May 2022, a customer reported that the engine on their 2019 Ford Ecosport went out "without warning at 62,000 miles causing complete engine failure" and a "Ford representative told [the customer] that the belt for the oil pump shredded and caused loss of oil pressure which le[d] to a complete loss of power."

- In August 2022, a customer reported that the engine on their 2019 Ford Ecosport experienced issues, requiring an "emergency pullover," and that the dealer stated there was a "loss of engine oil pressure."

- In December 2022, a customer reported oil pump problems on their 2020 Ford EcoSport, stating that the "wet belt and the rubber teeth c[a]me off stopping up the oil pump and causing it not to work proper," adding that "I am left with no choice but to replace the engine at a cost of $5,000.00."

- 32 -

67.     Consistent with the average estimated costs provided by Ford (*see* ¶54), customers reported that the engine replacements due to oil pump failures, recommended by Ford dealerships, would cost thousands of dollars (*e.g.*, "$7500," "$7400," "$7100," "$6500," "5,000").

68.     By early 2022, Ford's CCRG had investigated the oil pump issue but decided to take no action to fix it because "[t]here were no accident or injury allegations related to the concern at the time."  However, regardless of the safety impact of the oil pump issue, Ford knew that it was widespread and would be costly if not addressed, as replacing engines from failed oil pumps on years' worth of defective automobiles would be exponentially more expensive than replacing the oil pumps.

69.     *Third*, by October 2020, Ford had identified a defect in rear-view-cameras ("RVCs") installed in at least seven different models, spanning production in 2019 and 2020, and potentially affecting hundreds of thousands of vehicles.[20] Specifically, a lack of "electrical conductivity" in the RVCs was causing them to "intermittently display[] a blank or distorted image."  This defect required that the RVCs be "replace[d]," rather than fixed through less-costly OTA updates.

---

[20] *See* Safety Recall Report No. 20V-575.  Federal standards recognize that rearview visibility is an important safety issue that can reduce deaths and injuries, making Ford's defective RVCs a significant safety concern.  *See* Federal Motor Vehicle Safety Standard No. 111, "Rear Visibility," 49 C.F.R. §571.111.

- 33 -

4933-9010-5723.v1

Thereafter, Ford continued to acknowledge that the scope of the RVCs problems was not limited to just the models identified, but that large aspects of Ford's product lines equipped with similar RVC components suffered defects, requiring various fixes.[21]

70.     *Fourth*, starting in 2020, Ford provided advanced OTA updates on certain vehicles through the Company's in-vehicle infotainment system: SYNC 4. Specifically, Ford's website claims that OTA updates provide consumers "wireless upgrades with little-to-no action on your [the consumer's] part" and "are designed to help make your [the consumer's] vehicle better over time."   Through OTA updates, Ford remotely "deliver[s] new features and functionality" such as software and firmware enhancements, quality improvements, and safety and security updates.

71.     In July 2021, defendant Farley emphasized the importance that "dealers are very knowledgeable about these new OTA features that are really meaningful in the use of the customer's life."  However, during the Class Period, rather than utilize OTA updates to fix issues on a cost efficient basis, dealerships were replacing entire

---

[21]   For example, in Safety Recall Report No 21V-223, issued in March 2021, Ford acknowledged an RVC defect in Lincoln Aviators built in 2018 through 2020, causing "intermittent loss of image on the rearview camera display" with "a blank or distorted image."  Similarly, in Safety Recall Report No 22V-252, issued April 2022, Ford acknowledged an RVC defect on certain Ford trucks, including F-150s, causing an "intermittent[] display[] [of] blank or distorted image."

- 34 -

modules, which would be known to Ford through its close monitoring of such updates and warranty repair costs. *See also* ¶¶47-55.

**Expert Insight Corroborates the Allegations**

72.     Plaintiffs consulted with an expert in automobile operations, manufacturing, and engineering, Kai Spande, to analyze the significance of the alleged defects.

73.     Mr. Spande holds a Bachelor's of Science degree in Industrial Technology from the University of Northern Iowa.  Mr. Spande has decades of industry experience and has served in multiple automotive leadership roles throughout his 30+ year career with GM, a multi-billion dollar global vehicle manufacturer.  For example, Mr. Spande served as Plant Manager at: (i) GM's Bowling Green, Kentucky manufacturing plant, where he led the production of two generations of GM's Chevrolet Corvette vehicles, including design and production of castings, engine components, and engines; and (ii) GM's Romulus, Michigan manufacturing plant, where he led the production of GM's V6 and V8 engines; and GM's Bay City, Michigan manufacturing plant, where he led waste reduction efforts for vehicle castings.[22]

---

[22] Other relevant experience includes serving as an Engineering Director, Powertrain Operations and as a Global Director, Casting Processes-Powertrain. Mr. Spande also previously completed a fellowship sponsored by the United States Department of Commerce.

74. Mr. Spande reviewed, among other things, NHTSA recall acknowledgement letters, dealership notifications and supplements thereto (including technical service bulletins ("TSBs")), Part 573 Safety Recall Reports, recall chronologies as reported by Ford to NHTSA, Ford notices to owners and supplements thereto, and Ford's annual and quarterly recall reports to NHTSA for the following recalls:

- NHTSA Recall No. 23V-896 and Ford Recall No. 23S65 (affecting "certain 2021-2023 F-150 vehicles equipped with the Trailer Tow Max Duty package and a 9.75-inch heavy duty axle with a 3/4 float axle design");

- NHTSA Recall No. 25V-512 and Ford Recall No. 25S82 (affecting "certain 2023-2025 F-150 vehicles equipped with the Trailer Tow Max Duty package and a 9.75-inch heavy duty axle with a 3/4 float axle design");

- NHTSA Recall No. 23V-905 and Ford Recall No. 23S64 (affecting certain "2016-2018 Ford Focus" and "2018-2022 Ford EcoSport" vehicles. "The engine oil pump drive belt tensioner arm may fracture, separate from the tensioner backing plate, and/or the oil pump drive belt material may degrade and lose teeth, resulting in a loss of engine oil pressure.");

- NHTSA Recall No. 20V-575 and Ford Recall No. 20C19 (affecting various model year 2020 vehicles with "intermittent or inoperative rearview cameras"); and

- Thirty-six additional NHTSA-reported recalls (as distinguished by independent NHTSA and Ford recall numbers) relating to Ford's RVCs, ranging based on date of report to the NHTSA from March 30, 2021 through September 4, 2025.

4933-9010-5723.v1

75. Based on his extensive experience in the automotive industry and review of such materials, Mr. Spande reached the following conclusions, which corroborate Plaintiffs' allegations above.

*Expert Conclusions Regarding the Axle Bolt Issue*

(a) Ford's axle bolt issue, potentially affecting up to nearly 217,000 MY 2021-2025 F-150 vehicles, involved a "3/4 floating" rear axle design offered as part of a "Max Tow" package for certain F-150 vehicles. This rear axle design was introduced starting with model year 2021 vehicles and was intended to improve the F-150's towing capacity. However, the rear axle design experienced failures in the bolt that held the axle hub (on which the tire is mounted) to the axle. Due to the nature of the axle hub design, the axle bolt would materially fatigue as a result of physical overloading, thus failing and causing the bolt to break, which in turn led to parts related to the axle and wheel to wear out. This impeded both the ability of the affected wheel(s) to propel the vehicle when customers pressed the gas, potentially rendering the vehicle "undriveable," and the ability of the vehicle to be parked safely, as the vehicles could then roll away.

(b) Because the bolt that held the axle hub was overloaded and experiencing fatigue, it would be highly unlikely that this issue could be adequately fixed by simple or low-cost repairs, such as replacing the bolt or adding fasteners, which would be likely to result in the same overloading, fatigue, and failure. Instead,

- 37 -

to address the physical overloading being placed on the bolt, a redesign of the axle assembly would likely be required.  Such redesigns are generally costly not only to implement (driving significant parts and labor costs), but also to develop, as engineering teams need to expend substantial time and resources to reach a workable solution that will last.  Ford did ultimately develop and issue a redesigned axle to replace the defective ones.  In addition, because the rear axle bolt could impact the truck's ability to be safely driven, Ford could be required to incur substantial additional expenses to pay for towing to a dealership and/or loaner vehicles to certain customers, and other consequential costs.

(c)     In Mr. Spande's experience, vehicle manufacturers closely monitor and respond to potential defects reported on their vehicles, even without any contact from the NHTSA.  According to the chronology Ford reported to the NHTSA for the first of two recalls for the axle bolt issue, Ford was contacted by the NHTSA regarding customer reports of the issue by June 6, 2022, culminating with Ford's Field Review Committee approving a field action (recall) for MY 2021–2023 Ford F-150 vehicles on December 15, 2023 – during which time Ford would have been manufacturing and shipping MY 2024 F-150 vehicles containing the same, defective design.  Ford later issued the second of its two recalls for the axle bolt design on August 1, 2025 for up to over 103,000 MY 2024-2025 F-150s.  Thus, Ford continued

- 38 -

to sell F-150s containing the defective axle design even after June of 2022 and December of 2023.

*Expert Conclusions Regarding the Oil Pump Issue*

(d)     Ford's oil pump issue, potentially affecting up to nearly 140,000 MY 2016-2018 Ford Focus and MY 2016-2022 Ford EcoSport vehicles, was significant in magnitude given the nature of the issue and related repairs. All of the vehicles potentially affected by this issue shared in common a new design that Ford introduced in model year 2016 vehicles consisting of an engine oil pump drive system for automatic transmission vehicles using a "wet belt" where the oil pump drive belt is submerged into engine oil.  This design was faulty and caused the oil pump belt tensioner to fail, because the engine would run out of lubrication (*i.e.*, oil), which in turn reduced customers' ability to control the vehicle until coming to a rest, and/or which would cause the engine to seize and the vehicle to shudder or jerk, each of which constituted a safety concern.

