VANOVERBEKE, MICHAUD & TIMMONY, P.C.
THOMAS C. MICHAUD (P46787)
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
tmichaud@vmtlaw.com

Local Counsel

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| ALBERT GUZMAN, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> FORD MOTOR COMPANY, et al., <br><br> Defendants. | Civ. No. 2:24-cv-12080-LVP-KGA (Consolidated with Civ. No. 2:24-cv-12492) <br><br> Honorable Linda V. Parker <br><br> Magistrate Judge Kimberly G. Altman <br><br> <u>CLASS ACTION</u> |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

4927-4048-6553.v1

**TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ........................................................................................1

II. STATEMENT OF FACTS ........................................................................4

    A.  Defendants Promised to Improve Warranty Costs................................4

    B.  Defendants Closely Monitored Warranty Costs ..................................5

    C.  Defendants Delayed Recalls and Concealed the Magnitude of
        Defects to Suppress Reserves and Report Positive Trends...................6

    D.  Defendants Falsely Touted Positive Warranty Trends .........................7

    E.  The Truth Is Revealed that Warranty Costs Remained Sky-High........8

III. ARGUMENT.............................................................................................10

    A.  Legal Standards on a Motion to Dismiss ...........................................10

    B.  The Complaint Adequately Alleges False and Misleading
        Statements ...........................................................................................10

        1.  Defendants Made False and Misleading Statements
            Portraying Positive Quality and Warranty Trends....................11

        2.  Defendants Reported Suppressed Reserves in Violation
            of GAAP ...................................................................................17

        3.  Defendants' Inflation Statements Were Misleading.................21

        4.  Defendants Provided False and Misleading Risk
            Disclosures that Failed to Warn Investors of Reality ..............22

        5.  Defendants' Remaining Arguments Lack Merit.......................24

            a.  The Statements Are Not Protected Under the Safe
                Harbor ...........................................................................24

            b.  The Statements Are Not Inactionable Opinions............25

            c.  The Statements Are Not Immaterial Puffery.................28

**Page**

C. The Totality of Allegations Sufficiently Plead a Strong Inference of Scienter as to Each Defendant ......................................30

    1. Defendants' Admitted Focus, Close Monitoring, and Frequent Statements Support Scienter .....................................31

    2. The NHTSA Consent Order Supports Scienter ........................33

    3. Defendants' Admissions They Were Aware of Warranty Issues Shortly After Vehicle Launch Support Scienter ............34

    4. The Importance of Warranty Costs and Recalls Support Scienter ...............................................................................35

    5. The Magnitude of the Reserve Increases Supports Scienter ...............................................................................37

    6. Defendants' Motive Supports Scienter .....................................38

    7. Defendants' Competing Inference is Implausible ....................39

D. The Control Person Claims Should Be Sustained.............................40

IV. CONCLUSION..........................................................................................40

- ii -

4927-4048-6553.v1

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ...........................................................36

*Blatt v. Corn Prods. Int'l, Inc.*,
  2006 WL 1697013 (N.D. Ill. June 14, 2006).....................................24

*Bond v. Clover Health Invs., Corp.*,
  587 F. Supp. 3d 641 (M.D. Tenn. 2022) .....................................*passim*

*Bondali v. Yum! Brands, Inc.*,
  620 F. App'x 483 (6th Cir. 2015) .....................................................23

*Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.*,
  2018 WL 1071442 (N.D. Ill. Feb. 27, 2018) ...............................17, 22

*Chapman v. Mueller Water Prods.*,
  466 F. Supp. 3d 382 (S.D.N.Y. 2020) ...............................................28

*Chow v. Archer-Daniels-Midland*,
  2025 WL 790854 (N.D. Ill. Mar. 12, 2025) ......................................30

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
  399 F.3d 651 (6th Cir. 2005) ............................................................13

*City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus.*,
  29 F.4th 802 (6th Cir. 2022) .............................................................38

*Constr. Indus. & Lab. Joint Pension Tr. v. Carbonite, Inc.*,
  22 F.4th 1 (1st Cir. 2021)..................................................................29

*Franchi v. Smiledirectclub, Inc.*,
  633 F. Supp. 3d 1046 (M.D. Tenn. 2022) ........................................36

*Frank v. Dana Corp.*,
  547 F.3d 564 (6th Cir. 2008) ............................................................30

*Frank v. Dana Corp.*,
  646 F.3d 954 (6th Cir. 2011) ......................................10, 30, 31, 32

- iii -

**Page**

*Godinez v. Alere Inc.*,
  272 F. Supp. 3d 201 (D. Mass. 2017) ................................................................18

*Grae v. Corr. Corp. of Am.*,
  2017 WL 6442145 (M.D. Tenn. Dec. 18, 2017) .........................................29, 32

*Grae v. Corr. Corp. of Am.*,
  2021 WL 1100799 (M.D. Tenn. Mar. 23, 2021) ................................................15

*Hedick v. Kraft Heinz Co.*,
  2021 WL 3566602 (N.D. Ill. Aug. 11, 2021) ..............................................29, 33

*Helwig v. Vencor, Inc.*,
  251 F.3d 540 (6th Cir. 2001) (en banc),
  *abrogated on other grounds by*
  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007).....................................................................................*passim*

*Hills v. BioXcel Therapeutics, Inc.*,
  2025 WL 2777129 (D. Conn. Sept. 29, 2025)...................................................27

*IBEW v. Ltd. Brands, Inc.*,
  788 F. Supp. 2d 609 (S.D. Ohio 2011) ..............................................................17

*In re BioScrip, Inc. Sec. Litig.*,
  95 F. Supp. 3d 711 (S.D.N.Y. 2015) .................................................................33

*In re Cardinal Health Inc. Sec. Litig.*,
  426 F. Supp. 2d 688 (S.D. Ohio 2006) .........................................................36, 38

*In re Envision Healthcare Corp. Sec. Litig.*,
  2019 WL 6168254 (M.D. Tenn. Nov. 19, 2019)...................................27, 35, 38

*In re Envision Healthcare Corp. Sec. Litig.*,
  2022 WL 4551876 (M.D. Tenn. Sep. 29, 2022).........................................15, 34

*In re Facebook, Inc. Sec. Litig.*,
  87 F.4th 934 (9th Cir. 2023) .......................................................................20, 22

**Page**

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  352 F. Supp. 2d 429 (S.D.N.Y. 2005) ...............................................................19

*In re Ford Motor Corp. Sec. Litig.*,
  381 F. 3d 563 (6th Cir. 2004) ...........................................................................29

*In re Heritage Glob. Network L.A., Inc. v. Welch*,
  2024 WL 695772 (M.D. Tenn. Feb. 20, 2024).....................................................31

*In re Hertz Glob. Holdings, Sec. Litig.*,
  2017 WL 1536223 (D.N.J. Apr. 27, 2017), *aff'd*,
  905 F.3d 106 (3d Cir. 2018) ..............................................................................28

*In re Humana, Inc. Sec. Litig.*,
  2009 WL 1767193 (W.D. Ky. June 23, 2009) .....................................................17

*In re Huntington Bancshares Inc. Sec. Litig.*,
  674 F. Supp. 2d 951 (S.D. Ohio 2009) ...............................................................28

*In re Kindred Healthcare, Inc. Sec. Litig.*,
  299 F. Supp. 2d 724 (W.D. Ky. 2004)................................................................25

*In re LDK Solar Sec. Litig.*,
  584 F. Supp. 2d 1230 (N.D. Cal. 2008)..............................................................20

*In re Omnicare, Inc. Sec. Litig.*,
  769 F.3d 455 (6th Cir. 2014) .......................................................................27, 40

*In re Perrigo Co. PLC Sec. Litig.*,
  435 F. Supp. 3d 571 (S.D.N.Y. 2020) ................................................................20

*In re Shoals Techs. Grp., Inc. Sec. Litig.*,
  802 F. Supp. 3d 1024 (M.D. Tenn. 2025) ...........................................................25

*In re Ulta Salon, Cosms. & Fragrance, Inc. Sec. Litig.*,
  604 F. Supp. 2d 1188 (N.D. Ill. 2009)................................................................30

*In re Upstart Holdings, Inc. Sec. Litig.*,
  2023 WL 6379810 (S.D. Ohio Sept. 29, 2023) ...............................16, 25, 32, 35

- v -

**Page**

*In re Virtu Fin., Inc. Sec. Litig.*,
  770 F. Supp. 3d 482 (E.D.N.Y. 2025) ...............................................................29

*In re Vivendi Universal, S.A. Sec. Litig.*,
  765 F. Supp. 2d 512 (S.D.N.Y. 2011), *aff'd*,
  838 F.3d 223 (2d Cir. 2016) ..............................................................................34

*In re Walmart Inc., Sec. Litig.*,
  151 F.4th 103 (3d Cir. 2025) ..............................................................................28

*Jonna v. GIBF GP, Inc.*,
  617 F. Supp. 3d 789 (E.D. Mich. 2022) .............................................................31

*King v. Whitmer*,
  71 F.4th 511 (6th Cir. 2023) ..............................................................................27

*Knurr v. Orbital ATK Inc.*,
  294 F. Supp. 3d 498 (E.D. Va. 2018) .................................................................40

*Kyrstek v. Ruby Tuesday, Inc.*,
  2016 WL 1274447 (M.D. Tenn. Mar. 31, 2016) .................................................32

*Lim v. Hightower*,
  2025 WL 2965692 (6th Cir. Oct. 21, 2025) .......................................................39

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) ......................................................................*passim*

*Malin v. XL Cap.*,
  499 F. Supp. 2d 117 (D. Conn. 2007), *aff'd*,
  312 F. App'x 400 (2d Cir. 2009) ........................................................................19

*Mayer v. Mylod*,
  988 F.2d 635 (6th Cir. 1993) ..............................................................................26

*MJK Fam. LLC v. Corp. Eagle Mgmt. Servs.*,
  2009 WL 4506418 (E.D. Mich. Nov. 30, 2009)...........................................11, 13

- vi -

**Page**

*N. Port Firefighters' Pension-Loc. Option Plan v.*
  *Fushi Copperweld, Inc.*,
  929 F. Supp. 2d 740 (M.D. Tenn. 2013) ...........................................................19

*Omnicare, Inc. v. Laborers Dist. Council Constr.*
  *Indus. Pension Fund*,
  575 U.S. 175 (2015)..................................................................................26

*Padilla v. Cmty. Health Sys., Inc.*,
  2022 WL 3452318 (M.D. Tenn. Aug. 17, 2022).......................................*passim*