(e)     Because the faulty design caused the belt tensioner to fail, it would be highly unlikely that this issue could be adequately fixed by simple or low-cost repairs, such as replacing the belt, which would be likely to result in the same failure; and even investigating the issue would involve opening the engine which already triggers significant expense.  In this situation, however, modifications to the oil pump tensioner system would likely be required, resulting in significant costs

- 39 -

4933-9010-5723.v1

from developing the solution, and also labor and parts costs to implement the fix. Moreover, given the nature of the issue that was inherent in a common design, and consistent with vehicle manufacturing industry practices, it likely would have been straightforward for a manufacturer to "read across" vehicles with this common engine oil pump drive system to assess the scope and magnitude of the problem.

(f)     Adding to the magnitude, the oil pump issue could lead to the vehicle not being able to be operated safely, making it what is known in the industry as a "walk home" issue, thus exposing Ford to expenses related to pay for towing to a dealership and/or loaner vehicles for customers, and other consequential costs. Moreover, running such vehicles' engines for too long without adequate lubrication would likely cause complete engine failure, requiring high-cost replacement of the engine.

*Expert Conclusions Regarding the Rearview Camera Issues*

(g)     Ford automobiles have suffered significant RVC issues, dating back to at least 2020.  On September 23, 2020, Ford issued a recall potentially affecting up to 620,246 vehicles including certain MY 2020 F-150, F-250, F-350, F-450, F-550, Edge, Escape, Expedition, Explorer, Mustang, Ranger, and Transit vehicles.  Such RVC issues impact the ability of drivers to use their RVCs, which is a well-understood safety concern in the automotive industry.

- 40 -

4933-9010-5723.v1

(h)     Notably, many of Ford's vehicles share common platforms, which are shared structural and engineering foundations that are used across multiple vehicle models.  In the automotive industry, it is common practice to "read across" vehicle platforms to identify where common or identical parts, designs, and suppliers in already-recalled vehicles would be present in further vehicles, requiring additional recalls.  Through September 2025, Ford has issued recalls relating to RVCs that have affected up to more than 5 million vehicles across nearly all of Ford's models under its Ford and Lincoln brands,[23] including vehicles produced from 2015 through 2025.  Given the scope of recalls covering nearly all of Ford's models, and the repeated attempted fixes outlined in the documents Mr. Spande reviewed, Mr. Spande concludes that the RVC issues at Ford have been widespread for years.

## DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS

76.    Throughout the Class Period, Defendants made false and misleading statements that overstated their purported success in improving quality and reducing warranty costs.  More specifically, Defendants made false and misleading statements that portrayed positive trends in warranty costs and quality improvements,

---

[23] Models impacted by RVC recalls through September 2025 include Aviator, Bronco, Continental, Corsair, Econoline, Edge, Escape, Expedition, Explorer, F-150, F-250, F-350, F-450, Fiesta, Flex, Maverick, MKC, Mustang, Navigator, Nautilus, Ranger, Transit, and Transit Connect vehicles.

- 41 -

concealing that Ford continued to be plagued by significant and expensive vehicle defects that threatened Ford's ability to increase profits to fund the Ford+ strategy. In addition, Defendants further concealed such then-existing defects and the resulting increasing warranty and FSA costs by falsely and misleadingly: (i) assuring that they were monitoring defects and updating warranty reserves accordingly; and (ii) issuing boilerplate warnings that stated only that warranty costs theoretically "could" increase and impact Ford's reputation and market acceptance of its vehicles.

**Defendants' False and Misleading Statements**
**Claiming Positive Trends in Ford's Warranty**
**Costs and Quality Improvements**

77.    On October 27, 2021, Ford filed its quarterly report on Form 10-Q for the period ending September 30, 2021 ("3Q 2021 Form 10-Q").  The 3Q 2021 Form 10-Q contained signed certifications by defendants Farley and Lawler and reported positive trends in Ford's warranty reserves by recording a tiny increase. Specifically, Ford reported "*[c]hanges in accrual related to pre-existing warranties*" of only *$44 million*, which was 3% of the increase reported in the prior year of $1.4 billion.[24]

---

[24]  A warranty reserve is the total amount that a company sets aside to cover the costs of claims.  An accrual is the process of determining the necessary amounts to include in the warranty reserves.  Thus, when Ford reports a change in accrual, it is reporting the amount it is adding to (or subtracting from) the warranty reserves.

- 42 -

78.    On the same day, defendants Farley and Lawler participated in a conference call to discuss Ford's third quarter 2021 ("3Q 2021") earnings results. In response to an analyst question regarding sales in the second half of 2021, defendant Lawler acknowledged that, "from a headwind standpoint . . . we are going to see some higher warranty costs on a sequential basis in the fourth quarter for things that we have to take care of around extended warranties and a little bit higher coverages" but assured investors it was a short term issue by adding that, "*our warranty will improve in the fourth quarter and full year on a year-over-year basis. Our warranty, we expect to be good by about $1.4 billion*."

79.    Analysts reacted positively to Defendants' false and misleading statements reflecting the $1.4 billion improvement.  For example, on October 27, 2021, RBC Capital Markets increased its price target for Ford stock based, in part, on improvements in warranty, stating: "F[ord] hopes to continue to make headway reducing warranty ($1.4bn in 2021)."   On the same day, Wells Fargo likewise increased its price target for Ford stock from $17 per share to $19 per share and commented that, even "[m]ore positively, there is still opportunity for more warranty improvements as Ford is targeting a $2bn reduction and will be down $1.4bn in 2021, leaving a $600mn 2022 cost opportunity."

80.    On February 3, 2022, Ford filed its annual report on Form 10-K for the year ending December 31, 2021 ("2021 Form 10-K"), signed by defendants Farley

- 43 -

and Lawler, in which Defendants reported positive trends in Ford's warranty reserves by recording a small increase.   Specifically, Defendants reported "*[c]hanges in accrual related to pre-existing warranties*" of only **$221 million** which was a $2.2 billion improvement from the prior year.

81.   The same day, Ford issued a release announcing earnings results for the period ended December 31, 2021 (the "FY 2021 Release").   In discussing the Company's FY 2021 EBIT, the FY 2021 Release claimed that Ford's "*lower warranty costs*" had "*more than offset the effects of production losses and higher commodity costs*."

82.   Also on that day, defendants Farley and Lawler participated in a conference call to discuss Ford's FY 2021 earnings results.   During this conference call, defendant Lawler made the following false and misleading statements:

(a)   During prepared remarks, defendant Lawler claimed that "*improvement in warranty costs*" had contributed to "*offset[ting] commodity headwinds and supply chain-related production losses*."

(b)   In response to an analyst question requesting "more color" on Ford's "margin" targets and how Defendants would "improv[e] margins from here," defendant Lawler stated that "*[w]e're improving our quality*, which is important. *We saw that come through this year, from a year-over-year warranty standpoint*

- 44 -

*was down roughly $1.4 billion*" and claimed Ford was "*leveraging what we have from the connected vehicle [e.g., OTAs] to improve warranty even further*."

83.    Analysts continued to react positively to Defendants' false and misleading statements.  For example, on February 3, 2022, RBC Capital Markets expressed optimism in Ford's ability to generate more profit to fund EVs, stating "[i]t was also good to hear they [Defendants] could ring more profit out of ICE" and added that "we believe higher profits from ICE (from cycle or more efficiencies) get redeployed to increase and accelerate" EV investment and growth.  Similarly, on February 4, 2022, Credit Suisse commented that "near-term financial strength is supporting better funding of Ford's long-term [EV] transition," adding that in 2022, investing in EVs should be "offset by tailwinds from material cost and warranty."

84.    On April 27, 2022, Ford filed its quarterly report on Form 10-Q for the period ending March 31, 2022 ("1Q 2022 Form 10-Q").  The 1Q 2022 Form 10-Q contained signed certifications by defendants Farley and Lawler and reported positive trends in Ford's warranty reserves by recording a tiny increase. Specifically, Ford reported "*[c]hanges in accrual related to pre-existing warranties*" of only *$21 million*, further portraying Ford as having reversed the 2019 and 2020 trends resulting in $2 billion of increased reserves related to pre-existing warranties ($1.9 billion in 2019 and $2.4 billion in 2020).

- 45 -

85. On April 28, 2022, Credit Suisse wrote, "we appreciate ongoing progress in Ford's EV transition" and noted that Ford's "EV spend" would be "offset by tailwinds from material cost and warranty."

86. On July 27, 2022, Ford filed its quarterly report on Form 10-Q for the period ending June 30, 2022 ("2Q 2022 Form 10-Q"). The 2Q 2022 Form 10-Q contained signed certifications by defendants Farley and Lawler and reported positive trends in Ford's warranty reserves by recording a small increase. Specifically, Ford reported "*[c]hanges in accrual related to pre-existing warranties*" in the first half of 2022 of only *$395 million*, further portraying Ford as having reversed the 2019 and 2020 trends resulting in $2 billion of increased reserves related to pre-existing warranties ($1.9 billion in 2019 and $2.4 billion in 2020).

87. The same day, defendants Farley and Lawler participated in a conference call to discuss Ford's second quarter 2022 ("2Q 2022") earnings results. During prepared remarks, defendant Farley assured investors that Ford continues to "identif[y] issues" and "*take[s] actions quickly to resolve them* . . . including by making *much more frequent use of [OTAs]*" which "*ha[ve] . . . worked for us*."

88. On October 22, 2022, Ford filed its quarterly report on Form 10-Q for the period ending September 30, 2022 ("3Q 2022 Form 10-Q"). The 3Q 2022 Form 10-Q contained signed certifications by defendants Farley and Lawler and reported positive trends in Ford's warranty reserves by recording a small increase.

- 46 -

Specifically, Ford reported "*[c]hanges in accrual related to pre-existing warranties*" in the first nine months of 2022 of only **$449 million**, further portraying Ford as having reversed the 2019 and 2020 trends resulting in $2 billion of increased reserves related to pre-existing warranties ($1.9 billion in 2019 and $2.4 billion in 2020).