*Pierrelouis v. Gogo*,
  2021 WL 1608342 (N.D. Ill. Apr. 26, 2021)................................................16, 40

*Pittman v. Unum Grp.*,
  861 F. App'x 51 (6th Cir. 2021) ......................................................................36

*Police & Fire Ret. Sys. City of Detroit v. Argo Grp.*
  *Int'l Holdings*,
  2024 WL 5089970 (S.D.N.Y. Dec. 12, 2024)...................................................28

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014), *overruled on other grounds by*
  *City of Dearborn Heights Act 345 Police & Fire Ret Sys. v.*
  *Align Tech.*,
  856 F.3d 605 (9th Cir. 2017) ...........................................................................32

*Ret. Sys. v. Ernst & Young, LLP*,
  622 F.3d 471 (6th Cir. 2010) ...........................................................................37

*Roofers Loc. No. 149 Pen. Fund v. Amgen Inc.*,
  751 F. Supp. 3d 330 (S.D.N.Y. 2024) ..............................................................15

*Ross v. Abercrombie & Fitch Co.*,
  501 F. Supp. 2d 1102 (S.D. Ohio 2007) ...........................................................39

*Roth v. OfficeMax, Inc.*,
  527 F. Supp. 2d 791 (N.D. Ill. 2007)................................................................27

4927-4048-6553.v1

**Page**

*S. Ferry LP #2 v. Killinger*,
  687 F. Supp. 2d 1248 (W.D. Wash. 2009) .......................................................33

*Shulman v. Weston*,
  __ F. Supp. 3d __, 2025 WL 3754159 (D.N.J. Dec. 29, 2025) ..........................24

*Shupe v. Rocket Cos.*,
  660 F. Supp. 3d 647 (E.D. Mich. 2023) ..........................................14, 31, 34, 38

*Silverman v. Motorola, Inc.*,
  2008 WL 4360648 (N.D. Ill. Sept. 23, 2008) ...................................................23

*Smilovits v. First Solar, Inc.*,
  119 F. Supp. 3d 978 (D. Ariz. 2015), *aff'd sub nom. by*
  *Mineworkers' Pension Scheme v. First Solar Inc.*,
  881 F.3d 150 (9th Cir. 2018) .......................................................................18, 19

*Smilovits v. First Solar, Inc.*,
  2012 WL 6574410 (D. Ariz. Dec. 17, 2012) .....................................................13

*Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings*,
  83 F.4th 514 (6th Cir. 2023) ............................................................................35

*Underland v. Alter*,
  2011 WL 4017908 (E.D. Pa. Sept. 9, 2011)................................................23, 25

*Wilkof v. Caraco Pharm. Laby's, Ltd.*,
  2010 WL 4184465 (E.D. Mich. Oct. 21, 2010)...........................................14, 33

*Winslow v. BancorpSouth, Inc.*,
  2011 WL 7090820 (M.D. Tenn. Apr. 26, 2011) ....................................24, 25, 32

*Woolgar v. Kingstone Cos.*,
  477 F. Supp. 3d 193 (S.D.N.Y. 2020) ..............................................................19

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
  §78j(b)......................................................................................................10, 14, 40

- viii -

4927-4048-6553.v1

**Page**

17 C.F.R.
  §240.10b-5 ...............................................................................................10

Federal Rules of Civil Procedure
  Rule 12(b)(6)........................................................................................10, 13

Private Securities Litigation Reform Act of 1995
  Pub. L. No. 104-67, 109 Stat. 737 (1995) .....................................................16, 24

- ix -

4927-4048-6553.v1

## STATEMENT OF THE ISSUES PRESENTED

1.      Whether the allegations in the Consolidated Complaint for Violations of the Federal Securities Laws (ECF 48) ("Complaint"), accepted as true, sufficiently plead that each defendant made at least one actionable false or misleading statement or omission within the meaning of §10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder?

2.      Whether the allegations in the Complaint, accepted as true and considered holistically, raise a strong inference of Defendants' scienter within the meaning of §10(b) of the Exchange Act and SEC Rule 10b-5?

3.      Whether the allegations in the Complaint, accepted as true, sufficiently plead a "control person" claim under §20(a) of the Exchange Act?

- x -

4927-4048-6553.v1

## CONTROLLING OR MOST APPROPRIATE AUTHORITIES

15 U.S.C. §78u-4

15 U.S.C. §78j(b)

17 C.F.R. §240.15b-5

Fed. R. Civ. P. 9(b)

Fed. R. Civ. P. 12(b)(6)

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308 (2007)

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015)

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651 (6th Cir. 2005)

*City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus.*, 29 F.4th 802 (6th Cir. 2022)

*Frank v. Dana Corp.*, 646 F.3d 954 (6th Cir. 2011)

*Helwig v. Vencor, Inc.*, 251 F.3d 540 (6th Cir. 2001) (en banc)

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008)

*Bond v. Clover Health Invs., Corp.*, 587 F. Supp. 3d 641 (M.D. Tenn. 2022)

*Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.*, 2018 WL 1071442 (N.D. Ill. Feb. 27, 2018)

*Grae v. Corr. Corp. of Am.*, 2017 WL 6442145 (M.D. Tenn. Dec. 18, 2017)

*In re Upstart Holdings, Inc. Sec. Litig.*, 2023 WL 6379810 (S.D. Ohio Sept. 29, 2023)

*Padilla v. Cmty. Health Sys., Inc.*, 2022 WL 3452318 (M.D. Tenn. Aug. 17, 2022)

*Shupe v. Rocket Cos.*, 660 F. Supp. 3d 647 (E.D. Mich. 2023)

*Wilkof v. Caraco Pharm. Laby's, Ltd.*, 2010 WL 4184465 (E.D. Mich. Oct. 21, 2010)

*Winslow v. BancorpSouth, Inc.*, 2011 WL 7090820 (M.D. Tenn. Apr. 26, 2011), *R&R adopted*, 2012 WL 214635 (M.D. Tenn. Jan. 24, 2012)

4927-4048-6553.v1

Plaintiffs respectfully submit this response to Defendants' Motion to Dismiss the Complaint (ECF 53) ("Motion" or "MD").[1]

## I.      INTRODUCTION

Upon being promoted to leadership in 2020, defendants Farley and Lawler promised to fix Ford's biggest problem: industry-high warranty costs from poor-quality vehicles.  Ford's legacy gas vehicles business was strangled by a "$2 billion headwind" of warranty costs – a problem so severe it cost Defendants' predecessors their jobs.  Ford needed to lower repair costs on its gas vehicles to boost profitability and fund its "$30 billion" pivot to electric vehicles ("EVs").  Defendants promised they had a "very concrete plan" and a "laser focus" on fixing quality.

In moving to dismiss, Defendants claim they never reported positive quality and warranty trends, yet, throughout the Class Period, Defendants made false and misleading claims, such as Lawler touting that "*lower warranty costs*" had contributed to "*offset[ting] production losses and higher commodity costs*" and that "*we're improving our quality . . . and we saw that come through this year from a year-over-year warranty standpoint it was down roughly $1.4 billion*."  Defendants repeatedly assured investors that warranty costs were declining, as new technologies were

---

[1]      Citations to "¶__" or "¶¶__" are to paragraphs of the Complaint.  Unless otherwise indicated, emphasis is added, internal citations are omitted, and capitalized terms shall have the same meaning as in the Complaint.  Bold and italics have been added to identify the specific statements alleged as false and misleading statements.

- 1 -

reducing repair costs because dealers were "***making much more frequent use of over-the-air updates ["OTA"] [a]nd boy, has that worked for us***."  These misleading words were backed by misleading numbers, as Ford reported inflated profits by recording much lower warranty reserve increases than in years prior.  *E.g.*, ¶8.

In truth, Ford was facing massive unreserved liabilities from widespread, expensive defects on older vehicles – including failing rear axles on the flagship F-150 dating back to 2020, catastrophic oil pump failures on vehicles dating back to 2016, and defective rearview cameras dating back to 2019, none of which were repairable through OTAs.  In order to suppress reserves, Defendants engaged in a scheme in which they concealed the defects, delayed recalls, and misled their regulator (the NHTSA) about recalls, leading to a historic $165 million fine.  Since Ford's reserves were calculated based on historical costs, by excluding defects and delaying recalls, they delayed booking the necessary reserve increases, thereby inflating profits.  Such a scheme does not happen by accident, especially since Defendants had promised investors that they had a granular focus on warranties, discussed costs at weekly meetings, had real-time access to warranty and cost data, and were under NHTSA investigation throughout the Class Period.

The truth emerged through disclosures in October 2023 and July 2024, apparently forced by the ongoing NHTSA investigation, when Ford shocked investors by recording billions of dollars in warranty charges that Defendants admitted were

from long-existing issues on Ford's "older models," not new cars or unforeseen issues. Booking these old liabilities caused the short-term boost in profits to reverse and the stock price to crash.

Unable to muster grounds to dismiss such a coordinated scheme, Defendants inject alternate facts that have no place at the pleading stage.   For example, Defendants point to irrelevant disclosures to claim investors were fully informed of the warranty problems (MD PageID.1277-78), yet that is refuted by the massive stock drop when the warranty troubles were belatedly disclosed.  ¶¶133-142.  Defendants offer unsworn speculation about their auditors and cite multiple exhibits.  *See* MD PageID.1284-85.  Not only are these disputed facts inappropriate for consideration on a motion to dismiss, but they are unpersuasive because auditors have frequently been misled by management in frauds, just as Ford misled regulators here.  Defendants even claim they did not "participate[] in setting warranty accruals" (MD PageID.1264-65), which is contrary to their SOX certifications and signatures attesting to the accuracy of the financial statements and their admissions that they held weekly "deep dive[]" meetings specifically to monitor costs.  ¶¶48, 146-147.

In short, because the Complaint details Defendants' specific, corroborated fraud to misleadingly portray success in controlling Ford's warranty problems while suppressing the true defects and costs, Defendants' Motion should be denied.

- 3 -

## II.    STATEMENT OF FACTS

### A.    Defendants Promised to Improve Warranty Costs

Ford incurs costs for repairs or replacements to address: (i) problems covered by warranties; and (ii) recalls and fixes outside of warranty coverage, called Field Service Actions ("FSA").  ¶¶32-33, 126.  Ford estimates these collective costs as warranty reserves at the time of sale, and purportedly adjusts those reserves "on a regular basis" based on "actual experience."  ¶¶34-37.  So, as more defects arise, "actual experience" of repairs increases, which under Ford's formula results in increases to the reserves, and, if a costly recall of all affected vehicles is issued, then reserve increases will be substantial.  *E.g.*, ¶¶75(c), 138.  Conversely, delaying or failing to issue recalls will limit the costs in the "actual experience," which results in artificially reduced warranty reserves far below reality.  ¶36.  Since reserves are charged against income, suppressing reserves is a way to artificially boost reported profitability.  ¶¶7, 119.