89.     On February 2, 2023, Ford filed its annual report on Form 10-K for the year ending December 31, 2022 ("2022 Form 10-K"), signed by defendants Farley and Lawler, in which Defendants reported positive trends in Ford's warranty reserves.  Specifically, Defendants reported "*[c]hanges in accrual related to pre-existing warranties*" of **$1.1 billion** which, as set forth above (¶56), represented a positive reversal of massively increased accruals in 2018 through 2020 of $1.8 billion to $2.4 billion and a continuation of the positive trend from the prior year.

90.     The same day, defendants Farley and Lawler participated in a conference call to discuss Ford's earnings results for the period ended December 31, 2022 ("FY 2022").  During prepared remarks, defendant Lawler emphasized that Ford Blue's "*entire enterprise quality operating system*" was "*overhauled*" and "*we are already seeing improvements in initial quality*," while concealing the major issues in pre-existing automobiles.

- 47 -

91. The statements set forth in ¶¶77-78, 80-82, 84, 86-90 were false and misleading when made. The true facts, which Defendants knew or recklessly disregarded, were:

(a) Rather than experiencing positive trends in warranty costs and reserves, such as reported reserves that reversed the negative trend of massive increases in prior years, and rather than seeing lower warranty costs that were "good by about $1.4 billion" that "offset the effects of production losses" or "commodity headwinds," Ford continued to be plagued by significant and expensive vehicle defects (mainly to older models), consistent with prior years, and the reported reserves understated the true state of Ford's warranty problems and costs, which was revealed by the massive increases in warranty costs and reserves at the end of the Class Period;

(b) Defendants' statements that Ford was "improving quality," had "overhauled" Ford's quality operating systems to improve "initial quality," and was using the "connected vehicle to improve warranty" and "taki[ing] action to quickly resolve" quality issues including through "frequent use of [OTAs]" that were working well, were misleading because they omitted to disclose: (i) the significant and expensive quality problems in older vehicles that were not addressed or improved by OTAs and were negatively impacting warranty costs, such as the Ford F-150 rear axle defect, RVC problems, and the 2016 oil pump defect; and (ii) OTAs

- 48 -

were not working well as dealerships failed to repair issues using OTAs, and instead brought vehicles in for service to do costly replacement of in-car computer modules.

92.     On February 15, 2023, defendants Farley and Lawler participated in a conference call as part of the Wolfe Research Global Auto, Auto Tech, and Mobility Conference.  During the conference call, an analyst asked the Individual Defendants about the Company's "variable costs" and whether investors could "actually see[] evidence of improvement."   In response, the Individual Defendants made the following false and misleading statements:

(a)     Defendant Lawler stated that "warranty is an issue for us of about $1 billion" but assured investors that, "*[i]n 2021, we improved by about $1 billion*" and added that "*we were about flat*" in 2022.

(b)     Defendant Farley immediately followed up, stating "[a]nd *on warranty, we'll see it [the improvement] in initial quality*" with "the warranty cost to be lagging, *but you'll see very quick progress on initial quality*," adding "*our fitness there [in initial quality] will show up there first*."

93.     On May 2, 2023, Ford filed its quarterly report on Form 10-Q for the period ending March 31, 2023 ("1Q 2023 Form 10-Q").  The 1Q 2023 Form 10-Q contained signed certifications by defendants Farley and Lawler and reported positive trends in Ford's warranty reserves by recording a small increase. Specifically, Ford reported "*[c]hanges in accrual related to pre-existing*

- 49 -

*warranties*" of only ***$226 million***, further portraying Ford as having reversed the 2019 and 2020 trends resulting in $2 billion of increased reserves related to pre-existing warranties ($1.9 billion in 2019 and $2.4 billion in 2020).

94.   On <u>May 22, 2023</u>, defendants Farley and Lawler participated in a conference call as part of Ford's Capital Markets Day.  During prepared remarks, defendant Lawler emphasized "Ford Blue's focus on reducing costs" in order to reach "an EBIT margin in the low double digits" and stated that, "[s]pecifically, ***contribution costs improved by about 4 points driven by several key factors including*** material, logistics and ***warranty*** along with lower commodity costs."

95.   On <u>July 27, 2023</u>, defendants Farley and Lawler participated in a conference call to discuss Ford's second quarter 2023 ("2Q 2023") earnings results. During prepared remarks, defendant Lawler commented that Ford's updated financial guidance for 2023 reflected expected "increased warranty costs." However, rather than disclose and attribute the increased costs to the significant and continued underlying defects and quality issues in older vehicles, he claimed that Ford was experiencing and would continue to experience increased warranty costs due to "inflationary pressures," stating:

> *[W]e're also seeing some inflationary pressures*.  And *we saw that in the quarter as well*, we see that going through the second half, *primarily around warranty, and that's with the costs that we're seeing come through the dealers.  So they're increasing their costs and warranty for the repair.  Their labor rates, et cetera have gone up with inflation*.

- 50 -

96.     Following the 2Q 2023 earnings call, Jefferies commented that, "[l]ike GM, Ford mentioned headwinds on warranty as a result of inflation in repair costs," adding that this was "an industry-wide issue."

97.     The statements set forth in ¶¶92-95 were false and misleading when made.  The true facts, which Defendants knew or recklessly disregarded, were:

(a)     Rather than experiencing positive trends in warranty costs and reserves that reversed the negative trend of massive increases in prior years, and rather than seeing a "$1 billion" improvement followed by "flat" warranty costs and benefits from "improved" warranty, Ford continued to be plagued by significant and expensive vehicle defects (mainly to older models), consistent with prior years, and the reported accruals understated the true state of Ford's warranty problems and costs, which was revealed by the massive increases in warranty costs and reserves at the end of the Class Period;

(b)     Defendants' statements touting Ford's improvement "in initial quality" and "very quick progress on initial quality" were misleading because they omitted to disclose the continued significant and expensive quality problems in older vehicles that were not improving, and were negatively impacting warranty costs, including the Ford F-150 rear axle defect (which remained in 2023), RVC problems, and the 2016 oil pump defects; and

- 51 -

(c)     Contrary to defendant Lawler's claim that increased warranty costs were the result of "inflationary pressures" and dealers "increasing their costs and warranty for the repair," a significant part of Ford's increased warranty costs was the result of quality issues that continued to negatively impact Ford.

98.     On October 26, 2023, defendants Farley and Lawler participated in a conference call to discuss Ford's third quarter 2023 ("3Q 2023") earnings results. As discussed below in ¶¶133-134, certain disclosures partially revealed Ford's underlying quality issues and warranty costs, but the full scope and magnitude of the issues continued to be concealed.   To offset and allay any investor concern, Defendants continued to falsely and misleadingly understate reserves and claim they were adequately fixing the problems reported on October 26, 2023.

99.     On February 6, 2024, defendants Farley and Lawler participated in a conference call to discuss Ford's earnings results for the period ended December 31, 2023 ("FY 2023") earnings results.   In response to an analyst question regarding Ford's "line of sight on warranty coming down," defendant Lawler stated that, "*from a warranty standpoint, costs are probably going to be about flat this year*" because "*we're starting to see green shoots in the quality improvements*."[25]

---

[25]   "'Green shoots' is a term used to describe signs of economic recovery or positive data during an economic downturn."   Clay Halton, *Green Shoots: Meaning and Popularization by Ben Bernanke*, Investopedia (Mar. 9, 2024), https://www.investopedia.com/terms/g/green-shoots.asp.

4933-9010-5723.v1

100. Following the February 6, 2024 statements, BofA Securities commented that "[t]otal costs are expected to be flat YoY."  The next day, on February 7, 2024, Barclays stated that warranty costs "should be stable y/y" and were "still net neutral – even after several years of sharp headwinds."

101.  On April 24, 2024, Ford filed its quarterly report on Form 10-Q for the period ending March 31, 2023 ("1Q 2024 Form 10-Q").  The 1Q 2024 Form 10-Q contained signed certifications by defendants Farley and Lawler and reported positive trends in Ford's warranty reserves by recording a small increase.  Specifically, Ford reported "*[c]hanges in accrual related to pre-existing warranties*" of *$397 million*, signaling a reversal of the $2.6 billion reported in full year 2023.

102. The same day, defendants Farley and Lawler participated in a conference call to discuss Ford's first quarter 2024 ("1Q 2024") earnings results, during which defendant Farley stated that "*[o]ur quality is making real progress*" and emphasized that "*initial quality is 10% better than the previous model year*," purportedly because of Ford's new vehicle launch process, and claimed that Ford has "*so far . . . avoided about 12 recalls on F-150*" thanks to Ford's apparent focus on vehicle launches.

103. Analysts reacted positively to Defendants' false and misleading statements.  For example, on April 24, 2024, UBS raised its price target and stated

- 53 -

it was "incrementally more encouraged by . . . [i]mproving launch quality (even if launches go slower) as this should eventually yield warranty benefits." Furthermore, on April 26, 2024, BNP Paribas noted that one of their "key takes from the quarter" was that "Ford has seen 10% improvements in initial build quality in both model years 2023 and 2024."

104. On June 11, 2024, defendant Lawler participated in a conference call as part of the Deutsche Bank Global Auto Industry Conference. In response to an analyst question requesting insight on vehicle sales "specifically so far in the second quarter," defendant Lawler stated that he would "not . . . give any guidance or information around Q2" and emphasized that "[w]e're seeing some puts and takes on costs" and, specifically, "*[w]e're seeing some inflation in the warranty space, the cost per repairs going up*."