Before the Class Period, Ford faced a profitability crisis driven by industry-leading warranty costs – a "~$2 [billion] headwind" that had plagued Ford since 2017 and made it lag behind rival General Motors.  ¶¶3, 38-40, 42.  Farley and Lawler were promoted in 2020 to reverse Ford's "unacceptably high" costs.  ¶¶43-44.  They promised investors they had a "very concrete plan" and were "laser focused" on reducing the warranty costs that were hindering Ford. ¶¶3, 6, 43-45.

- 4 -

Reducing these costs was also necessary to fund Farley and Lawler's "Ford+" strategy.  Launched in May 2021, Ford+ was a $30 billion pivot to EVs that Farley touted as Ford's "'biggest opportunity for growth'" since the Model T.  ¶¶4, 29-30. Defendants, media, and analysts understood that reducing warranty costs was Ford's only viable lever to generate the billions in necessary capital, creating immense pressure on Defendants to demonstrate immediate progress.  ¶¶4-6, 46, 83, 85.

### B.     Defendants Closely Monitored Warranty Costs

Defendants established the goal and then personally participated in the processes to try to lower warranty costs.  ¶¶44-46.  Farley confirmed his and Lawler's granular focus, stating they "look at the root causes" of warranty issues and "go through . . . hundreds" of them.  ¶47.  Senior management, including Farley and Lawler, attended weekly cost meetings where they dedicated "Tuesday once a month on costs" and the remaining Tuesdays to "doing deep dives" into specific cost issues. ¶48.  Defendants also employed a Critical Concern Review Group ("CCRG") tasked with reviewing potential defects and safety issues.  *Id.*

Defendants monitored progress utilizing sophisticated data, including Ford's Global Warranty Measurement System ("GWMS"), which provided real-time warranty claims, costs, and trends from dealers "in aggregate on a weekly basis" to "gauge if the dealer network [was] on track to meet Ford's quality improvement goals."  ¶¶49-50.  Ford also received "service details, repair history, applicable recall

- 5 -

repairs" and "warranty . . . information" from dealers and monitored the internet for defect issues. ¶¶51-52. Farley and Lawler were directly involved in analyzing the data to set reserves and monitor warranty trends. Farley contacted Ford's Executive Director of Quality "several times a week" to engage on quality efforts. ¶52. Farley and Lawler conducted quarterly reserve reviews "as the actual claims [we]re incurred" to "compare this experience with the historic spend and the trends" to identify issues. ¶152. Defendants later acknowledged they had tracked "internal data" on the relevant warranty and reliability issues "for quite some time," and that "if these things come through . . . we're made aware of them," confirming their knowledge of issues with older models as they arose in the field. ¶¶169, 172.

### C. Defendants Delayed Recalls and Concealed the Magnitude of Defects to Suppress Reserves and Report Positive Trends

Ford was facing specific and costly defects in certain "older" vehicles that were concealed from investors. *See* ¶¶13, 138. First, a defective rear axle bolt design for Ford's flagship F-150 pickup truck (launched in 2020), caused the bolt to shear off. ¶¶59-64, 75(a)-(b), 138. This dangerous design failure, impacting more than 200,000 vehicles, could render the truck "undriveable." ¶75(a). Farley admitted knowing such repairs were "super expensive" and "complicated" (¶53), and indeed, the defect required a complete redesign (¶75(b)). By January 2022, the defect had reached internet forums, where Ford communicated with numerous F-150 owners impacted by the axle bolt issue. ¶¶58-61. As early as June 2022, Ford dealers were attempting

- 6 -

fixes and NHTSA met twice with Ford about the issue.  ¶¶59-61, 64, 75(c).  Yet, Ford continued to sell F-150s with the defective design, while failing to issue a recall (until December 15, 2023) and book adequate reserves.  ¶75(c).

Second, a catastrophic oil pump design defect impacted more than 100,000 vehicles, beginning with "2016 launched vehicles" equipped with the 1.0L EcoBoost engine.  ¶¶58, 65-66, 75(d), 138.  This defect clogged the oil pump, often leading to engine failure and requiring engine replacement costing $7,000 or more per vehicle.  ¶¶54, 65-67, 75(d)-(f).  Customers from at least June 2020 onward complained of, and Ford's CCRG investigated by early 2022, the oil pump issue.  ¶¶66, 68.  Yet, Defendants failed to issue a recall (until December 22, 2023) (*see* ¶65 n.17) or accrue necessary reserves for these "long-standing" liabilities.  ¶¶13, 65-68, 138-139.

Third, *hundreds of thousands* of Ford vehicles had defective rear-view cameras ("RVCs").  ¶¶69, 75(g).  While Defendants touted their ability to fix issues cheaply via OTA updates, the RVC defect required physical replacement of the camera.  ¶¶9 n.5, 34, 69.  Defendants delayed RVC recalls since late 2020, leading to a *historic* $165 million NHTSA penalty and finding that Ford was aware of defects but failed to timely recall vehicles and misled NHTSA and the public.  ¶¶175-179.

### D.    Defendants Falsely Touted Positive Warranty Trends

Before the Class Period, in 2019 and 2020, Ford had booked reserve increases of $1.9 billion and $2.4 billion, respectively, to address defects in "older" vehicles.

*See* ¶¶8, 84.  After the Class Period began, Defendants delayed recalls and concealed the magnitude of existing defects on hundreds of thousands of older vehicles.  §II.C. By removing costs of defects and recalls from Ford's "actual experience" to set warranty reserves, Defendants were able to record significantly smaller reserve increases in 2021 and 2022, which signaled that quality was improving and warranty costs were going down.  *See, e.g.*, ¶¶77, 80, 84, 86, 88-89, 93, 101.  Leaving no doubt what the numbers meant, Defendants boasted of "***improvement in warranty costs***" of "***about $1.4 billion***" (¶¶78, 82), which they claimed "***more than offset the effects of production losses and higher commodity costs***" (¶81), drawing positive reactions from analysts regarding the purported success of the Ford+ plan (¶¶83, 85).

Defendants also claimed that warranty costs were improving due to Ford's "***quality improvements***" (*e.g.*, ¶¶90, 99, 102) and technological advancements like OTA updates (*e.g.*, ¶¶9, 82(b), 87).  They claimed Ford could use remote OTA updates, which reduced repair costs by 95%, to quickly and cheaply resolve quality issues, stating, "***boy, has that worked for us***."  ¶¶9, 87.  However, dealerships were continuing to opt for physical repairs rather than OTAs, and the concealed defects plaguing Ford were not fixable by cheaper OTAs.  ¶¶58, 69, 71, 91(b), 139.

**E.     The Truth Is Revealed that Warranty Costs Remained Sky-High**

As the NHTSA investigation progressed, Ford began to disclose the truth when, on October 26, 2023, the Company reported a $1.2 billion increase in warranty costs

- 8 -

for the third quarter – more than double the first two quarters combined.  ¶¶10, 133.  Ford's stock price declined by 12%, wiping out more than $5 billion in market capitalization, and analysts attributed the decline to a "Q3 miss driven by more warranty issues."  ¶¶10, 133-134.  In discussing the increased warranty costs, Farley stated that Ford's RVCs were a "huge burden," but did not disclose RVC recalls had been delayed or the full extent of the problems.  ¶133.

The full truth was revealed on July 24, 2024, when Defendants again shocked investors by reporting that Ford Blue's EBIT had plummeted nearly 50%, as "[p]rofitability was affected by" a $1.4 billion increase in warranty reserves.  ¶¶136-137.  Defendants admitted this was due to long-standing issues in "older model[]" vehicles, not new cars or unforeseen defects.  ¶¶13, 58, 138.  Lawler said the "largest" impact was from the "axle bolt [issue]" and the "oil pump issue" in vehicles launched as far back as 2016.  ¶138.  These admissions confirmed that Ford was facing "super expensive" physical repairs for which they had failed to adequately reserve.  ¶¶13, 53, 58-75.  Following the July 24, 2024 admissions, Ford's stock price sank by 18%, the largest one-day decline since the 2008 financial crisis.  ¶¶15, 140.

Shortly after these disclosures and the conclusion of the NHTSA investigation, Ford announced in November 2024 it had entered a Consent Order with NHTSA, paying a $165 million fine.  ¶175.  The Consent Order revealed that Ford had failed to comply with federal regulations for its defective RVCs, provided inaccurate

- 9 -

information regarding RVCs and other defects dating back to late 2020, and delayed needed RVC recalls.  ¶¶177-179.  This regulatory finding, combined with Defendants' promises that they "look at the root causes" of warranty issues (¶47), make clear Defendants acted with scienter, not neglect.  *See also* ¶¶47, 52, 148-150.

## III.   ARGUMENT

### A.   Legal Standards on a Motion to Dismiss

The Complaint alleges violations of §10(b) of the Exchange Act and SEC Rule 10b-5.  ¶¶206-210.  Defendants only contest falsity and scienter, conceding all other elements of a §10(b)/Rule 10b-5 claim were adequately pled.  Although the Private Securities Litigation Reform Act ("PSLRA") requires specific pleading standards for §10(b) claims, they "are still *pleading* standards – not evidentiary ones" and "do[] not override the principle that, when a court considers a Rule 12(b)(6) motion, it must 'accept plaintiff's allegations as true and construe the complaint in its favor.'"  *Bond v. Clover Health Invs., Corp.*, 587 F. Supp. 3d 641, 667 (M.D. Tenn. 2022) (emphasis in original); *see also Frank v. Dana Corp.*, 646 F.3d 954, 958 (6th Cir. 2011) ("*Dana II*") (holding "[a]ll facts in the complaint must be accepted as true").

### B.   The Complaint Adequately Alleges False and Misleading Statements

Corporate actors must "'provide complete and non-misleading information with respect to the subjects on which [they] undertake[] to speak.'"  *Helwig v. Vencor, Inc.*, 251 F.3d 540, 560-61 (6th Cir. 2001) (en banc) (reversing dismissal), *abrogated on*

- 10 -

*other grounds by Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308 (2007) ("*Tellabs II*"). "When determining whether an omission renders prior statements misleading, context matters" because "'[s]ome statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors.'" *MJK Fam. LLC v. Corp. Eagle Mgmt. Servs.*, 2009 WL 4506418, at *7 (E.D. Mich. Nov. 30, 2009) (alteration in original).