105. The statements set forth in ¶¶99, 101-102, 104 were false and misleading when made. The true facts, which Defendants knew or recklessly disregarded were:

(a) Rather than experiencing positive changes in warranty reserves that reversed the 2023 increase, and rather than seeing "real progress" in warranty costs, such as "flat" costs and "green shoots in quality" following the spike in warranty costs 3Q 2023, Ford continued to be plagued by significant and expensive vehicle defects, consistent with prior years, and the reported accruals understated the

- 54 -

true state of Ford's warranty problems and costs, which was fully revealed by the massive increases in warranty costs and reserves at the end of the Class Period;

(b)     Defendants' statements that Ford's "initial quality" had improved and Ford had "avoided about 12 recalls on F-150" were misleading because they omitted to disclose: (i) the significant and expensive quality problems in older vehicles (including the F-150) that were not improving, and were negatively impacting warranty costs, including the Ford F-150 rear axle defect (which remained in 2024), RVC problems, and the 2016 oil pump defect; and (ii) Ford was experiencing increased costs from dealerships failing to use OTAs, and instead replacing in-car computer modules; and

(c)     Contrary to any claim that increased warranty costs would be the result of merely "inflation in the warranty space, the cost per repairs going up," Ford was experiencing increased warranty costs driven by Company-specific problems, such as: (i) significant and expensive quality problems in older vehicles; and (ii) dealerships failing to use OTAs, and instead replacing in-car computer modules.

**Defendants' False and Misleading Risk**
**Warnings and Reserves Disclosures**

106. In addition to the foregoing statements, during the Class Period, Defendants issued false and misleading boilerplate risk warnings that warned of mere potential or hypothetical risks or costs, when those risks had already

materialized, and assured investors that they were sufficiently increasing warranty reserves as necessary to reflect underlying quality issues, when in fact they were not.

107.  During the Class Period, Defendants filed with the SEC eight quarterly reports on Form 10-Q, all of which contained signed certifications by defendants Farley and Lawler.  These quarterly reports on Form 10-Q were for the quarters ended March 31, 2022-2024 (the "1Q Form 10-Qs"), June 30, 2022-2023 (the "2Q Form 10-Qs"), and September 30, 2021-2023 (the "3Q Form 10-Qs" and, collectively, the "Class Period Form 10-Qs").

108.  The 1Q Form 10-Qs were filed on April 27, 2022, May 2, 2023, and April 24, 2024.  The 2Q Form 10-Qs were filed on July 27, 2022 and July 27, 2023. The 3Q Form 10-Qs were filed on October 27, 2021, October 26, 2022, and October 26, 2023.

109.  The Class Period Form 10-Qs falsely and misleadingly stated that "Ford's vehicles" merely "***could be affected by defects that result in delays in new model launches, recall campaigns, or increased warranty costs***" (the "***Could be Affected by Defects Statement***").

110.  During the Class Period, Defendants filed with the SEC three annual reports on Form 10-K, all of which were signed and certified by defendants Farley and Lawler.  These annual reports on Form 10-K were for the year ending December 31, 2021, filed on February 3, 2022 (the 2021 Form 10-K), year ending December

- 56 -

31, 2022, filed on February 2, 2023 (the 2022 Form 10-K), and year ending December 31, 2023, filed on February 6, 2024 (the "2023 Form 10-K" and, collectively, the "Class Period Form 10-Ks").

111.   Ford's Class Period Form 10-Ks included the same ***Could be Affected by Defects Statement*** (¶109) as well as the following additional false and misleading statements:

(a)   In purporting to describe Ford's risks, the Class Period 10-Ks included a boilerplate warning that "[t]he cost of recall and customer satisfaction actions to remedy defects in vehicles that have been sold" merely "***could be substantial, particularly if the actions relate to global platforms or involve defects that are identified years after production***."

(b)   In purporting to describe Ford's risks, the 2021 Form 10-K and the 2022 Form 10-K stated that "***[i]f warranty costs are greater than anticipated*** as a result of increased vehicle and component complexity, the adoption of new technologies, or otherwise, ***such costs***" merely "***could have an adverse effect on our financial condition or results of operations***.  Furthermore, launch delays, ***recall actions, and increased warranty costs could adversely affect our reputation or market acceptance of our products***."

(c)   In purporting to describe Ford's risks, the 2023 Form 10-K similarly stated that "***[i]f warranty costs are greater than anticipated*** as a result of

- 57 -

increased vehicle and component complexity, the adoption of new technologies, the time it takes to improve the quality of our products and services (or if such efforts are unsuccessful), or otherwise (*including as a result of higher repair costs driven by inflation* or other economic factors), *such costs*" merely "*could continue to have an adverse effect on our financial condition or results of operations*."

112.   These largely unchanged, theoretical and boilerplate statements of risks that could or may occur, set forth in ¶¶109, 111, were false and misleading when made because they did not inform investors of the actual substantial costs and financial impact of underlying defects and warranty-related issues, including defects from "years after production," that were continuing to result in increased warranty costs that were having an adverse effect on Ford's financial condition, including the long-standing rear-axle defect impacting Ford's flagship F-150 pickup, the long-standing RVC problems that impacted a broad scope of Ford products, and the even longer-standing oil pump defect that could result in an entire engine replacement, as well as the fact that Ford dealerships were replacing costly computer modules, rather than utilizing cheaper OTA updates.

113.   Additionally, the Class Period Form 10-Ks included the following assurances that Ford was updating warranty reserves based on actual defects and existing information:

- 58 -

(a)     With respect to Ford's "estimate of base warranty obligations," Ford uses "a patterned estimation model" and "historical information regarding the nature, frequency, and average cost of claims for each vehicle line by model year," and "*[b]ased on this data, we update our estimates as necessary*."

(b)     With respect to Ford's "estimates of field service action obligations," Ford "*assess[es] our obligation for field service actions on a regular basis using actual claims experience and update[s] our estimates as necessary*."

114.   These statements, set forth in ¶113, were false and misleading when made because Ford was not "updat[ing] our estimates as necessary" to account for the continued actual substantial costs and financial impact of then-existing underlying defects and warranty-related issues, which were revealed by the massive increases in warranty costs and reserves at the end of the Class Period, including costs and issues related to the long-standing rear-axle defect impacting Ford's flagship F-150 pickup, the long-standing RVC problems that impacted a broad scope of Ford products, the even longer-standing oil pump defect that could result in an entire engine replacement, and Ford dealerships replacing costly computer modules, rather than utilizing cheaper OTA updates.

115.   In addition, Ford's 2023 Form 10-K falsely and misleadingly stated that "*our warranty costs have increased, in part, due to inflationary cost pressures at our dealers*," which was false and misleading when made because warranty costs

- 59 -

were continuing to increase overwhelmingly because of underlying defects and warranty-related issues, not inflationary cost pressures.

**FORD'S CLASS PERIOD FINANCIAL STATEMENTS WERE MATERIALLY FALSE AND MISLEADING**

116. As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate."   17 C.F.R. §210.4-01(a)(1). Regulation S-X also requires that interim financial statements filed with the SEC comply with GAAP.  17 C.F.R. §210.10-01(a).

117. GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.  The SEC has adopted the accounting standards set forth in the Financial Accounting Standards Board's Accounting Standards Codification ("ASC") as "the single source of authoritative nongovernmental U.S. generally accepted accounting principles."

118. Throughout the Class Period, Ford issued financial statements to investors that were filed with the SEC in its Forms 10-K and 10-Q signed or certified by defendants Farley and Lawler.  These financial statements represented that they were prepared in conformity with GAAP stating, in pertinent part, "[o]ur consolidated financial statements are presented in accordance with U.S. generally accepted accounting principles ('GAAP')."

- 60 -

119. This representation was materially false and misleading because Defendants, in violation of GAAP, knowingly or recklessly suppressed and delayed the recognition of warranty costs, thereby falsely inflating the Company's profitability during the Class Period. By materially understating warranty cost related reserves used to account for defective automobile parts and components, the financial statements failed to timely recognize warranty costs during the Class Period. In addition, the financial statements failed to make required disclosures associated with such costs and defects.

120. GAAP, in ASC Topic 460 *Guarantees*, sets forth the financial statement accounting and disclosure requirements for certain guarantees, including product warranties incurred in connection with the sale of goods or services. ASC Topic 460 provides that because of the uncertainty surrounding such claims, warranty obligations fall within the definition of a "loss contingency" and losses from warranty obligations are to be accrued and/or disclosed in financial statements in accordance with the requirements ASC Topic 450 *Contingencies*.[26]

---

[26] ASC 450 defines a loss contingency as "[a]n existing condition, situation, or set of circumstances involving uncertainty as to [a] possible loss to an enterprise that will ultimately be resolved when one or more future events occur or fail to occur."

- 61 -

4933-9010-5723.v1

121. ASC Topic 450 mandates when a contingency must be accrued as a liability and/or when financial statements must provide disclosure about contingent liabilities, as well as what the financial statements must disclose.

122. Specifically, ASC Topic 450 provides that a loss from a loss contingency is to be accrued as a liability, which results in a charge against income, if: (i) the contingent loss is probable, *i.e.*, likely; and (ii) the contingent loss is reasonably estimable.

123. Condition (i) above is met when, based on available information, it is probable that customers will make claims under warranties relating to goods or services that have been sold. ASC Topic 460-10-25-6. The satisfaction of Condition (ii) above normally depends on the experience of an entity or other information.

124. When no accrual is made, either because the contingent loss is not "probable" or because the amount of the contingent loss cannot be "reasonably estimated," the loss contingency *nonetheless must be disclosed* if there is at least a "reasonably possible" chance that a loss, or an additional loss, may have been incurred. GAAP defines reasonably possible as a *more than a slight*, but less than likely, chance a future event will occur. *See* ASC Topic 450-20.

125. When disclosure of a loss contingency is required, the disclosure must describe the "nature of the contingency" and provide "an estimate of the possible

- 62 -

loss or range of loss or a statement that such an estimate cannot be made." ASC Topic 450-20-50-4.