### 1. Defendants Made False and Misleading Statements Portraying Positive Quality and Warranty Trends

The following chart (¶56) shows Defendants reported drastically improved (and suppressed) warranty reserves during the Class Period, boosting profitability:



This purportedly positive reversal of prior trends in Ford's "pre-existing" warranty reserves signaled that warranty costs for older vehicles were significantly improving,[2] which matched Defendants' words. For example, Ford claimed that

---

[2]    Defendants reported favorable comparative metrics such as, in October 2021, reporting "***changes in accrual related to pre-existing warranties***" of only ***$44 million***, compared to the $1.4 *billion* increase in the prior year. ¶77; *see also* ¶78 (Lawler emphasizing "***our warranty will improve in the fourth quarter and full year***"

- 11 -

"*lower warranty costs*" had "*more than offset the effects of production losses and higher commodity costs*" (¶81), and Lawler likewise touted that Ford achieved "*improvement in warranty costs*" that "*offset commodity headwinds and supply chain-related production losses*" (¶82(a)) and "*contribution costs improved by about 4 points driven by . . . warranty*" (¶94).

Defendants attributed the positive trend of lower warranty costs to improved quality and increased OTA usage.  For example, Lawler said "*we're improving our quality . . . .  We saw that come through this year, from a year-over-year warranty standpoint was down roughly $1.4 billion*" and Ford was "*leveraging what we have from the connected vehicle [OTAs] to improve warranty even further*."  ¶82(b). Similarly, Farley assured investors costs were declining because Ford identifies defects and "*takes actions quickly to resolve them*" with "*much more frequent use of OTAs*" which had "*worked for us*" (¶87), and Defendants had "*overhauled*" Ford's "*entire enterprise quality operating system*" and were "*seeing improvements in initial quality*" (¶90).[3]  In early 2024, Lawler assured investors that "*from a warranty*"

---

and "*we expect to be good by about $1.4 billion*").  In February 2022, Defendants reported "*changes in accrual related to pre-existing warranties*" of *$221 million*, a $2.2 *billion* improvement.  ¶80.  Lawler stated that for warranty costs, "*in 2021, we improved by about $1 billion*" and "*we were about flat*" in 2022.  ¶92(a).

[3]     Farley also said "*our quality is making real progress*" and "*initial quality is 10% better*" (¶102), that "*on warranty . . . you'll see very quick progress on initial quality*" because "*our fitness . . . will show up there first*" (¶92(b)), and that Ford "*so far . . . avoided about 12 recalls on F-150*" (¶102).

- 12 -

4927-4048-6553.v1

***standpoint, costs are probably going to be about flat***" because "***we're starting to see green shoots [positive signs] in the quality improvements***."  ¶99.

The chart (¶56) and Defendants' prior statements refute their present claim that they accurately disclosed negative trends and increasing warranty costs (MD PageID.1277-79).  *See* §§II.B.-D.; *Helwig*, 251 F. 3d at 565 (rejecting defense interpretation because "[f]act-splitting is hardly persuasive or appropriate considering the Rule 12(b)(6) posture of this case").  Defendants' statements were misleading because they omitted to disclose that there was no billion-dollar improvement in warranty costs.  Rather, Defendants artificially suppressed the warranty reserve calculation by delaying recalls on then-existing costly defects plaguing older vehicles (and could not be remedied with OTAs).  *See* §§II.C.-E.; *Padilla v. Cmty. Health Sys., Inc.*, 2022 WL 3452318, at *20 (M.D. Tenn. Aug. 17, 2022) (upholding statements concealing understatement of bad debt because plaintiffs "plausibly alleged that [d]efendants distorted certain figures disclosed to the public and stated what the practices were and how they allegedly distorted the data"); *MJK*, 2009 WL 4506418, at *8 (finding incomplete disclosures of some conflicts were actionable because they concealed other, serious conflicts).[4]

---

[4]     *See also City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 669-81 (6th Cir. 2005) (reversing dismissal of statement that misleadingly understated exposure to claims for defective tires); *Smilovits v. First Solar, Inc.*, 2012 WL 6574410, at *4 (D. Ariz. Dec. 17, 2012) (holding statements that concealed product defects to understate reserves were actionable).

- 13 -

Defendants cannot undermine their plain words with fact disputes.  First, they claim investors were not misled because Ford reported increased reserves in some quarters.  MD PageID.1277-78.  This "truth-on-the-market" defense is "'intensely fact-specific and is rarely an appropriate basis for dismissing a §10(b) complaint.'" *Wilkof v. Caraco Pharm. Laby's, Ltd.*, 2010 WL 4184465, at *4 (E.D. Mich. Oct. 21, 2010) (upholding statements that failed to "share complete information" about company problems and rejecting argument that market knew of concealed facts). Moreover, those relatively smaller quarter-over-quarter increases in Ford's warranty reserves in 2021-2023 represented a positive reversal from the drastically higher (up to 10x larger) increases in 2018-2020 and do nothing to explain why warranty costs and reserves increased by over $2 billion at the end of the Class Period (in 3Q23 and 2Q24) for old-car issues.  *See* §§II.D.-E.; ¶¶8, 133-138; *Shupe v. Rocket Cos.*, 660 F. Supp. 3d 647, 670-71 (E.D. Mich. 2023) (upholding statements that concealed negative cost exposure from rising interest rates and rejecting argument that investors were "nitwits" if they were misled).[5]  Defendants attempt to demonstrate their honesty

---

[5]     As Defendants concede, Ford did not report the quarterly metrics in their chart. MD PageID.1270 n.2.  This is because Ford has admitted that seasonality impacts reserves and, thus, quarter-over-quarter is not an accurate comparison.  *See* Ford Motor Company, Annual Report at 43 (Form 10-K) (Feb. 5, 2025).  Rather, when each quarter in 2021 and 2022 is properly compared to the same quarters in 2019 and 2020, it shows a dramatic decrease, falsely portraying positive warranty trends.  *See* ¶¶77, 80, 84, 86, 88; *see also* ¶165 (comparing suppressed first half 2021-2023 reserve increases with true increases revealed by the 2Q24 corrective disclosure).

- 14 -

by pointing to the year-over-year reserve increase of "2000%" in Q3 2023 (MD PageID.1271, 1277-78), but that increase is one of the corrective disclosures that came during the NHTSA investigation and shocked investors, causing a 12% stock decline. *See* ¶¶133-134; *Roofers Loc. No. 149 Pen. Fund v. Amgen Inc.*, 751 F. Supp. 3d 330, 348-49 (S.D.N.Y. 2024) (holding omission of fact was not offset by disclosure of other related facts where the "[c]ompany's share price declined appreciably" after omitted fact was revealed).

Second, Defendants continue their improper truth-on-the-market defense by pointing to other statements that Ford was "number one in recalls" and had "more work to do" on quality to suggest investors were fully informed of the concealed facts. MD PageID.1279, 1288-89.  But saying Ford has lots of recalls on disclosed defects did not inform investors that Ford was facing massively higher costs on the undisclosed defects and delaying even more required recalls to suppress reserves and boost profits, or that OTA usage was not improving warranty costs.  *E.g.*, ¶¶91, 97, 105, 112, 114.  If telling half the story were enough, Defendants could never be liable. *See Grae v. Corr. Corp. of Am.*, 2021 WL 1100799, at *23 (M.D. Tenn. Mar. 23, 2021) (rejecting truth-on-the market defense at summary judgment where "bits and pieces" disclosed to public about "quality issues" failed to "paint[] the whole picture").  That analysts interpreted Defendants' statements to indicate quality and warranty costs were improving refutes Defendants' argument.  *See, e.g.*, ¶¶79, 83; *In*

- 15 -

*re Envision Healthcare Corp. Sec. Litig.*, 2022 WL 4551876, at *8 (M.D. Tenn. Sep. 29, 2022) (adopting interpretation of statement corroborated by analysts).

Third, Defendants claim Plaintiffs must back-cast the over $2 billion in belated warranty costs and reserve increases to each quarter of the Class Period.  MD PageID.1281.  But that level of detail, which also requires experts, is not required, as the PSLRA would not serve its "purpose 'to protect investors'" if it "bec[a]me a choke-point for meritorious claims" at the pleading stage, particularly given the "suspension of all discovery pending a motion to dismiss." *Helwig*, 251 F.3d at 553. Thus, those details can await fact and expert discovery.  *See id*.; *In re Upstart Holdings, Inc. Sec. Litig.*, 2023 WL 6379810, at *14 (S.D. Ohio Sept. 29, 2023) ("[C]ourts must be cautious when considering . . . hindsight arguments at the motion to dismiss stage because there has been little if any discovery and the court has no visibility into the evidence that was available to the corporate [defendants].");  *Pierrelouis v. Gogo*, 2021 WL 1608342, at *6-*7, *11 (N.D. Ill. Apr. 26, 2021) (assessing pleadings in light of "the limited information available to plaintiff concerning . . . internal deliberations"); *Bond*, 587 F. Supp. 3d at 667.

Here, Plaintiffs sufficiently detail that the over $2 billion increases in warranty costs and reserves at the end of the Class Period were attributed primarily to pre-existing defects well-known and discussed within Ford and among its dealers and customers, for which the touted OTAs were useless.  *See* §§II.C., II.E., III.B.2.  For

- 16 -

example, Defendants admitted in 2Q24 the increased costs were driven by the longstanding defects in older-model vehicles and dealers were not using OTAs, contrary to their prior claims. ¶¶138-139. Fraud by hindsight is when *unforeseeable* defects arise to make prior reserve and warranty statements inadequate, not when known, old defects are concealed and recalls are delayed and suppressed.[6]

### 2. Defendants Reported Suppressed Reserves in Violation of GAAP

Ford's financial statements were false and misleading because they did not comply with GAAP, including violating ASC 450, governing disclosure of a "loss contingency." ¶¶116-131. ASC 450 required that Ford accrue a charge to income when: (i) the Company has information indicating a loss was probable (*i.e.*, "likely" to occur) before the financial statements were issued; and (ii) the amount of the loss can be reasonably estimated. ¶122. Here, Defendants were required to book appropriate reserves under ASC 450 for the defects plaguing Ford during the Class Period, which

---

[6] *See also Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.*, 2018 WL 1071442, at \*6 (N.D. Ill. Feb. 27, 2018) (rejecting "'fraud by hindsight'" argument because defendant's admission "does not merely indicate" his statements "were incorrect in retrospect; it suggests that they were incorrect when made"). The facts here are distinct from those cited by Defendants. *See, e.g.*, *IBEW v. Ltd. Brands, Inc.*, 788 F. Supp. 2d 609, 635 (S.D. Ohio 2011) (dismissing where defendants *disclosed* company's specific underlying problems and plaintiffs failed to plead facts undermining defendants' claims that they were working hard to fix them); *In re Humana, Inc. Sec. Litig.*, 2009 WL 1767193, at \*16-\*17 (W.D. Ky. June 23, 2009) (finding statements regarding sales for one program were not rendered misleading for failing to disclose pricing issues for a different program).