126. Accordingly, GAAP required that the Ford's Class Period Form 10-Ks and Class Period Form 10-Qs recognize warranty costs and include disclosures regarding the quality problems and increased warranty costs related to older-model vehicles that were plaguing Ford during the Class Period, as revealed by the massive increases in warranty costs and reserves at the end of the Class Period. Indeed, in Ford's Class Period Form 10-Ks, the Company confirmed that, pursuant to its warranties, "[Ford] will repair, replace, or adjust all parts on a vehicle that are defective in factory-supplied materials or workmanship during the specified warranty period," and that Ford "also incur[s] costs as a result of field service actions (*i.e.*, safety recalls, emission recalls, and other product campaigns), and for customer satisfaction actions."

127. As noted, GAAP required these loss contingencies to be timely accrued and disclosed in Ford's financial statements during the Class Period. Throughout the Class Period, Defendants knew that Ford's underlying warranty exposure had not changed from the massive increases in prior years and it continued to be plagued by longstanding warranty and FSA issues. *See* ¶56. Further, Ford defects on older-model vehicles included the long-standing rear-axle defect impacting Ford's flagship F-150 pickup, the long-standing RVC problems that impacted a broad scope

- 63 -

of Ford products, and the even longer-standing oil pump defect that could result in an entire engine replacement.  *See* ¶¶56-75.

128.   Thus, no later than the start of the Class Period, the requirements for accrual under ASC 450 had been met, and Ford was required under GAAP to increase its warranty reserves to account for the known warranty costs arising from Ford's longstanding quality problems, which had not changed.

129.   In addition, even if the losses could not be reasonably estimated, it was clearly "more than remote" that losses had been incurred, and Ford's financial statements during the Class Period were required to disclose the specific nature of the warranty loss contingency and either estimate "the possible loss or range of loss" or "state that such an estimate cannot be made."

130.   However, Ford did not accrue the warranty obligations or disclose that it was more than remote that the losses had been incurred.   Therefore, Ford's financial statements during the Class Period were materially false and misleading and presented in violation of GAAP because they failed to disclose that:

(a)   The financial statements included in those SEC filings materially understated the reported warranty balance;

(b)   The quality problems and increased warranty costs related to Ford's underlying warranty exposure that had not changed from the massive increases in prior years, and its longstanding warranty and FSA issues on older

- 64 -

vehicles, constituted a loss contingency, and the financial statements further failed to disclose: (i) an estimate of the possible loss or range of loss for the loss contingency; or (ii) state that such an estimate cannot be made; and

(c)    the financial statements were not prepared in "in conformity with U.S. generally accepted accounting principles" and did not comply with Ford's stated warranty reserves policies.

131.    Ultimately, evidencing that the Class Period 10-Qs and Class Period 10-Ks violated GAAP, on July 24, 2024, Ford belatedly increased its pre-existing warranty balance by *over $1.4 billion (60%)* and issued nearly $1.5 billion in warranty payments during the period.

**THE TRUTH EMERGES**

132.    The truth about the Company's failure to reduce warranty costs and improve the Company's profitability in order to fund future EV investments and technologies emerged over the course of two disclosures, causing declines in the price of Ford common stock.

**October 2023 Disclosures**

133.    After market close on October 26, 2023, Ford announced, and convened an earnings call to discuss, Ford's 3Q 2023 earnings results.  During prepared remarks, defendant Lawler disclosed that the Company had experienced "higher warranty [costs] driven by recalls and higher per unit repair costs due to inflation."

4933-9010-5723.v1

While this statement initially blamed inflation, defendant Lawler eventually conceded the majority related simply to higher costs from warranties. More specifically, when asked by an analyst about a slide deck that showed $1.7 billion in warranty costs year-to-date, defendant Lawler asserted that the massive $1.2 billion spike in 3Q 2023 consisted of "about $300 million of that was inflationary costs and roughly $900 million was the issue with warranties." Defendant Farley quickly added in response to the same question, to "explain our operational headwinds," that "we have a lot of revenue power in the company, but we also have a lot of technology, and that technology that we rolled out like cameras before our competitors, it puts a huge burden on that electric architecture with a lot of extra modules and software." After these disclosures, Ford's stock price declined by $1.39 per share (approximately 12%), from $11.35 per share on October 26, 2023, to $9.96 per share on October 27, 2023.

134. Analysts attributed Ford's stock price decline to the increased warranty costs, with Wells Fargo reporting that Ford shares had declined "on [the] Q3 miss driven by more warranty issues." The next day, on October 27, 2023, Barclays commented that $900 million of the $1.2 billion in Ford's quarterly warranty expenses were unrelated to inflationary pressures, which "is frustrating as it reminds us of a key weak point for Ford around quality," but added that "[r]esolving these

- 66 -

issues has been a key focus of CEO Jim Farley" and stated that "as bad as it [may] appear – roughly 3/4 of the warranty cost should be non-recurring" in nature.

**July 2024 Disclosures**

135.   The true scope and magnitude of the facts regarding Ford's warranty costs fully emerged on July 24, 2024, when Ford was forced to belatedly admit it had not been successful, as investors were led to believe, in reducing warranty costs and improving quality.  Instead, Ford reported rising warranty costs revealing that Defendants had not been turning around Ford, rather, Ford continued to suffer from massive quality and warranty issues, causing a massive decline in Ford's stock price.

136.   On July 24, 2024, after the market closed, Ford published a release disclosing that: (i) the Company reported disappointing EBIT of $2.8 billion (far below analyst expectations of $3.7 billion), as "[p]rofitability was affected by an increase in warranty reserves"; (ii) Ford Blue reported a massive year-over-year EBIT decline from $2.3 billion to $1.2 billion (also far below analyst expectations of $2.5 billion), "mostly because of the higher warranty costs;" and (iii) Ford Blue's full-year 2024 EBIT guidance was lowered by $1 billion, from $7.0 to $7.5 billion to $6.0 to $6.5 billion, due to "higher warranty costs."  The release quoted defendant Lawler admitting, "'[w]e still have lots of work ahead of us to raise quality and reduce costs and complexity.'"

4933-9010-5723.v1

137.   In Ford's 2Q 2024 quarterly report on form 10-Q, filed after market close on July 24, 2024 ("2Q 2024 Form 10-Q"), Ford reported that in-period warranty and FSA payments for the first half of 2024 had increased by more than 40%, from $2 billion in 2023 to $2.8 billion in 2024.  The 2Q 2024 Form 10-Q also disclosed that Ford had increased its accruals relating to pre-existing warranties in the first half of 2024 by more than 60%, from $880 million in 2023 to $1.4 billion in 2024.

138.   Defendants Farley and Lawler hosted a conference call the same evening.  During opening remarks, defendant Farley initially stated that the higher warranty costs recorded in 2Q 2024 were "tied to new technologies, FSAs, and inflationary pressures for the cost of repair."  In response to an analyst question about "the warranty performance that led to the higher cost," defendant Lawler stated:

> [T]hese are issues that are popping up in the field on these older models. The largest one coming through is on a rear axle bolt for vehicles that were engineered for the 2021 model year was when they were introduced.  And if these things come through, at a higher time in service, we're made aware of them, we need to take care of our customers, we go out to fix them.  And we have several of those types of things popping up on older models.  We got a failed oil pump issue that's popping up on, 2016-launched vehicles.

139.   Contrary to defendant Lawler's claim that "it is hard to predict on some of these units that have been out in the field for quite a while that one of these issues is going to show up with these longer-term durability and quality issues," Defendants had known about Ford's quality problems for years leading up to and during the

- 68 -

Class Period (and, for example, the rear axle bolt, RVC, and oil pump issues had been known for years), but concealed the scope and impact they continued to have on warranty costs during the Class Period.  During the July 24, 2024 call, defendant Farley also attributed increased warranty costs to the dealers replacing components, rather than using OTA updates.  He stated it was "difficult for the dealers to diagnose when customers come in and say something is wrong with my SYNC system.  They replace modules unnecessarily, et cetera, and that hits our warranty reserves."

140.  On this news, Ford's stock price declined by $2.51 per share (approximately 18%), from $13.67 per share on July 24, 2024, to $11.16 per share on July 25, 2024, reportedly marking the stock's largest one-day percentage decline since the 2008 financial crisis, and removing artificial inflation caused by Defendants' fraud and causing Plaintiffs to suffer losses.

141.  Analysts reacted negatively to Ford's shocking disclosures.  For instance:

- On July 24, 2024, Piper Sandler stated it was "cutting" its 2024 earnings estimates for Ford following the July 24, 2024 earnings call.  Piper Sandler noted that "[t]he stock is indicated lower by ~11% in after-hours trading, due (in our view) to unwelcome warranty headwinds. Ford referenced quality problems on vehicles from the 2016 and 2021 model years."

- On July 25, 2024, Barclays cut its price target for Ford stock, citing Ford's "warranty headwind[s]" and "warranty pressures" that included "a ~$700mn drag on cost in [Ford] Blue" and commenting that these "warranty challenges are frustrating for investors."  Barclays noted that Ford's reported EBIT of $2.8 billion was well short of consensus

> analyst expectations of $3.7 billion, and the same was true of Ford Blue's reported EBIT of $1.8 billion, compared to consensus expectations of $2.5 billion.

- On July 25, 2024, UBS also reduced its price target for Ford stock, noting that "[w]arranty was a ~$700mm y/y headwind in Ford Blue during [the] quarter as Ford had a number of field service actions (FSAs) on older product."

- On July 26, 2024, BNP Paribas likewise lowered its price target for Ford stock, stating "[t]his qtr. has entirely rekindled our concerns over Ford's historical track record of inconsistent execution" and "sudden periods of excess costs . . . as was the case w/ 2Q's [Ford] Blue warranty outlay."

142.   Media also reported on the disclosures and resulting stock price decline. *Bloomberg* published an article on July 24, 2024, which was subsequently updated on July 25, 2024, reporting that the stock "sank 18%" and had its "worst day in more than 15 years" – or "since November 2008" – following news that Ford saw "a surge in warranty repair costs for older vehicles."  The article further noted that the "18%" stock decline "wiped out the 2024 gain for the stock, which is now down more than 8% for the year."  Similarly, *The Detroit News* reported on July 25, 2024 that Ford shares had "plunged" and the spike in warranty costs "caught investors by surprise," citing Wedbush Securities Inc. as stating that Ford's disclosures amounted to "'a code red situation at Ford after a disaster quarter.'"