- 17 -

were widespread and consistent (¶¶59-61, 65-66, 69, 74-75), expensive (¶¶53-54, 67, 69, 75(b), 75(e)-(h), 133, 138), closely monitored (¶¶43-54, 62-63, 68-69, 75(c), 169, 172), and under regulatory noncompliance review (¶¶64-66, 69, 176-177), making the high costs to fix them clearly probable and estimable.  But Defendants delayed recalls, suppressing historic costs and the reported reserves based on those understated costs, only to belatedly (as the NHTSA probe neared completion) issue recalls, requiring them to pay increased warranty costs and book increased reserves at the end of the Class Period.  *See* §§II.C.-E.; ¶¶126-128; *Godinez v. Alere Inc.*, 272 F. Supp. 3d 201, 217 (D. Mass. 2017) (rejecting that defendants would "not have known before July 2016" that a recall was sufficiently probable to require accrual of a loss under ASC 450 because later-disclosed "loss was attributed to circumstances in existence before the end of 2015"); *Smilovits v. First Solar, Inc.*, 119 F. Supp. 3d 978, 1005-06 (D. Ariz. 2015) (upholding under-accrual claims on summary judgment), *aff'd sub nom. by Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 150 (9th Cir. 2018).

Defendants' fact disputes and speculation (MD PageID.1280-85) have no place in a motion to dismiss and do not conclusively refute the allegations (§III.B.1).  First, Defendants speculate that their external auditors approved the delayed recalls and suppressed reserves.  MD PageID.1269-71, 1284.  But there are no allegations, and Defendants do not even suggest, that the auditors were informed of the older-model vehicle defects, delayed recalls, and inaccurate information provided to the NHTSA.

*See* MD PageID.1284.  Whether the auditors approved the scheme, as Defendants suggest, or were provided inaccurate information like the regulators, must await trial. *See Helwig*, 251 F.3d at 553 (holding inferences "'must be construed in the plaintiff's favor'"); *First Solar*, 119 F. Supp. 3d at 1005-06 (rejecting reliance on auditor defense on warranty reserve issue at summary judgment because of questions of fact over whether company withheld or misstated facts to auditors).[7]

Second, Defendants again argue Plaintiffs must reconstruct the quarterly reserves that "Ford *should have accrued instead*."  MD PageID.1277 (emphasis in original).  However, investors need not be CPAs to pursue recovery under the securities laws and can rely on expert discovery to back-cast when the over $2 billion in belated reserve increases and costs should have been reserved.  *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 467 (S.D.N.Y. 2005) (holding no requirement to plead specific dates or "precisely quantify" financial

---

[7]     *See also N. Port Firefighters' Pension-Loc. Option Plan v. Fushi Copperweld, Inc.*, 929 F. Supp. 2d 740, 785 & n.7 (M.D. Tenn. 2013) ("Assertions that [Defendants] employed an independent accounting firm's assessment on these issues does not confer immunity nor can such an issue be decided at pleading stage."). Unlike in Defendants' cases, there is evidence here that Ford misled regulators, supporting an inference the auditors were also misled, and the errors here did not arise from mere "accounting deficiencies" (*Malin v. XL Cap.*, 499 F. Supp. 2d 117, 127, 143, 148 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009)), or valuation of claims already subject to reserves (*Woolgar v. Kingstone Cos.*, 477 F. Supp. 3d 193, 228-29 (S.D.N.Y. 2020)), but arose from Defendants failing to accurately bring existing, significant defects into the reserve assessment, which an auditor would not have known.  *See* §§II.C.-E.; MD PageID.1348.

- 19 -

misstatements).[8]  It is enough at this stage that billions clearly related, by Defendants'

admission, primarily to pre-existing defects and, by Ford's reported reserve formula,

delaying recalls would suppress historical costs and reduce reported reserves.[9]

Finally, Defendants' argument that they complied with GAAP by disclosing

"possible costs *in excess of* our accruals" (MD PageID.1283 (emphasis in original)) is

both subject to expert testimony and incorrect.  GAAP does not permit below-the-line

reporting of "possible" costs as a substitute for above-the-line costs and reserves that

reduce profit (¶¶122-124), and Defendants cite no authority suggesting otherwise.  If

anything, Defendants' argument that they accounted for the concealed defects at issue

by adding "$700 million to $1.5 billion in the Class Period" for "possible costs" (MD

---

[8]      *See also In re Perrigo Co. PLC Sec. Litig.*, 435 F. Supp. 3d 571, 582-87
(S.D.N.Y. 2020) (finding violation of ASC 450 sufficiently pled even though there
had been "no final determination" on precise amount of liability); *In re Facebook, Inc.
Sec. Litig.*, 87 F.4th 934, 950 (9th Cir. 2023) (holding statements "could be misleading
even if the magnitude of the ensuing harm was still unknown").  In a parenthetical,
Defendants suggest their unilateral decision not to restate reserves negates Plaintiffs'
claimed GAAP violations (MD PageID.1284-85), but that is not true.  *See In re LDK
Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1245 (N.D. Cal. 2008) ("[T]he lack of a
restatement did not mean that [Defendants] only engaged in legitimate conduct.");
*Padilla*, 2022 WL 3452318, at *38; *Bond*, 587 F. Supp. 3d at 674.

[9]      For example, Defendants had identified RVC defects in October 2020 (¶69),
and the oil pump defect was causing expensive damage in 2020 and 2021 (¶66), yet
they increased reserves only $44 million (versus $1.4 billion in prior year) (¶77).  As
another example, as NHTSA pressed on Ford's inadequate RVC recalls and the oil
pump defect wreaked havoc (¶¶66-68, 176-178), the expensive rear-axle defect on
Ford's flagship F-150 was clear in 2021 and 2022, with NHTSA meeting twice with
Ford by June 2022.  ¶¶59-64, 75(a)-(c), 75(g)-(h).  Yet, in 1Q-3Q 2022, Defendants
reported only small reserve increases that did not match reality.  ¶¶84-88.

- 20 -

PageID.1283-84) concedes *they knew they had an over $2 billion problem* during the Class Period but tried to minimize (and understate) it as possible, not probable. As discussed, the allegations show those costs were in fact probable (*i.e.*, likely) and being delayed. §§II.C.-D. Thus, the costs were required to be booked in the financial statements as a reserve that *lowered profits*. ¶¶126-128. Defendants' words are again undercut by their actions since, at the end of the Class Period, they were forced to increase costs and reserves above the line and decrease profits to comply with GAAP, rather than continue footnoting only "possible" costs. MD PageID.1642.[10]

### 3.      Defendants' Inflation Statements Were Misleading

Defendants misleadingly attributed certain warranty cost increases to temporary "inflation" rather than the quality defects they needed to fix. In July 2023, Lawler stated Ford was seeing increased warranty costs due to "***some inflationary pressures***" and dealerships "***increasing their costs***" (¶95), but, in truth, as later admitted in October 2023, 75% of the increased costs (*i.e.*, $900 million) in 3Q 2023 was "driven by recalls" and "warranties." ¶¶133-134. It was misleading to publicly blame the 25% cause (inflation), while concealing the 75% cause (warranty problems). Thereafter, the market understood the 3Q23 warranty problems would be non-

---

[10]      Defendants claim Plaintiffs did not include the "possible costs" disclosure in the Complaint (*id.* 1284), as if to suggest it is Plaintiffs' burden to refute every conceivable weak argument Defendants might advance. That has never been a rule of advocacy, but if it were, Defendants committed a far bigger violation by ignoring in their Motion Plaintiffs' most compelling allegations.

recurring (¶134), and Defendants misleadingly affirmed that perception by again citing only inflation as a source of increased warranty costs in 2024, with Defendants claiming in February 2024 that "*our warranty costs have increased, in part, due to inflationary cost pressures*" (¶115), and Lawler saying in June 2024 that Ford was only "*seeing . . . inflation in the warranty space, the cost per repairs going up*" (¶104). These statements concealed that 2024 costs were increasing because of the massive warranty problems Defendants were failing to contain, as admitted in July 2024. ¶¶136-138. By choosing to speak about the supposed source of increased warranty costs, Defendants were required to tell the whole truth. *See Allstate*, 2018 WL 1071442, at *4 (holding by "elect[ing]" to discuss one cause of increased claims (weather), defendants had "to do so in a manner that was not misleading; that is, by disclosing [the company's] reduction in underwriting standards").

### 4.    Defendants Provided False and Misleading Risk Disclosures that Failed to Warn Investors of Reality

Defendants' claim that their "risk warnings" fully informed investors (MD PageID.1290-92) fails because those were also false and misleading. For example, they claimed only that vehicles "*could be affected by defects that result in . . . recall campaigns, or increased warranty costs*" and such costs "*could be substantial*" and "*have an adverse effect on*" Ford's financial condition and reputation. ¶¶107-111. Defendants did not warn that recalls on existing defects were being delayed, and costs were being concealed, to suppress reserves and inflate profits. *See Facebook*, 87 F.4th

- 22 -

at 949 (finding risk statements presented "as purely hypothetical when that exact risk had already transpired" were inadequate).