143.   A week later, on August 1, 2024, BofA Securities issued a report regarding a conversation with defendants Farley and Lawler.  On the topic of warranty costs, BofA Securities stated that "[c]ommentary suggests the primary

- 70 -

4933-9010-5723.v1

issues have been associated with the powertrain," which includes rear axles, "and Ford has also had challenges with technology from the supply base, including cameras/screens."

## ADDITIONAL SCIENTER ALLEGATIONS

**The Individual Defendants' Public Statements**
**Support a Strong Inference of Scienter**

144.   Through defendant Farley's role as CEO and President and defendant Lawler's role as CFO, the Individual Defendants were able to, and did, determine the content of the various SEC filings and other public statements pertaining to Ford during the Class Period.  Defendants Farley and Lawler signed or certified Ford's annual and quarterly reports filed with the SEC.  *See* ¶¶80, 84, 86, 88-89, 101, 107-108, 110.  Defendants Farley and Lawler were repeatedly quoted in Ford releases during the Class Period.  And, defendants Farley and Lawler attended conference calls and spoke on behalf of the Company during the Class Period.  *See, e.g.*, ¶¶78, 82, 87, 90, 92, 94, 99, 102, 104.

145.   Further, the Individual Defendants participated in the drafting, preparation and/or approval of such public statements and were provided with copies of the documents alleged herein to be false and misleading prior to or shortly after their issuance and had the ability and/or opportunity to prevent their issuance or cause them to be corrected.   Accordingly, the Individual Defendants were responsible for ensuring the accuracy of the public reports and releases detailed

- 71 -

herein and for verifying that the facts supported the statements and there were no material omissions, and they are therefore liable for the misrepresentations and omissions therein.

146. During their time as directors and/or senior executive officers of Ford, the Individual Defendants were privy to confidential and proprietary information concerning Ford's warranty reserves and the factors the Company considers when setting its reserves. Each of them also: (i) had access to, *inter alia*, internal corporate documents, and conversations with corporate officers and employees; (ii) attended management and Board meetings and committees thereof; and (iii) reviewed reports and other information provided to them in connection therewith. Because of their possession of such information, each of the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

147. By executing certifications in accordance with the Sarbanes-Oxley Act of 2002 ("SOX Certifications"), which were attached to each Class Period 10-Q and each Class Period 10-K, defendants Farley and Lawler undertook the affirmative obligation to ensure the Company's disclosures to the market were true and to obtain the requisite knowledge of material information, like the existence of understated warranty reserves. In fact, through signing the SOX Certifications, defendants Farley and Lawler certified that they had designed "disclosure controls and

4933-9010-5723.v1

procedures . . . to ensure that material information relating to [Ford] . . . is made known to us by others . . . particularly during the period in which [each] report [was] being prepared." And at no point since the revelation of the negative facts discussed herein, have any of the Defendants claimed that those SOX Certifications were untrue and that defendants Farley and Lawler had not been informed about material information relating to Ford's ballooning warranty costs and the impact these costs had on Ford's financial statements.

148. Additionally, defendants Farley and Lawler held themselves out to investors and the market as the persons directly involved in, and most knowledgeable about, Ford Blue, the Company's purported focus on quality and quality improvements, and the Company's warranty issues. Their repeated statements to the investing public during the Class Period demonstrate knowledge of the topics on which they directly spoke. *See, e.g.*, ¶¶53, 78, 82, 87, 90, 92, 94, 99, 102.

149. For example, defendant Lawler hosted conference calls during which he specifically addressed warranty-related issues and questions during the Class Period, and also provided detail about the Company's quality, warranty costs, and process of establishing warranty reserves. ¶¶78, 82, 90, 92(a), 94, 95, 99, 104; *see also* ¶35.

- 73 -

150.   Likewise, defendant Farley repeatedly discussed quality and warranty related issues, and held himself outs as executing "a very concrete plan" to address warranty costs.  ¶43; *see also* ¶¶87, 92(b), 102.  Defendant Farley has expressed a detailed understanding of the topics at issue here, explaining, for example, that when the "transmission and rear axle" in ICE vehicles "go[] bad" it's "super expensive" and "complicated."  ¶53.

151.   The Individual Defendants' repeated statements regarding, and their direct involvement in the decisions impacting, these topics support an inference that at the time they spoke they were actively monitoring and had access to, and knew or recklessly disregarded, the facts that rendered their statements false and misleading.

**Defendants Closely Monitored Ford Warranty
Costs and Financial Performance, Which Were
Critical to Ford**

152.   Because reserves are such a significant cost item, they are closely monitored by senior management and accountants.  For example, as stated by defendant Lawler, "on a quarterly basis, we conduct reserve reviews to assess the adequacy of th[e] reserves" and "[a]s the actual claims are incurred, we compare this experience with the historic spend and the trends we see to identify whether an adjustment to the reserve is required."

153.   Defendants had to monitor warranty reserves because they sign off on the financial statements, which include the updated warranty reserves at each

- 74 -

quarter. In its financial statements, Ford reports both the warranty and FSA costs it incurred and its estimated "future warranty and field service action costs" on a quarterly and annual basis. In doing so, the Company provides a beginning and ending balance for the period reported, as well as how the differences in those balances were impacted by changes from: (i) payments made during the period; (ii) warranties issued during the period; (iii) changes in accrual related to pre-existing warranties; and (iv) foreign currency translation or other impacts.

154. In their roles as CEO (Farley) and CFO (Lawler), the Individual Defendants were required to not only keep themselves informed of the Company's day-to-day business and operations, but to keep Ford's non-management directors apprised of the state of the Company's business, operations, and trends.

155. As discussed above (*see* ¶¶27-55), Ford and the Individual Defendants publicly acknowledged that the profits and success of Ford's ICE business (Ford Blue), and controlling warranty costs, were critical to Ford's profitability, operations, and growth, and the execution of the Individual Defendants' highly-touted Ford+ strategy. In short, the Ford Blue business was the core of Ford's historical success, and allowed Ford to heavily invest in the development of present and future EVs in Ford Model e, so long as warranty costs did not impede profitability. As the leaders of Ford, defendants Farley and Lawler determined

- 75 -

business strategy and made and approved the decision to move forward with Ford+, restructure the business, and change the Company's financial reporting structure.

156.   More specifically, with respect to Ford's ICE business (Ford Blue), the success of that business and Ford's ability to rein in warranty costs and quality control issues were critical to Ford's stock price and closely followed by analysts and investors.  The Individual Defendants reported on, and responded to, analyst questions regarding Ford's warranty costs and the Company's plan to lower them before, during, and after the Class Period.  For example, during a February 26, 2020 conference call, defendant Farley emphasized that "we need to lower our warranty spending" and stated that Ford apparently had "a very concrete plan" to lower warranty costs.  In response to an analyst question later in the call, defendant Farley added that Ford's warranty problems had "taken a little work.  But I don't think it was a total mystery," adding "[t]here are issues that people knew about that just weren't being resolved."

157.   Furthermore, Ford held an October 28, 2020 conference call discussing Ford's 3Q 2020 earnings results.  Notably, this was defendants Farley and Lawler's first quarterly earnings call as CEO and CFO, respectively.  During this conference call, analysts asked multiple questions about Ford's warranty costs and the Company's plan to address them.  One analyst "noticed that . . . warranty costs moderated a bit" in the quarter and wondered whether this was "a sign that things

- 76 -

are finally peaking," and even asked a follow-up question: "The warranty cost, is this a sign that you're starting to get your arms around that and that . . . there's visibility on when that's going to start coming back down?"  In response, Farley confirmed his and Lawler's focus on Ford's warranty costs:

> A warranty in the last few years, coverage is up $1 billion to $2 billion depending on the year, and that is not okay.
>
> So although it moderated in the quarter and we have taken a lot of actions on craftsmanship, long-term durability, we have a much bigger ambition to improve the quality of our vehicles.

158.   Another analyst also focused on Ford's warranty expenses and sought additional information on the Company's plan, asking "what need[ed] to be done on the warranty side and the quality side" and what was "being done or can be done?"

159.   Moreover, during a June 15, 2023 conference call, an analyst asked defendant Lawler about "[profit] margin improvement in contribution cost," which includes warranty costs.  In response, defendant Lawler identified warranty costs specifically, stating that "[t]here's 4 points which will be in that contribution cost area" and "[w]arranty is about 1 point."

160.   Additionally, Ford and the Individual Defendants, before, during, and after the Class Period, repeatedly emphasized the critical importance of Ford Blue and, specifically, the F-Series trucks, which includes the F-150 (with the axle bolt defect).  For example, before the Class Period, on June 26, 2020, then-COO defendant Farley was asked during an interview on CNBC about the F-150's

- 77 -

4933-9010-5723.v1

"complete redesign" and how "critical" it was that the F-150 "connect with buyers." In response, defendant Farley stated it was "very critical" that it connect with buyers, and added F-150 was Ford's "most important vehicle at Ford globally."  The same day, in an interview with Yahoo! Finance, defendant Farley once again emphasized the F-150, stating that F-Series is "fundamental," the "F-Series lineup is the second most valuable consumer product, only second to the iPhone" and "from a revenue and profit standpoint, it is fundamental to the Company."

161.   Moreover, during the Class Period, in an April 26, 2022 release announcing production of Ford's all-electric F-150 Lightning, the Company stated that its F-Series trucks had been the "best-selling truck for 45 years in a row" in the United States "and is second only to the iPhone in revenue among all American consumer products."  In October 2025, defendant Farley stated in an online post that the "F-Series lineup" has been the best-selling truck in the United States for nearly 50 years, and the best-selling vehicle of any kind in the United Stated since 1981.