Defendants' citation to *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 491 (6th Cir. 2015) (MD PageID.1291), is unavailing because the *Yum!* court recognized that "there may be circumstances under which a risk disclosure might support [§]10(b) liability." *Id.* This is such a case. In *Yum!*, plaintiffs only alleged that eight batches out of thousands of chicken tested positive for antibiotic residues, with no context to show these "were so severe that they would have resulted in financial loss for Yum." *Id.* By contrast, here, the existing defects and delayed recalls caused over $2 billion of reserve increases and costs. *See* §III.E.[11] Similarly, Defendants' statements that they purportedly "***assess our obligation for [FSAs] on a regular basis***" to "***update our estimates as necessary***" (¶113(b)) were clearly false and misleading because Defendants were not doing that and instead were hiding defects and delaying recalls to avoid updating their estimates. §II.C.; *see also Underland v. Alter*, 2011 WL 4017908, at *9 (E.D. Pa. Sept. 9, 2011) ("Because Plaintiffs have sufficiently alleged

---

[11] Under these facts, "a reasonable investor would be []likely to infer" (*Yum!*, 620 F. App'x at 491) Ford was not delaying recalls or facing massive costs on concealed defects. *See also Silverman v. Motorola, Inc.*, 2008 WL 4360648, at *10 (N.D. Ill. Sept. 23, 2008) (finding statements that product launches were "on track" were false in light of "omissions regarding the problems plaguing the 3G rollout"). Notably, Ford has conceded its risk warnings were inadequate during most of the Class Period by changing them on October 26, 2023, the first corrective disclosure date. *See* MD PageID.1291. Even this belated revision still did not inform investors that warranty costs were not improving and continued to plague Ford's financial results.

- 23 -

that Defendants departed from their claimed methodology to calculate the loan loss reserve, they have sufficiently alleged . . . loan loss reserves were misstated.”).

### 5.   Defendants' Remaining Arguments Lack Merit

#### a.   The Statements Are Not Protected Under the Safe Harbor

Defendants incorrectly suggest that warranty reserves are forward-looking estimates protected by the PSLRA's safe harbor.  MD PageID.1285-87.  However, "'reserves and their adequacy are not per se forward-looking'" under the PSLRA. *Winslow v. BancorpSouth, Inc.*, 2011 WL 7090820, at *18 (M.D. Tenn. Apr. 26, 2011) (denying motion to dismiss), *R&R adopted*, 2012 WL 214635 (M.D. Tenn. Jan. 24, 2012).  Instead, reserve statements are not protected if they, for example: (i) "'"are directed to the then-present state of the Company's financial condition"'" (*id.*); (ii) are misleading "'based upon omissions of existing facts or circumstances'" (*Shulman v. Weston*, __ F. Supp. 3d __, 2025 WL 3754159, at *8 (D.N.J. Dec. 29, 2025)); (iii) lack a reasonable basis (*Blatt v. Corn Prods. Int'l, Inc.*, 2006 WL 1697013, at *4 (N.D. Ill. June 14, 2006)); or (iv) are "mixed present/future" statements that are misleading as to "the part of the statement that refers to the present" (*Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) ("*Tellabs III*")).

Here, the reserves and quality statements were directed at the condition of Ford's *present* financial condition and were publicly stated to be based on historical cost experience.  But Defendants suppressed them by delaying recalls on existing

- 24 -

defects, and OTA usage was low.  §§II.C.-E.  That is far different than claiming

Defendants failed to predict future events, as the concealed facts had nothing to do

with the future.  *See Winslow*, 2011 WL 7090820, at *18 (upholding statements where

plaintiff claimed "the reserves were insufficient in light of the existing risks").[12]

### b.      The Statements Are Not Inactionable Opinions

Defendants claim their reported warranty reserves and unspecified "related

statements about warranty costs" are inactionable opinions.  MD PageID.1279-84.

However, Ford's reserves are not alleged to be misleading opinions about the future,

but to have contained the false factual assertion that Ford's reported positive trends

reflected improved historical information (*e.g.*, ¶113) when, in reality, Defendants

were manipulating historical results by excluding the costs of recalling and fixing

then-existing costly defects impacting hundreds of thousands of vehicles.  *See* §§II.C.-

E.; *Shoals*, 802 F. Supp. 3d at 1043-44 (finding warranty cost statements actionable

given concealment of existing liabilities); *Underland*, 2011 WL 4017908, at *9

---

[12]      *See also In re Shoals Techs. Grp., Inc. Sec. Litig.*, 802 F. Supp. 3d 1024, 1043 (M.D. Tenn. 2025) (rejecting forward-looking argument that "ignores [p]laintiffs' allegations that [defendants] shielded the market from learning about real, calculable liabilities that had already accrued"); *Padilla*, 2022 WL 3452318, at *38 (holding statements not forward-looking where "one could determine" when "the statements were spoken, whether relevant evidence was excluded"); *Upstart*, 2023 WL 6379810, at *15, *17 (upholding statements about "expectations" that were "inconsistent" with existing omitted facts).  Defendants' cases are unavailing, as the reserves were not verifiable until "liability claims were actually filed" (MD PageID.1285-86 (citing, *e.g.*, *In re Kindred Healthcare, Inc. Sec. Litig.*, 299 F. Supp. 2d 724, 738 (W.D. Ky. 2004)), but here the defects existed and the high costs were clear.  §§II.C.-E.

- 25 -

(upholding reserve statements as misleading where company "refused to incorporate, among other things, *current* losses into its calculations" (emphasis in original)); *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 188-89 (2015) (misleading "embedded facts" within opinions are actionable).

Even if viewed as opinions, Defendants' reserve statements are actionable because Plaintiffs adequately allege: (i) Defendants did not believe the opinion; and (ii) the statements omitted material facts that would "conflict with what a reasonable investor would take from the statement itself." *Omnicare*, 575 U.S. at 188-89.

First, Defendants could not believe the reserves were accurate because they were delaying recalls and the resulting belated over $2 billion in increases were for *preexisting* defects for older models monitored during the Class Period. §§III.C.-E. Likewise, the NHTSA Consent Order concerned delayed RVC recalls as early as September 2020 and the investigation, which they attempted to thwart with inaccurate information, began in August 2021 – before the Class Period. ¶¶175-178. Moreover, in 1Q21, Defendants began manipulating profits by putting over $1 billion below the line in "possible costs *in excess of*" reserves (MD PageID.1283 (emphasis in original)), while simultaneously reducing reported warranty reserves by nearly the same figure, demonstrating scienter. *See* §III.B.2. Engaging in a scheme to suppress reserves, delay recalls, and provide false information to a regulator, shows Defendants did not believe reported warranty reserves were adequate. *See Mayer v. Mylod*, 988

- 26 -

F.2d 635, 639-40 (6th Cir. 1993) (holding "statements of opinion, if not truly believed and not supported by available facts, are actionable under [§]10(b)").[13]

Second, Defendants' statements omitted to disclose the costly existing defects and that they delayed recalls to suppress the historical costs of repairing the defects, which suppressed warranty reserves under their publicly stated accounting policy. §§II.C.-E.; §§III.B.1.-2.   Those omitted facts "'conflict with what a reasonable investor would take'" from Defendants' positive warranty trends and were necessary to make their statements not misleading.   *Padilla*, 2022 WL 3452318, at \*23-\*24 (holding opinions about receivables actionable for "omitt[ing] that there were growing problems with [the company's] aged receivables"); *In re Envision Healthcare Corp. Sec. Litig.*, 2019 WL 6168254, at \*12 (M.D. Tenn. Nov. 19, 2019) (holding

---

[13]   Kai Spande's expert opinion adds further support because it was based on objective data and industry experience and provided details regarding the timing, widespread nature, and expense of the defects. *See Hills v. BioXcel Therapeutics, Inc.*, 2025 WL 2777129, at \*9 (D. Conn. Sept. 29, 2025) (citing cases) ("'[I]t is permissible for a plaintiff to bolster a complaint by including a nonconclusory opinion to which an expert may potentially testify.'").   Defendants' cases rejecting expert opinions are distinguishable because those opinions were "not based on any facts whatsoever" (*Roth v. OfficeMax, Inc.*, 527 F. Supp. 2d 791, 801-02 (N.D. Ill. 2007)), but on "baseless" assumptions (*King v. Whitmer*, 71 F.4th 511, 523 (6th Cir. 2023)).   Moreover, the totality of facts here, including Defendants' admissions of monitoring and the pervasiveness of the identified defects, negatively impacting financials and thousands of vehicles (*see* §III.C.), are not like *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 482-83 (6th Cir. 2014), where the complaint failed to identify the "specific irregularities" or "nature of the concerns" undermining defendants' statements.

4927-4048-6553.v1

"[w]hether stated as an opinion or fact," a reasonable person could view statements as misleading for omitting material information).

Defendants suggest no reasonable investor "would believe that Ford promised that warranty accruals would not increase." MD PageID.1282. But Plaintiffs do not claim Defendants misrepresented the future, rather they misrepresented the present, as reasonable investors did believe Defendants were succeeding in reversing the negative trend of warranty costs, only to learn otherwise, shocking the market and causing Ford's stock to crash. *See* §III.B.1.; ¶¶79, 83, 103, 133, 143.[14]

### c.      The Statements Are Not Immaterial Puffery

Defendants fail in challenging four statements as immaterial puffery. MD PageID.1290. "The Sixth Circuit has made clear that even superficially broad

---

[14]      Again, Defendants' claim that the reserve increases were in the range of "possible costs *in excess of*" reserves (MD PageID.1283 (emphasis in original)) only supports that Defendants knew of the defects, which combined with the delayed recalls, shows they knew they were probable, not just possible costs. These facts do not exist in Defendants' cases, where a new event or third-party act caused reserves to increase. *See, e.g.*, *Police & Fire Ret. Sys. City of Detroit v. Argo Grp. Int'l Holdings*, 2024 WL 5089970, at *6-*7 (S.D.N.Y. Dec. 12, 2024) (reserves increased due to newly "tighten[ed] underwriting . . . and exposures going forward"); *In re Hertz Glob. Holdings, Sec. Litig.*, 2017 WL 1536223, at *7, *11-*12 (D.N.J. Apr. 27, 2017) (errors arose from, in part, "challenges related to managing complex, inefficient legacy systems"), *aff'd*, 905 F.3d 106 (3d Cir. 2018); *In re Walmart Inc., Sec. Litig.*, 151 F.4th 103, 120 (3d Cir. 2025) (no duty to predict potential outcome of ongoing government investigation); *In re Huntington Bancshares Inc. Sec. Litig.*, 674 F. Supp. 2d 951, 964-65 (S.D. Ohio 2009) ("[n]o information suggests" acquiring company was aware of deteriorating portfolio of acquiree); *Chapman v. Mueller Water Prods.*, 466 F. Supp. 3d 382, 393 (S.D.N.Y. 2020) (reserves increased based on a "'new analysis of [company's] warranty expense experience'").