**The Scope and Severity of the Massive**
**Spike in Ford's Warranty Costs Support**
**a Strong Inference of Scienter**

162.   Contrary to Defendants' Class Period representations, Ford's October 26, 2023 and July 24, 2024 announcements revealed an enormous decline in profitability that was primarily attributable the severe and undisclosed warranty issues.  The magnitude of this undisclosed warranty issue and the financial impact it

- 78 -

had on Ford's profitability supports a strong inference that Defendants' misstatements were made with scienter.

163. For example, on July 24, 2024, Ford announced that while the Ford Blue segment had a 7% increase in revenue year-over-year, increasing to $26.7 billion, Ford Blue's EBIT declined by $1.1 billion year-over-year ($1.2 billion EBIT in 2Q 2024 compared to $2.3 billion in 2Q 2023), a nearly 50% decline, which Ford explained was "mostly because of the higher warranty costs."

164. The higher warranty costs in the Ford Blue segment impacted Ford's overall profitability as well. While the Company's total quarterly revenue grew by $2.8 billion, or 6%, year-over-year ($47.8 billion in 2Q 2024 compared to $45.0 billion in 2Q 2023), the Company's net income declined during that same year-over-year period. As Ford bluntly admitted in its Q2 2024 release: "Profitability was affected by an increase in warranty reserves . . . ."

165. Indeed, Ford's reported warranty accruals as of the six months ended June 30, 2024 ("2H2024") were $2.7 billion higher than the same period a year earlier (approximately $12.6 billion as of June 30, 2024 compared to approximately $9.9 billion as of June 30, 2023), an increase of 27%, and, on a quarterly basis, Ford's accruals for warranty in 2Q 2024 were approximately $1.0 billion higher than just a quarter earlier (approximately $12.6 billion as of June 30, 2024 compared to $11.5 billion as of March 31, 2024). As to increases to warranty reserves related to

- 79 -

pre-existing warranties (older vehicles) which Defendants have confirmed continued to be at the center of Ford's quality and warranty problems, Ford's accruals as of 2Q 2024 increased by 60% from the prior year (from $880 million as of 2Q 2023 to $1.44 billion as of 2Q 2024). In fact, the $1.44 billion increased accrual for pre-existing warranties in the first half of 2024, was more than three times the average first half increased accruals in 2021, 2022, and 2023:



166. The sheer scale of the increases to warranty reserves, combined with the erasure of nearly half of Ford Blue's profitability due to the increased warranty costs, demonstrate that the warranty and quality issues were not isolated or unforeseen, but rather systemic problems that had remained since prior to the Class Period. Indeed, the failure to disclose a mounting liability of this magnitude – a

- 80 -

problem so severe it erased nearly half of the Ford Blue segment's profitability – is precisely the type of core omission that demonstrates a conscious, or at minimum severely reckless, disregard for the truth.

167. Such substantial financial provisions do not materialize overnight; they reflect ongoing quality defects and recalls that had been present for years and would have continued to have been tracked through internal reporting mechanisms, including warranty claims data, quality control metrics, and risk assessments routinely reviewed by senior executives. Indeed, Ford's EBIT was listed in the "COMPANY KEY METRICS" section of every one of Ford's quarterly and annual reports to the SEC during the Class Period (*i.e.*, the Class Period 10-Qs and Class Period 10-Ks), as well as listed in a "Company Key Metrics" summary in each quarterly earnings release issued by Ford during that time.

168. The Individual Defendants, as key officers responsible for Ford's operations and financial disclosures, had access to this information throughout the Class Period, making their failure to disclose the escalating warranty liabilities a reckless disregard for the truth, or intentional concealment.

169. The Individual Defendants' detailed commentary on the warranty issues on the corrective dates adds to the strong inference of scienter. For example, during Ford's 2Q 2024 earnings call, held on July 24, 2024, defendant Farley confirmed that Ford "did see warranty costs increase in 2Q" and defendant Lawler

- 81 -

acknowledged "headwinds in warranty" but asserted that Ford was "working to mitigate these costs." When an analyst asked about Ford management's "visibility" into the purportedly "surprise warranty issues," defendant Farley admitted Ford has "internal data" on warranty and reliability issues that they had been tracking "for quite some time."

170. Defendant Farley asserted that he could speak to the "hundreds" of "root causes for these [warranty] issues" and even spoke about a few in particular, explaining that when dealers fail to properly diagnose an issue and replace modules unnecessarily, "that hits our warranty reserves."

171. Demonstrating the magnitude and importance of these continued warranty issues, defendant Farley concluded: "[W]e're working all of those [warranty] cost curves every day for each of our models." Defendant Lawler added that warranty and FSAs are "an issue that the team is focused on."

172. When another analyst asked for additional details about "the warranty performance that led to the higher cost," defendant Lawler was able to provide details about particular defects that contributed to the higher costs, pinpointing that the "largest one coming through is on the rear axle bolt for vehicles that were engineered for the 2021 model year" and commenting on "a failed oil pump issue that's popping up on 2016 launched vehicles." He also admitted that "if these things come through at a higher time in service, we're made aware of them." *See also* ¶133.

- 82 -

173. The Individual Defendants' comments, in response to analyst questions on the corrective dates, demonstrate that Ford tracked data internally about these warranty issues, that the Individual Defendants were aware of the continued significant quality problems and warranty costs, and that managing warranty costs was a constant focus of the executive team.

174. Taken together, the sheer magnitude of continued significant quality problems and the Individual Defendants' detailed admissions confirming their long-standing, specific knowledge of the Ford's quality problems and warranty costs – create a cogent and compelling inference that Defendants' misstatements were made with knowledge of the ongoing warranty issues and costs that were concealed from investors throughout the Class Period.

**Ford's Consent Order with the NHTSA**
**Supports a Strong Inference of Scienter**

175. On November 14, 2024, NHTSA, an operating administration of the DOT, announced a Consent Order with the Company (the "Consent Order"). In a press release discussing the Consent Order, NHTSA stated that the Consent Order concerned Ford's "fail[ure] to comply with federal recall regulations" and included a civil penalty of $165 million against Ford. The $165 million civil penalty against Ford was historically significant, then-representing the second-highest penalty NHTSA had ever obtained in the agency's more than 50-year history.

4933-9010-5723.v1

176. The Consent Order centered on Ford's recall of RVCs in Ford vehicles, originally announced on September 23, 2020, which concerned intermittent or inoperative RVCs and potentially affected up to 620,000 vehicles. On August 3, 2021, during the Class Period, NHTSA opened a "Recall Query" to investigate Ford's compliance with the National Traffic and Motor Vehicle Safety Act of 1996 (the "Safety Act") in connection with Ford's first RVC recall, including the timeliness and scope of the recall. On April 14, 2022, after NHTSA opened its Recall Query, Ford filed an expanded RVC recall. By March 8, 2024, following discussions with NHTSA, Ford expanded the recall again.

177. According to NHTSA's investigation into Ford, which included information provided by the Company, NHTSA stated that Ford violated multiple provisions of the Safety Act and regulations thereunder. These violations included that Ford: (i) provided inaccurate and/or incomplete information concerning RVCs in its reports to the NHTSA; (ii) failed to timely recall vehicles with RVCs; and (iii) failed to fully comply with the requirement for public availability of recall information with respect to several recalls concerning RVCs.

178. In addition to the monetary provision contained in the Consent Order (*i.e.*, the $165 million civil penalty), the Consent Order also required Ford to meet with NHTSA on a quarterly basis, to submit complete and accurate safety

evaluations lists, and to undergo a "thorough review" of all its recalls from the three years prior to "ensure that it . . . accurately scoped each recall."

179.    The NHTSA's findings, as set forth in the Consent Order, that Ford repeatedly failed to address a defect, understated the initial scope of the recall, and failed to disclose required safety information during the investigation in the Class Period further supports that Defendants likewise knew of the underlying warranty issues plaguing Ford during the Class Period, but failed to adequately address them, understated their significance, and underreported related reserves.

**Insider Stock Sales Support a Strong Inference of Scienter**

180.    The Individual Defendants financially benefited by selling Ford stock at artificially inflated prices during the Class Period.  As Defendants made false and misleading statements, Ford's stock price increased from around $17 per share at the start of the Class Period to around $25 per share in 2022, and remained artificially inflated until the truth was fully revealed in July 2024.  While knowingly or recklessly disregarding the undisclosed scheme alleged herein, the Individual Defendants disposed of hundreds of thousands shares of Ford common stock.

181.    Defendant Farley did not report any sales of Ford stock in 2020 (the year before the Class Period) or in 2021 through the start of the Class Period (October 28, 2021).  During the Class Period, when Ford stock was trading at artificially inflated prices, defendant Farley engaged in multiple rounds of stock

4933-9010-5723.v1

selloffs, selling approximately 265,000 shares for a total of roughly $4.3 million in proceeds. For example, on March 3, 2022, when Ford stock was trading at nearly $18 per share and just after defendant Farley had reported a $2.2 billion improvement on warranty reserve increases related to pre-existing warranties (¶80), defendant Farley sold over 185,000 shares and grossed over $3.3 million in proceeds. Similarly, defendant Lawler did not report any sales of Ford stock in the 3 years leading up to the Class Period, and then sold nearly 30,000 shares of Ford stock on a single trading day during the Class Period, collecting almost $390,000 in proceeds.

182. Other Ford senior executives financially benefited from insider stock sales as well. On December 3, 2021, then Controller and Principal Accounting Officer Cathy O'Callaghan (who signed many of the Class Period SEC filings) sold nearly 73,000 shares of Ford stock at over $20 per share, generating nearly $1.5 million.