statements of corporate self-praise must be evaluated in context to determine if they convey more than just a generalized optimism." *Grae v. Corr. Corp. of Am.*, 2017 WL 6442145, at \*14 (M.D. Tenn. Dec. 18, 2017). Here, all four statements were material because they concerned Ford's concrete efforts to improve quality and the purported positive impact of those efforts (¶¶82(b), 87, 99, 102), which were critical to Defendants funding their highly-touted Ford+ strategy (¶¶27-55). *See also Constr. Indus. & Lab. Joint Pension Tr. v. Carbonite, Inc.*, 22 F.4th 1, 8-9 (1st Cir. 2021) (finding materiality where CFO stated product was "'really important . . . for us'").[15]

Materiality is also shown by the fact that two of the misstatements (¶¶82(b), 99) were in direct response to analyst questions about Ford's "warranty coming down" and how Ford was "improv[ing] margins." *See In re Virtu Fin., Inc. Sec. Litig.*, 770 F. Supp. 3d 482, 502 (E.D.N.Y. 2025) (finding statements responding to analyst questions "materially misleading"); *Hedick v. Kraft Heinz Co.*, 2021 WL 3566602, at

---

[15] Defendants remove the statements from their context to suggest they are only vague claims, like those in *In re Ford Motor Corp. Sec. Litig.*, 381 F. 3d 563, 570 (6th Cir. 2004) (dismissing isolated statements such as "'quality comes first'" and "'[w]e aim to be the quality leader'"). MD PageID.1290. But in context, the statements were both tied to their progress of lowering warranty costs (to fund Ford+) and quantified, which made them material to investors assessing Ford's success in achieving those goals. For example, the statement, "*we're improving our quality*" continues "*[w]e saw that come through this year . . . [with warranties] down roughly $1.4 billion*." ¶82(b); *see also* ¶87 (connecting Ford "*takes actions quickly to resolve [issues]*" with "*more frequent use of OTAs . . . [which have] worked for us*"); ¶99 (claiming "*green shoots in the quality improvements*" would result in "*flat*" warranty costs); ¶102 (tying "*our quality is making real progress*" to "*quality is 10% better*").

- 29 -

*10 (N.D. Ill. Aug. 11, 2021) (finding statements "in response to questions from analysts" material).  Further, the "fact that the price of the stock plummeted shortly after disclosure demonstrates" materiality of the concealed information.  *In re Ulta Salon, Cosms. & Fragrance, Inc. Sec. Litig.*, 604 F. Supp. 2d 1188, 1196 (N.D. Ill. 2009).  And, materiality is a question of fact that should not be decided on a motion to dismiss.  *See Helwig*, 251 F.3d at 563 (citing cases).

### C.      The Totality of Allegations Sufficiently Plead a Strong Inference of Scienter as to Each Defendant

Scienter may be alleged by: (i) "knowing and deliberate intent to manipulate, deceive, or defraud"; or (ii) "recklessness," meaning "'"highly unreasonable conduct which is an extreme departure from the standards of ordinary care.'"" *Dana II*, 646 F.3d at 958-59.  In evaluating scienter, courts must consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs II*, 551 U.S. at 322-23, 326 (emphasis in original).  The inference must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent," but "need not be . . . the 'most plausible of competing inferences.'" *Id.* at 314, 324; *see also Frank v. Dana Corp.*, 547 F.3d 564, 571 (6th Cir. 2008) ("draw" goes to the plaintiffs).  Direct evidence is not required, as circumstantial allegations are sufficient.  *See Chow v. Archer-Daniels-Midland*, 2025 WL 790854, at *3 (N.D. Ill. Mar. 12, 2025).

Before *Tellabs II*, the Sixth Circuit set forth a "not exhaustive" list of factors to consider in assessing scienter.  *See Helwig*, 251 F.3d at 552 (listing factors).  Post-

- 30 -

*Tellabs II*, courts in this Circuit have found scienter adequately pled without the *Helwig* factors or where only certain factors were present.[16]  Here, the totality of facts alleged, "collectively," establish the inference of scienter is at least as compelling as the competing inference that Defendants were fed misinformation.  *See Tellabs III*, 513 F.3d at 709-11 (finding inference that executives were fed misinformation on critical matter "is conceivable," but "exceedingly unlikely").

### 1.  Defendants' Admitted Focus, Close Monitoring, and Frequent Statements Support Scienter

Defendants' admissions of monitoring, and detailed discussions of the relevant issues, strongly support scienter.  *See* §II.B.; *Shupe*, 660 F. Supp. 3d at 678 (holding "self-admitted monitoring infers scienter").  Farley and Lawler specifically claimed they would reduce warranty costs and improve quality.  ¶¶3, 6, 38-44.  They placed "lower[ing] our warranty spending" at the top of "the four things that we need to fix" at Ford and were "laser focused" with "a very concrete plan" on reducing warranty costs, and had made quality "a key metric" for "our management team."  ¶¶43-45.

---

[16]     *See, e.g.*, *Dana II*, 646 F.3d at 961-62 (eschewing *Helwig* factor approach for "holistic" scienter analysis under *Tellabs II*).  Defendants' contention that the absence of some *Helwig* factors "indicates the absence of scienter," based on a narrow reading of one case predating *Tellabs II* (MD PageID.1293-94), is clearly wrong.  *See Jonna v. GIBF GP, Inc.*, 617 F. Supp. 3d 789, 807 (E.D. Mich. 2022) (not referencing factors in finding scienter pled under *Tellabs II*); *Bond*, 587 F. Supp. 3d at 676 (*Helwig* factors are not a "pleading requirement"); *In re Heritage Glob. Network L.A., Inc. v. Welch*, 2024 WL 695772, at *13 (M.D. Tenn. Feb. 20, 2024) (noting most *Helwig* factors "involve situational circumstances with little bearing on many types of fraud").

4927-4048-6553.v1

As such, Defendants closely monitored warranty cost and quality issues, including through weekly "deep dive[]" cost meetings, frequent discussions with Ford's head of Quality, looking at the "root causes" of "hundreds" of warranty issues, monitoring granular repair data from Ford's GWMS, monitoring message boards and social media to identify quality and warranty issues (including those at issue here), and performing quarterly analyses on existing issues impacting reserves. *See* §II.B. Farley and Lawler also signed certifications that the financial statements reporting reserves were investigated and accurate (¶¶152-153), stated reserves were based on an accounting policy that accounted for historical costs (¶¶33-34), and made repeated and detailed statements demonstrating knowledge of these topics and their then-existing status (¶¶53, 78, 82, 87, 90, 92, 94-95, 99, 102, 104). All these facts support a strong inference of scienter. *See Grae*, 2017 WL 6442145, at \*20 (holding defendant's "own public statements . . . go a long way toward" showing scienter); *Kyrstek v. Ruby Tuesday, Inc.*, 2016 WL 1274447, at \*9 (M.D. Tenn. Mar. 31, 2016) (finding scienter where defendants' "statements allegedly confirm that the Company was monitoring Lime Fresh's performance"); *Winslow*, 2011 WL 7090820, at \*23 (finding admissions of monitoring supported scienter).[17]

---

[17]    *See also Dana II*, 646 F.3d at 962 (defendants' roles and statements supported scienter); *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014) (finding it "unlikely that [defendant] was not aware of" issue she discussed), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret Sys. v. Align Tech.*, 856 F.3d 605 (9th Cir. 2017); *Upstart*, 2023 WL 6379810, at \*23 (defendants "voluntarily and

- 32 -

### 2.    The NHTSA Consent Order Supports Scienter

The NHTSA fine and Consent Order support that Defendants were engaged in a scheme to delay recalls and suppress reserves, supporting scienter. *See In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 733 (S.D.N.Y. 2015) (holding knowledge pled where regulatory demand sent to company).  After the NHTSA probe started in 2021, Ford filed expanded recalls in 2022 and 2024 for RVCs and filed belated recalls for the long-standing oil pump and rear axle defects in 2023, and NHTSA imposed a $165 million penalty on Ford.  §II.C.  NHTSA found Ford committed regulatory violations, including providing inaccurate information to NHTSA, failing to publicly disclose information about recalls, failing to timely recall vehicles and address defects, and understating the scope of recalls.  ¶¶175-179.  Such pattern of delaying recalls and misleading a regulator is not accidental, but shows Defendants were purposely delaying recalls to suppress historical costs and, by their publicly stated accounting policy, suppress reported reserves and inflated profits to support their EV pivot.[18]

---

repeatedly discussing" topics supported scienter); *Hedick*, 2021 WL 3566602, at *13 (similar); *S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1260 (W.D. Wash. 2009) ("If [Defendants] did not in fact have such knowledge, it would be at least actionably reckless to reassure the public about these matters at all."); *Wilkof*, 2010 WL 4184465, at *6 (certifications "indicating that the information in the [SEC filing] fairly presents the financial conditions and results of operations" supported scienter).

[18]    These facts also support *Helwig* factors 5 (existence of pertinent lawsuit), 2 (divergence from internal reports), and 6 (disregard of "current information"). Defendants' claim that the Consent Order did not discuss warranty reserves or name

- 33 -

### 3. Defendants' Admissions They Were Aware of Warranty Issues Shortly After Vehicle Launch Support Scienter

Defendants' admissions that they were made aware of warranty issues on older vehicles in real-time also strongly support scienter. *See Shupe*, 660 F. Supp. 3d at 678-79 (admitted access to real-time data and its significance supported scienter); *Envision*, 2022 WL 4551876, at *12 (alleged "divergence between external statements and internal information" supported scienter). Here, Lawler admitted Defendants "start to see the warranty issues coming in" for vehicles "12 to 18 months" after launch. ¶53. Because Defendants later admitted the spike in warranty costs at the end of the Class Period was from "older models" that were "in the field for quite a while" – *i.e.*, 2016-2020-launched models (¶¶138-139) – during their quarterly reviews of "actual claims . . . incurred" to set reserves (¶152), there is a strong inference they knew of the warranty issues before and during the Class Period. *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 553-54 (S.D.N.Y. 2011) (finding scienter pled where admissions of liquidity crisis supported inference it did not arise overnight), *aff'd*, 838 F.3d 223 (2d Cir. 2016).

In fact, Farley admitted that Ford management had "internal data" on warranty and reliability issues they tracked "for quite some time" and Lawler admitted that "if

---

Farley and Lawler (MD PageID.1298-99) is inapt, as it is a scathing indictment of Ford's conduct done in furtherance of Defendants' stated goals. §II.A.