183. In addition, Mark Kosman, who replaced O'Callaghan as the Company's Principal Accounting Officer, sold nearly 27,000 shares of Ford stock on March 6, 2024, at over $12 per share for a total of approximately $337,000.[27]

---

[27] Kosman departed Ford in 2025, and joined joined The Hertz Corporation ("Hertz") in a similar role. According to Hertz, Kosman would receive an annual salary of $450,000, along with other incentives. Thus, Kosman's insider sale

- 86 -

## LOSS CAUSATION AND ECONOMIC LOSS

184.   During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Ford common stock and operated as a fraud or deceit on Class Period purchasers of Ford common stock by misrepresenting and concealing: (i) the fraudulent scheme to understate its warranty reserves; (ii) the quality and defects of Ford vehicles and their impact on warranty costs and reserves; and (iii) the materialization of the undisclosed risk that Ford would incur hundreds of millions of dollars in warranty expenses to cover defective products covered under either warranties or FSAs.

185.   Defendants' false and misleading statements and omissions, individually and collectively, had their intended effect and directly and proximately caused Ford's common stock to trade at artificially inflated levels, reaching a Class Period high of $25 per share.

186.   As a result of Defendants' fraudulent conduct as alleged herein, the price at which Ford common stock traded was artificially inflated throughout the Class Period. When Plaintiffs and other members of the Class (defined *infra* ¶200) purchased their Ford common stock, the true value of such common stock was

---

executed on a single day at the end of the Class Period for a total of roughly $337,000, represented nearly 75% of his subsequent annual salary.

substantially lower than the prices actually paid.  As a result of purchasing Ford common stock during the Class Period at artificially inflated prices, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under federal securities laws, when such artificial inflation dissipated.

187.   As a result of Defendants' materially false and misleading statements, Plaintiffs and other members of the Class relied to their detriment on such statements, documents, and omissions, and/or the integrity of the market, in purchasing their Ford common stock at artificially inflated prices during the Class Period.  Had Plaintiffs and other members of the Class known the truth, they would not have taken such actions.

188.   When the misrepresentations and omissions that Defendants had concealed from the market began to be partially revealed on October 26, 2023, Ford's stock price declined by $1.39 per share (approximately 12%), from $11.35 per share on October 26, 2023, to $9.96 per share on October 27, 2023, wiping out more than $5 billion of Ford's market value.

189.   As reflected in the chart below, while Ford common stock fell approximately 12%, the S&P 500 decreased by 0.5% and the Dow Jones

- 88 -

Automobiles & Parts Titans 30 Index, of which Ford is a component, decreased by 0.6%:[28]



190.   And, when misrepresentations and omissions that Defendants had concealed from the market were fully revealed on July 24, 2024, the price of Ford common stock declined by $2.51 per share, or approximately 18%, from $13.67 per share on July 24, 2024, to close at $11.16 per share on July 25, 2024, wiping out approximately $9.8 billion of Ford's market value.

191.   As reflected in the chart below, while Ford common stock fell approximately 18%, the S&P 500 decreased by 0.5% and the Dow Jones

---

[28]   In its Annual Reports on Form 10-K, Ford compared its common stock returns with the returns of the S&P 500 and the Dow Jones Automobiles & Parts Titans 30 Index.

- 89 -

Automobiles & Parts Titans 30 Index, of which Ford is a component, decreased by 2.7%:



192.   The new, Company-specific, material information released on October 26, 2023 and July 24, 2024 was directly related to the false and/or misleading statements previously made by the Defendants.

193.   The timing and magnitude of the price decline of Ford common stock negate any inference that the losses suffered by Plaintiffs and other Class members were caused by changed market conditions, macroeconomic factors or industry factors, or Company-specific factors unrelated to Defendants' wrongful conduct.

194.   Analyst and media reports reflected that the revelation of the previously undisclosed information was responsible for the stock decline.  *See* ¶¶134, 141-142.

4933-9010-5723.v1

**PRESUMPTION OF RELIANCE**

195. At all relevant times, the market for Ford common stock was an efficient market for the following reasons among others:

(a) Ford common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficiency and automated market;

(b) According to Ford's 3Q 2023 Form 10-Q, the Company had more than 3.9 billion shares of common stock outstanding as of October 23, 2023;

(c) Ford regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures; and

(d) Ford was followed by numerous securities analysts employed by major brokerage firms, such as BofA Securities, Barclays, JP Morgan, Morgan Stanley, Nomura, Piper Sandler, UBS Securities, and Wells Fargo.

196. As a result of the foregoing, the market for Ford common stock promptly digested current information regarding Ford from publicly available sources and reflected such information in Ford's common stock price. Under these circumstances, a presumption of reliance applies to Plaintiffs' purchases of Ford common stock.

- 91 -

4933-9010-5723.v1

197. A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Plaintiffs' claims are based, in significant part, on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Ford's business and operations, positive proof of reliance is not a prerequisite for recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the material omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

198. The false and misleading statements alleged herein were not forward-looking. To the extent any of the alleged false and misleading statements were forward-looking, the federal statutory safe harbor for forward-looking statements under certain circumstances does not apply. Many of the specific statements alleged were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, they were not accompanied by meaningful cautionary statements. To be meaningful, cautionary statements must identify important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Such meaningful cautions were absent

- 92 -

4933-9010-5723.v1

from Ford's Class Period filings and oral disclaimers, and instead Ford's purported risk warnings were false and misleading. *See* ¶¶109-112.

199. Alternatively, to the extent that the statutory safe harbor could apply to any forward-looking statements pleaded herein, Ford and the Individual Defendants are liable for those false and misleading forward-looking statements because, at the time each of those forward-looking statements were made, the speaker knew that the particular forward-looking statement was false or misleading and the forward-looking statement was authorized and approved by an executive officer of Ford who knew that those statements were false or misleading when made.

## CLASS ACTION ALLEGATIONS

200. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of Ford common stock during the Class Period (the "Class"). Excluded from the Class are Defendants, the current and Class Period officers and directors of the Company, the members of the immediate families and the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person, and any entity in which such excluded persons have or had a controlling interest.

201. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Ford common stock was actively traded on the NYSE. According to the Company's 3Q 2023 Form 10-Q, the

- 93 -

Company had more than 3.9 billion shares of common stock outstanding as of October 23, 2023. While the exact number of Class members can only be determined by appropriate discovery, Plaintiffs believe that Class members number at least in the hundreds, if not thousands, and that they are geographically dispersed.

202. Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs' and all the Class members' damages arise from and were caused by the same representations and omissions made by or chargeable to Defendants. Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

203. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

204. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by or chargeable to Defendants during the Class Period misrepresented or omitted material facts;

(c)    whether the price of Ford common stock was artificially inflated during the Class Period; and

- 94 -

4933-9010-5723.v1

(d)    to what extent the members of the Class have sustained damages and the proper measure of damages.

205.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for members of the Class to individually redress the wrongs done to them. Plaintiffs are not aware of any difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5
### Against Defendants Ford, Farley, and Lawler

206.    Plaintiffs incorporate the foregoing paragraphs by reference.

207.    During the Class Period, defendants Ford, Farley, and Lawler disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

208.    Defendants violated §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder in that they:

- 95 -

(a)   employed devices, schemes, and artifices to defraud;

(b)   made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)   engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and other members of the Class in connection with their purchases of Ford common stock.

209.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their respective purchases of Ford common stock during the Class Period, because, in reliance on the integrity of the market, Plaintiffs and other members of the Class paid artificially inflated prices for Ford common stock and experienced losses when the artificial inflation was released from Ford common stock as a result of the leakage and disclosure of information and price declines detailed herein.  Plaintiffs and other members of the Class would not have purchased Ford common stock at the prices paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by the false and misleading statements.

210.   By virtue of the foregoing, defendants Ford, Farley, and Lawler have each violated §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

4933-9010-5723.v1

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against Defendants Farley and Lawler

211. Plaintiffs incorporate the foregoing paragraphs by reference.

212. Defendants Farley and Lawler acted as controlling persons of Ford within the meaning of §20(a) of the Exchange Act.

213. By virtue of their high-level positions, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's disclosures, practices, and business model, Farley and Lawler had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading. Farley and Lawler were provided with, or had unlimited access to copies of, the Company's public filings and other statements alleged by Plaintiffs to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

214. As set forth above, Ford violated §10(b) and SEC Rule 10b-5 promulgated thereunder by its acts and omissions as alleged in this complaint. By virtue of their positions as controlling persons, and as a result of their aforementioned conduct, Farley and Lawler are liable pursuant to §20(a) of the Exchange Act for the §10(b) violations. As a direct and proximate result of these

- 97 -

4933-9010-5723.v1

Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period, as evidenced by, among others, the stock price declines discussed above, when the artificial inflation was released from the Company's stock.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.      Declaring this action to be a class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and certifying Plaintiffs as Class Representatives and Robbins Geller Rudman & Dowd LLP as Class Counsel;

B.      Awarding compensatory damages in favor of Plaintiffs and other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs reasonable costs and expenses incurred in this action, including attorneys' fees, experts' fees, and other costs and disbursements; and

D.      Awarding such further relief, including any equitable/injunctive relief, as the Court may deem just and proper.

4933-9010-5723.v1

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:  November 21, 2025

VANOVERBEKE, MICHAUD
  & TIMMONY, P.C.
THOMAS C. MICHAUD (P46787)


*s/ Thomas C. Michaud*
THOMAS C. MICHAUD

79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
tmichaud@vmtlaw.com

Local Counsel

ROBBINS GELLER RUDMAN
  & DOWD LLP
JAMES E. BARZ*
FRANK A. RICHTER*
MICHAEL J. STRAMAGLIA*
200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  630/696-4107
jbarz@rgrdlaw.com
frichter@rgrdlaw.com
mstramaglia@rgrdlaw.com

Lead Counsel for Lead Plaintiff

- 99 -

4933-9010-5723.v1

LEVI & KORSINSKY, LLP
SHANNON L HOPKINS*
GREGORY M. POTREPKA*
1111 Summer Street, Suite 403
Stamford, CT  06905
Telephone:  203/992-4523
212/363-7171 (fax)
shopkins@zlk.com
gpotrepka@zlk.com

Counsel for Additional Named Plaintiff
Ronald A. Ferrante

*Admissions forthcoming

- 100 -

4933-9010-5723.v1