- 34 -

[defects] come through at a higher time in service, we're made aware of them." ¶¶169, 172; *see also* ¶49 (Ford warranty manager stating Ford "'always had data on actual costs'"). Farley also knew axle repairs, such as those comprising the reserve spike, were "super expensive" and "complicated." ¶53.[19]

### 4. The Importance of Warranty Costs and Recalls Support Scienter

The critical importance of warranty costs to Ford's results, and intense focus of Defendants and market analysts thereon, strongly supports scienter. *See Envision*, 2019 WL 6168254, at *22 ("'Courts may presume that high-level executives are aware of matter[s] related to their business's operations where the misrepresentations and omissions pertain to'" facts "'critical to a business's core management.'"); *Bond*, 587 F. Supp. 3d at 677 (similar).

As noted, warranty costs were a notorious "headwind" for Ford that directly impacted profits, Farley and Lawler were promoted to reduce them, they claimed it

---

[19] These facts also support *Helwig* factors 2 (divergence from internal reports) and 6 (disregard of "current information"). Defendants' demand for more "smoking gun" details is not required. *Tellabs II*, 551 U.S. at 324; *Upstart*, 2023 WL 6379810, at *22-*23 (rejecting that scienter cannot be pled without "'confidential witnesses, . . . accounts of conversations or meetings, [or] internal documents or reports'" as such details would "require[] a degree of omniscience that is unrealistic at the preliminary stages of the litigation process"). Defendants' citation to *Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings*, 83 F.4th 514, 520-21, 529-30 (6th Cir. 2023) (MD PageID.1296), is inapposite because the defendants there promptly disclosed a sudden termite crisis, unlike Defendants' concealment and suppression of longstanding defects and warranty costs in this case. §§II.C.-D.

- 35 -

was a top priority, and Ford's warranty reserves and quality issues were the topic of frequent discussion by Defendants and analysts. *See* §II.A., §III.B.1.; ¶¶155-159. Moreover, one of the main defects concerned the axle on Ford's flagship F-150, which Farley called the "most important vehicle at Ford globally" and "fundamental to the Company." ¶160. Given the Individual Defendants' "laser focus" on warranty and quality issues, and frequent detailed discussion and acknowledged critical importance thereof, it would be "absurd to suggest" they were unaware of Ford's true defects and warranty costs being significantly deferred. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987-89 (9th Cir. 2008) (finding scienter where "it would be 'absurd to suggest' that top management was unaware" of omitted facts that would have "devastating effect" on company's revenue); *In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 726 (S.D. Ohio 2006) (finding scienter where statements and omissions concerned "primary area of focus" and market scrutiny).[20]

---

[20]     *Pittman v. Unum Grp.*, 861 F. App'x 51, 55 (6th Cir. 2021) (MD PageID.1297), is inapposite, as Plaintiffs here do not rely on Defendants' alleged familiarity merely with a business line in general (there, "long-term-care" policies), but on a *specific critical problem* – defects and high warranty costs. §§II.A.; II.E. Courts after *Pittman* have reiterated that "core operations" allegations are "relevant in the holistic *Tellabs* scienter analysis." *Padilla*, 2022 WL 3452318, at *28-*29; *see also Franchi v. Smiledirectclub, Inc.*, 633 F. Supp. 3d 1046, 1086 (M.D. Tenn. 2022) (same and finding scienter adequately pled where it was "reasonably inferable" that the defendants "would be aware of core financial metrics").

- 36 -

### 5. The Magnitude of the Reserve Increases Supports Scienter

That the belated warranty increases were several billion dollars for defects from "older [2016-2020-launched] models" (¶¶138-139, 167) and, severe, dangerous, and costly to fix (¶¶75(a)-(h)), supports scienter. *See Bond*, 587 F. Supp. 3d at 677 (finding it "highly implausible" for defendants to be unaware of "widespread" issue). Indeed, among other things, the defects rendered vehicles "undriveable," caused engine seizure, created unsafe and expensive "walk home" situations, and involved issues management would typically easily "read across" other models and platforms with similar parts to know they were widespread. ¶75; *see also* ¶¶58-74, 138-139.

Ford ultimately booked a warranty reserve increase at June 30, 2024 that was *$2.7 billion higher* than the prior year period, and a *60% increase* to reserves related to pre-existing warranties (older vehicles) from 2Q 2023 ($880 million) to 2Q 2024 ($1.44 billion), causing Ford's gas-powered business to suffer a near-50% decline in year-over-year EBIT – for "older" 2016-2020 launched vehicles. ¶¶163-165. The severe magnitude of Ford's underlying defects and costs (and resulting impact on Ford's financials) are the "types of 'in your face' (alleged) circumstances that are so extreme that they reasonably should have been obvious to Defendant." *Padilla*, 2022 WL 3452318, at *29-*31; *see also* ¶¶166-174.[21] The closeness in time of the sudden

---

[21]   Defendants' citation to *La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 484 (6th Cir. 2010) (MD PageID.1298), is misplaced because it addressed

spike in reserves (¶¶133, 136-137), and Defendants' prior reassurances (*e.g.*, ¶¶93-95, 99, 101-102, 104, 115), further supports scienter.  *See Helwig*, 251 F.3d at 552 (factors 3 and 6); *Shupe*, 660 F. Supp. 3d at 681.

### 6.     Defendants' Motive Supports Scienter

While motive is not required (*Tellabs II*, 551 U.S. at 325), where present, it supports scienter (*Envision*, 2019 WL 6168254, at *22).  Here, Farley and Lawler were under tremendous pressure to reduce Ford's reported warranty costs to increase earnings to fund their "Ford+" strategy and avoid the fate of their predecessors.  *See* ¶¶4-5, 14, 28-30, 40-45; *Cardinal Health*, 426 F. Supp. 2d at 725-26 (finding strategic pressure to show growth may support scienter); *Helwig*, 251 F.3d at 552 (listing factor 9 as motivation to save salaries or jobs).  In addition, "insider trading at a suspicious time *or* in an unusual amount" supports scienter.  *Helwig*, 251 F.3d at 552.  Whereas Farley sold no Ford stock in 2020 or 2021 and Lawler sold no Ford stock in 3 years before the Class period, after they made false positive statements portraying reversal of Ford's negative warranty trends (¶¶77-78, 80-82), Farley sold approximately 265,000 shares for about $4.3 million and Lawler sold nearly 30,000 shares, for almost $390,000 (¶181).  Such insider sales out of line with prior patterns and while adverse facts were concealed, are suspicious and unusual.  *City of Taylor Gen. Emps.*

---

*auditor* defendants.  In the Sixth Circuit, although the magnitude of errors does not generally support scienter for outside auditors, the opposite is true for corporate officers running the company.  *Padilla*, 2022 WL 3452318 at *29-*31 (citing cases).

- 38 -

*Ret. Sys. v. Astec Indus.*, 29 F.4th 802, 814 (6th Cir. 2022) (finding CEO's $3.1 million of class-period stock sales after years of no sales supported scienter).[22]

### 7.      Defendants' Competing Inference is Implausible

Defendants' argued inference that they were playing "catch-up" on these defects (MD PageID.1300) is not persuasive because: (i) the defects preceded the Class Period; (ii) Defendants' stated goal was to lower warranty costs, which they assured investors they were monitoring at a granular level; (iii) Defendants quickly flipped a negative warranty trend to a purportedly positive despite the omitted facts (low OTA usage and costly defects on hundreds of thousands of vehicles) demonstrating such a reversal was baseless; (iv) the NHTSA investigation preceded the Class Period and found Ford had delayed recalls (on thousands of vehicles) and provided inaccurate information; and (v) Defendants pushed costs below the line to "possible," but had to admit they belonged above the line as they massively increased reserves and belatedly issued multiple recalls.  *See* §§II.A.-E.  It is "exceedingly unlikely" Defendants were fed misinformation, and Plaintiffs' inference that they

---

[22]      Unlike in *Lim v. Hightower*, 2025 WL 2965692, at \*11-\*12 (6th Cir. Oct. 21, 2025) (MD PageID.1295), Farley and Lawler profited from actual Ford stock sales. That Farley and Lawler later "acquired" shares (MD PageID.1294) is irrelevant, as they were granted as compensation "without payment" (*e.g.*, MD PageID.1672, 1682), not purchased at inflated market prices.  Nor is it a defense at this stage that Defendants did not sell more of their stock, which creates a factual dispute. *Ross v. Abercrombie & Fitch Co.*, 501 F. Supp. 2d 1102, 1117 (S.D. Ohio 2007) (stock sales favored scienter even though "[d]efendants retained the majority of their holdings").

knew or recklessly disregarded the misleading nature of their statements is "at least as compelling" as Defendants' "catch-up" theory.  *See Tellabs III*, 513 F. 3d at 707, 709-11; *Gogo*, 2021 WL 1608342, at *11 (finding "it is hard to imagine" defendants were unaware product defect "was serious enough to require a reassessment of their expectations for the company's financial performance on some level").

Because Plaintiffs have alleged Farley and Lawler's scienter, they have established Ford's scienter as well.  *See Bond*, 587 F. Supp. at 675-76.[23]

### D.      The Control Person Claims Should Be Sustained

Because Plaintiffs have stated primary claims under §10(b), their control person claims under §20(a) should be upheld as well.  *Cf.* MD PageID.1300.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied.

DATED:  March 23, 2026                    VANOVERBEKE, MICHAUD
                                          & TIMMONY, P.C.
                                          THOMAS C. MICHAUD (P46787)


                                                  s/ Thomas C. Michaud
                                          THOMAS C. MICHAUD

---

[23]      Alternatively, Ford's corporate scienter may be imputed from the Ford employees (GWMS managers, Principal Accounting Officers) who supplied the information regarding defects and warranty costs for inclusion in statements to investors.  *See Knurr v. Orbital ATK Inc.*, 294 F. Supp. 3d 498, 514-15 (E.D. Va. 2018) (citing *Omnicare*, 769 F.3d, at 476-77).

- 40 -

4927-4048-6553.v1

79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
tmichaud@vmtlaw.com

Local Counsel

ROBBINS GELLER RUDMAN
  & DOWD LLP
JAMES E. BARZ
FRANK A. RICHTER
MICHAEL J. STRAMAGLIA
200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  630/696-4107
jbarz@rgrdlaw.com
frichter@rgrdlaw.com
mstramaglia@rgrdlaw.com

Lead Counsel for Lead Plaintiff

LEVI & KORSINSKY, LLP
SHANNON L HOPKINS
GREGORY M. POTREPKA
1111 Summer Street, Suite 403
Stamford, CT  06905
Telephone:  203/992-4523
212/363-7171 (fax)
shopkins@zlk.com
gpotrepka@zlk.com

Counsel for Additional Named Plaintiff
Ronald A. Ferrante

- 41 -

4927-4048-6553.v1